**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| INFRASTRUCTURE SERVICES LUXEMBOURG S.A.R.L., and ENERGIA TERMOSOLAR B.V. | ) ) ) ) ) | |
| Petitioners, | ) ) | |
| v. | ) ) | Civil Action No. 1:18-cv-1753 (EGS) |
| THE KINGDOM OF SPAIN, | ) ) | |
| Respondent. | ) ) ) ) | |

**SECOND EXPERT DECLARATION OF STEFFEN HINDELANG IN SUPPORT OF RESPONDENT KINGDOM OF SPAIN'S MOTION TO DISMISS PETITION TO ENFORCE ARBITRAL AWARD**

## I.   INTRODUCTION

1.      I, STEFFEN HINDELANG, make this declaration based upon my personal knowledge, except as to those statements made upon information and belief, and I believe all such statements, and the information upon which they are based, to be true.

2.      This is my second declaration in this matter.  I affirm all the statements made in my first Expert Declaration in Support of Respondent the Kingdom of Spain's Motion to Dismiss Petition to Enforce Arbitral Award ("First Hindelang Declaration") (D.E. 18-7) filed in opposition to the petition to enforce the award issued on June 15, 2018 in *Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. v. The Kingdom of Spain*, ICSID Case No. ARB/13/31 (the "Award") (D.E. 18).

3.      My second declaration addresses the opinions on EU law expressed in the Expert Declaration of Sir Alan Dashwood (D.E. 21), the opinions on State aid under EU law expressed in the Expert Declaration of Conor Quigley (D.E. 22), and relevant opinions expressed in the

Expert Declaration of Andrea K. Bjorklund (D.E. 20), submitted by Infrastructure Services Luxembourg S.A.R.L. and Energia Termosolar B.V. (respectively "Infrastructure Services" and "Energia") in support of their Response to Spain's Motion to Dismiss and Reply in Support of Petition to Enforce Arbitral Award (D.E. 23).

4.      Exhibits cited in this declaration without a D.E. number refer to Exhibits appended to, and submitted with, this declaration.

5.      A true and correct copy of all the new legal authorities I have relied upon are produced and attached hereto as Exhibits to this declaration.

6.      My expertise is restricted to European Union ("EU") law and relevant public international law.  I do not express an opinion on any other law in this declaration.

## II.     THE CJEU'S *ACHMEA* JUDGMENT APPLIES TO ARTICLE 26 OF THE ECT

7.      In my first declaration, I explained that in its recent judgment in *Slovak Republic v. Achmea*, the Court of Justice of the EU (the "CJEU" or the "Court") confirmed that any dispute resolution mechanism in an international treaty entered into by EU Member States which hampers the functioning of the EU judicial system violates Articles 344 and 267 of the Treaty on the Functioning of the European Union ("TFEU") (D.E. 18-11, Hindelang Decl. Exhibit 4) and the principles of primacy and autonomy they codify.  CJEU, Case C-284/16, ECLI:EU:C:2018:158, ¶¶ 32-33 – *Achmea* ("*Achmea*") (D.E. 18-48, Hindelang Decl. Exhibit 41).  Applying this rule, the CJEU concluded:

> Articles 267 and 344 TFEU must be interpreted as precluding *a provision in an international agreement concluded between Member States*, *such as* Article 8 of the Agreement on encouragement and reciprocal protection of investments between the Kingdom of the Netherlands and the Czech and Slovak Federative Republic, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against

the latter Member State before an arbitral tribunal whose jurisdiction
that Member State has undertaken to accept.

*Id.*, ¶ 62 (emphasis added).  I further explained in my first declaration that Article 26 of the

Energy Charter Treaty ("ECT") (D.E. 1-3, Petition Exhibit 3), which formed the basis of the

purported arbitration agreement in the Award, is such a provision.  It thus violates Articles 267

and 344 of the TFEU and is precluded by the EU Treaties.  D.E. 18-7 ¶¶ 37-52.

8.      Because CJEU decisions determine the law as it stood from its enactment, Article

26 of the ECT is inoperative between EU Member States *ex tunc*, *i.e*., from the time the ECT

came into force.  This in turn means that *from the moment the ECT was concluded*, no valid offer

could have been made by any EU Member State to arbitrate disputes with nationals of another

EU Member State.  *Id.*, ¶¶ 26, 51-52.  For this reason, there could not have been an arbitration

agreement between Spain, on the one hand, and two EU companies, Infrastructure Services and

Energia, on the other hand, under Article 26 of the ECT.

9.      Dashwood's declaration avoids addressing the palpable conflict between the

purported intra-EU arbitration agreement based on Article 26 of the ECT and the EU law

principle of autonomy, as codified in Articles 19(1), 267 and 344 of the TFEU, and the principle

of primacy, a cornerstone of the EU Treaties reflected in the "Declaration concerning Primacy".

*See* Consolidated version of the Treaty on the Functioning of the European Union - Declarations

annexed to the Final Act of the Intergovernmental Conference which adopted the Treaty of

Lisbon, signed on 13 December 2007 - A. Declarations Concerning Provisions of the Treaties -

17. Declaration concerning primacy, OJ 115, 09/05/2008 P. 0344 - 0344 (Exhibit 13).  These

principles were at the core of *Achmea*.  Dashwood's opinion focuses on immaterial differences

between the bilateral investment treaty between The Netherlands and Slovakia (the "Dutch-

Slovak BIT") at issue in *Achmea* and the ECT, and misstates the reach of the principles of

autonomy and primacy of EU law.  The same holds true for Bjorklund's declaration to the extent she opines on the intersection of the ECT and EU law.

10.     As elaborated below, these considerations and differences do not warrant distinguishing the dispute resolution clause in the Dutch-Slovak BIT from Article 26 of the ECT in applying *Achmea*.  *First*, EU law – in particular, the Treaty on European Union ("TEU") and the TFEU (together, the "EU Treaties") – is directly relevant to the interpretation of Article 26 of the ECT under the Vienna Convention on the Law of Treaties of 1969 ("VCLT") and constitutes applicable law within the meaning of Article 26(6) of the ECT in disputes between an EU Member State and an investor from another EU Member State.[1]  *Second*, the principle of primacy of EU law, enshrined in the EU Treaties, is the supreme conflict rule governing the relationship between the EU Treaties and other international agreements concluded by the EU Member States.  It means that Article 26 of the ECT does not apply between EU Member States and precludes an EU Member State from extending a valid offer to arbitrate to a national of another EU Member State.  *Third,* the ruling and reasoning of *Achmea* apply to any provision purporting to contain an offer to arbitrate, whether contained in a bilateral or multilateral treaty. *Fourth*, it is irrelevant for this conclusion that the ECT is a multilateral treaty.  *Fifth,* the EU's participation in the ECT does not save Article 26 of the ECT from violating the EU Treaties. *Sixth,* the absence of an explicit "disconnection clause" in the ECT is not indicative of its compliance with EU law.

---

[1] Article 26(6) reads: "A tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law."

A. **The EU Treaties Constitute Applicable Rules of International Law Between EU Member States Within the Meaning of Article 26(6) of the ECT**

11.    Both Dashwood's and Bjorklund's declarations seek to obfuscate the fact that the EU Treaties create rules of international law applicable between the EU Member States that comprehensively govern the relations between them.  Dashwood asserts that the reference to "rules of international law" in Article 26(6) of the ECT is a reference to "general and customary principles of international law and not international treaty law."  D.E. 21 ¶ 64.  On that basis, he concludes that Article 26(6) precludes the application of EU law by tribunals established under that provision.  *See id.*, ¶¶ 62-67.  He cites no authority to support the extraordinary claim that "international law" does not include "international treaty law."  Instead, he makes reference to the views of unidentified "international lawyers."[2]  *Id.*, ¶ 64.  Bjorklund likewise opines – without citing legal authority – that only the VCLT "sets out the approach treaty interpreters should take," and that this means the EU Treaties are not applicable to the dispute.[3]  D.E. 20 ¶¶ 128-129.

12.    Their declarations ignore that Article 26(6) of the ECT, by its terms, includes *all* "applicable rules of international law."  Their reading of Article 26(6) of the ECT thus contradicts  Article 31 of the VCLT, which provides:

---

[2] Dashwood also attempts to distinguish the EU Treaties from the treaty in *Achmea* because the article does not refer to "the law in force of the Contracting Party concerned," or to "the provisions of other relevant agreements between the Contracting Parties."  D.E. 21 ¶ 63.  These differences with Article 8 of the treaty at issue in *Achmea* are irrelevant to the meaning of Article 26(6) of the ECT.  The EU Treaties and other rules of EU law are rules of international law under Article 26(6) and therefore must be applied under the ECT.

[3] The fact that I do not comment on each point made by Professor Bjorklund in respect of the interpretation of the VCLT itself and its application to the ECT and to the EU Treaties does not mean that I concur with her findings.

> 1. A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose
> . . .
> 3. There *shall be taken into account*, together with the context:
> . . .
> (c) *any relevant rules of international law applicable in the relations between the parties*.

As the International Court of Justice, the principal judicial organ of the United Nations, has stated: "an international instrument has to be interpreted and applied within the framework of the entire legal system prevailing at the time of the interpretation." *Legal Consequences for States of the Continued Presence of South Africa in Namibia (South West Africa) notwithstanding Security Council Resolution 276 (1970), Advisory Opinion*, I.C.J. Reports 1971, p. 31, ¶ 53 (Exhibit 17) (emphasis added).

13.     Dashwood and Bjorklund do not dispute that the EU Treaties are international treaties or deny that they satisfy the definition of a treaty set out in Article 2(1)(a) of the VCLT that a treaty is "[a]n international agreement concluded between [s]tates in written form and governed by international law."  The EU Treaties are thus undeniably international law.  As such, they would be "relevant rules of international law applicable in the relations between" Spain, the Netherlands and Luxembourg under Article 31(3)(c) of the VCLT and must be taken into account when interpreting and applying the ECT.  More importantly, they form part of the mandate in Article 26(6) of the ECT that a tribunal "shall decide the issues in dispute in accordance with . . . applicable rules and principles of international law."  Any court or tribunal interpreting or applying the ECT must therefore apply the EU Treaties as international law to decide all issues in dispute, including jurisdiction and merits alike.

14.     Accordingly, there is no doubt that Article 26 of the ECT falls within the ambit of *Achmea's* rule that a dispute resolution provision violates the EU Treaties if the tribunal "*may be*

called on to interpret or . . . apply EU law." *Achmea*, ¶ 42.  In fact, the arbitral tribunal in this case interpreted EU law when it decided that the EU Treaties did not preclude it from exercising jurisdiction.  Award, ¶¶ 223-230 (D.E. 1-1) (concluding, *inter alia*, that it "does not find anything within the provisions of EU law, as invoked and pleaded by Spain, that overrides the rights granted in Article 26 of the ECT regarding the settlement of disputes").  It is indeed not uncommon for ICSID tribunals to face questions of EU law.  By way of only one example, in *Electrabel v. Hungary,* the tribunal found that the EU Treaties formed part of the "applicable rules and principles of international law" within Article 26(6) of the ECT, but concluded, *wrongly* (as now settled by *Achmea*) that investor-state arbitration disputes were outside of the reach of Article 344 of the TFEU.  *See Electrabel S.A. v. Republic of Hungary*, ICSID Case No. ARB/07/19, Award (Nov. 25, 2015), ¶¶ 4.151-4.160 (Exhibit 18).

15.     Moreover, as I explain in the next section, the EU Treaties, as interpreted by the CJEU, provide for specific rules and principles that govern the interpretation of international agreements between the EU Member States.  These rules and principles take precedence over the general rules of treaty interpretation under customary international law, as codified in the VCLT.  This entails that Article 26 (6) of the ECT itself must be interpreted and applied  between the EU Member States consistent with the EU Treaties and the rules and principles created by them.  CJEU, Case C-188/07, ECLI:EU:C:2008:359 ¶ 84 – *Commune de Mesquer* (Exhibit 3).  Thus, between EU Member States, Article 26(6) of the ECT must be read as compelling the tribunal to apply the EU Treaties to clauses that relate to its jurisdiction and prohibiting the application of such clause to the extent it is incompatible with the EU Treaties, lest such a tribunal improperly circumvent the mandatory application of the EU Treaties.

**B.**     **The EU Treaties Contain Specific Rules and Principles That Directly Impact the Manner in Which Other International Agreements Must Be Interpreted and Applied Between EU Member States**

16.     The VCLT, heavily relied on by Bjorklund, is recognized to have largely codified the principles of customary international law relevant for the interpretation and application of international treaties.  This, however, does not mean that these rules are exhaustive or that States may not modify or deviate from these default rules.[4]  Sovereign states can agree on specific rules that apply to them and deviate from the default rules contained in the VCLT.[5]

17.     Notably, Bjorklund agrees that the VCLT itself does not provide the solution for the situation presented by the purported conflict between Article 26 of the ECT and Articles 267 and 344 of the TFEU, but "one must look to the treaties themselves to ascertain whether the parties have given any indication as to their views of the hierarchy among treaty obligations." *See* Bjorklund Dec., ¶ 139 (D.E. 20).  When looking for such indication, surprisingly, she ignores the higher ranking conflict rule established by the EU Treaties.

18.     By concluding the EU Treaties, the EU Member States have agreed to a set of specific rules and principles that affect the manner in which other international agreements must be interpreted and applied between EU Member States.  Those rules and principles take

---

[4] *See* O. Dörr, "Article 31: General rule of interpretation," VIENNA CONVENTION ON THE LAW OF TREATIES: A COMMENTARY 559, 577, ¶ 32 (Dörr & Schmalenbach eds. 2017) (Exhibit 20) ("There are much [sic] more rules of treaty interpretation applied in international practice and diplomacy than are codified in Arts 31–33 VCLT.  The Convention's rules of interpretation are not exclusive in a way that they prevent the interpreter from applying other principles compatible with the general rule laid down in Art 31.").

[5] This is consistent with the "residual character" of the VCLT because many of its rules and principles only apply where a particular agreement does not "otherwise provide" or where the contracting parties to an international agreement have not "otherwise agreed".   *See* K. Schmalenbach, "Article 1: Scope of the Present Convention," VIENNA CONVENTION ON THE LAW OF TREATIES: A COMMENTARY 2, ¶ 2 (Dörr & Schmalenbach eds. 2017) (Exhibit 19); *see*, *e.g.,* VCLT, Arts. 16, 20(4), 22(2), 24(3), 36(1), 22(3), 25(2), 37(1)).

precedence over any default rules contained in the VLCT or any other purportedly "special" rules created by the EU Member States such as those contained in the ECT.

19.     As demonstrated next, *first,* the EU Treaties, as interpreted and applied by the CJEU, contain specific rules on the interpretation of treaties concluded between the EU Member States.  *Second*, the EU Treaties, as interpreted and applied by the CJEU, provide specific rules on the resolution of conflicts between the EU Treaties and other treaties involving the EU Member States.  The EU Member States are not permitted to derogate from or contract around these rules (or any other rule established by the EU Treaties) by way of *inter se* agreements between EU Member States.

**1.   The EU Member States Have Agreed to Interpret and Apply the Terms of the ECT in Conformity With the EU Treaties in Their *Inter Se* Relations**

20.     The EU Treaties impose comprehensive obligations on the EU Member States to apply and give full effect to the EU Treaties with respect to all areas falling within their ambit. This includes specific rules of interpretation which dictate that, in an intra-EU context, any rule created by the EU Member States, irrespective of "whether the provisions in question were adopted *before or after* the [respective rule in the EU Treaties…][6] or *derive from international agreements entered into by the Member State*," must be interpreted, "as far as possible, in the light of the wording and the purpose of [the EU Treaties …], in order to achieve the result pursued by the [EU Treaties …]." CJEU, Case C-188/07, ECLI:EU:C:2008:359 ¶ 84– *Commune de Mesquer* (Exhibit 3).

21.     Indeed, in accordance with these specific rules of (treaty) interpretation, *i.e.*, the so-called principle of "interpretation in conformity with European law" which reflects standing

---

[6] This includes any rule created on the basis of the EU Treaties.

case law established in CJEU, Case 157/86, ECLI:EU:C:1988:62 ¶ 11 – *Murphy* (Exhibit 2), any

provision in the ECT must be interpreted in a way that accords with the requirements of the EU

Treaties.  To the extent this is not possible any such provision must be held "inapplicable."  *Id.*

Thus, it follows that, upon accession to the EU, EU Member States agreed to interpret and apply

international agreements in their *inter se* relations in conformity with the rules and principles

arising out of the EU Treaties.

> **2.   The EU Treaties Take Precedence Over International Agreements in
> Relations Between the EU Member States, Including Any Conflict Rule such
> as Article 16 of the ECT**

22.    In particular, as I explained in my first declaration, the EU Treaties establish an

all-encompassing *conflict rule*, the principle of primacy of EU law.  *See* D.E. 18-7 ¶¶ 20-24.

This rule means that in the international law relationships between EU Member States, the EU

Treaties and the legal order created by them prevail over any inconsistent treaty provision

entered into by the Member States.

23.    A conflict between Article 26 of the ECT and the EU Treaties exists because,

under *Achmea,* Article 26, when applied to intra-EU investment disputes, conflicts with Articles

267 and 344 of the TFEU.  D.E. 18-7 ¶¶ 37-52.  Thus, as with Article 8 of the Dutch-Slovak BIT

in *Achmea*, the conflict between Article 26 of the ECT and the EU Treaties must be resolved by

giving priority to the provisions of Articles 267 and 344 of the TFEU.

24.    Dashwood admits to the existence of the principle of primacy under the EU

Treaties, but nevertheless takes the position that "[t]o the extent that the ECT and the EU

Treaties cover the same subject matter," Article 16 of the ECT would determine priority between

provisions of the ECT and EU Treaties.  He is only able to assert this position because he

incorrectly denies that the primacy of EU law applies to treaties between EU Member States.

D.E. 21 ¶ 87.  He simply ignores that it is "settled case-law of the [CJEU that] an international

- 10 -

agreement cannot affect the allocation of powers fixed by the Treaties or, consequently, the autonomy of the EU legal system, observance of which is ensured by the Court." *Achmea*, ¶ 32. It has long been a bedrock principle of EU law that "the provisions of a convention concluded. . . by a Member State with another Member State could not apply … in the relations between those States if they were found to be contrary to the rules of the Treat[ies]".  CJEU, Case C-3/91, ECLI:EU:C:1992:420, ¶ 8 – *Exportur* (D.E. 18-27, Hindelang Decl. Exhibit 20)   *See also,* CJEU, Case 10/61, ECLI:EU:C:1962:2 – *Commission v. Government of the Italian Republic* (D.E. 18-16, Hindelang Decl. Exhibit 9); CJEU, Case C-469/00, ECLI:EU:C:2003:295, ¶ 37 – *Ravil* (D.E. 18-34, Hindelang Decl. Exhibit 27); CJEU, Case C-478/07, ECLI:EU:C:2009:521, ¶ 98 – *Budějovický Budvar* (D.E. 18-39, Hindelang Decl. Exhibit 32); CJEU, Case C-546/07, ECLI:EU:C:2010:25, ¶ 44 – *Commission v. Germany* (D.E. 18-40, Hindelang Decl. Exhibit 33).

25.     EU Member States are not permitted to derogate from or contract around the primacy of EU law (or any other rule established by the EU Treaties) by way of other international agreements between them.  In *Kadi* the CJEU made abundantly clear that "the obligations imposed by an international agreement cannot have the effect of prejudicing the … principles of the [Treaties]."  CJEU, Joined Cases C-402/05 P and C0415/05 P, ECLI:EU:C:2008:461, ¶ 285 – *Kadi* ("*Kadi*") (D.E. 18-38, Hindelang Decl. Exhibit 31).  *See* CJEU, Case C-266/16, ECLI:EU:C:2018:118 ¶ 46 – *Western Sahara Campaign UK* (Exhibit 4) (concluding in the context of an international agreement concluded by the EU, its Member States and third countries, that "[t]he provisions of such agreements must therefore be entirely compatible with the Treaties and with the constitutional principles stemming therefrom.").

26.     In sum, the principle of primacy enshrined in the EU Treaties is applicable to treaties between EU Member States, including the ECT.  It takes precedence over any other

conflict rule in an intra-EU context. Assuming that Article 16 of the ECT can be involved in

relation to the provisions of the EU Treaties, the principle of primacy takes precedence over

Article 16 and it takes precedence over any other default provisions found in the VCLT.  The EU

Member States cannot create any other "special" rules, such as the purported conflict rule in

Article 16 of the ECT, to derogate from their obligations under the EU Treaties.

      **C.**     **The Legal Conclusions in *Achmea* Apply to Any Provision Purporting to Contain an Offer to Arbitrate from One EU Member State to Investors from another EU Member State**

27.      The CJEU's findings of law and reasoning in *Achmea* apply to any provision

purporting to contain an offer to arbitrate from one EU Member State to investors from another

EU Member State that violates Article 267 and 344 of the TFEU, including 26 of the ECT.  As

explained above, Article 16 of the ECT cannot change this result.[7]

28.      Nor are the legal conclusions of the CJEU in *Achmea* restricted to the narrow

circumstances of the Dutch-Slovak BIT, as argued by Dashwood.  *See* D.E. 21 ¶¶ 49-50.

Preliminary rulings govern situations beyond the specific facts which led to the ruling itself.

---

[7] I take notice of the fact that twenty-two of the twenty-eight EU Member States affirmed that Article 26 of the ECT is in violation of the EU Treaties and, hence, it must be "disapplied" in an intra-EU context. *Declaration of the Representatives of the Governments of the Member States on the Legal Consequences of the Judgment of the Court of Justice in Achmea and on Investment Protection in the European Union* 1-2 (Jan. 15, 2019) (Exhibit 14).  The other EU Member States chose not to comment on the status of Article 26 of the ECT in an intra-EU context, and instead decided to wait until further consideration, including of an eventual decision by the CJEU on this issue. *See Declaration of the Representatives of the Governments of the Member States on the Enforcement of the Judgment of the Court of Justice in Achmea and on Investment Protection in the European Union* 3 (Jan. 16, 2019) (Exhibit 15); *Declaration of the Representative of the Government of Hungary on the Legal Consequences of the Judgment of the Court of Justice in Achmea and on Investment Protection in the European Union* 3 (Jan. 16, 2019) (Exhibit 16). Following the declarations made by the EU Member States, the European Commission reaffirmed that the application of the arbitration provisions in the ECT in intra-EU disputes is "incompatible with EU law." European Commission, Press Release – Daily News, at 1 (Jan. 17, 2019) (Exhibit 12).

Dashwood's declaration recognizes that "the CJEU's interpretative rulings are not only binding on the national court that made the reference but also apply generally as binding legal precedents in all EU national courts ('*erga omnes*' or 'towards everyone')." *Id.*, ¶ 31.  But he attempts to avoid the general effect of the ruling by stating that "the binding effect of a preliminary ruling applies only to the answer given by the CJEU to the question(s) of interpretation submitted to it by the referring court." *Id.*, ¶ 32.

29.     The notion that the binding effect of a preliminary ruling should be limited to the facts of the question referred to the Court contradicts well-settled CJEU case law.  The CJEU declared in 1982 that its preliminary rulings are applicable to cases which "are not strictly identical" to those already referred to the Court in the context of the preliminary ruling procedure.[8]  CJEU, Case 283/81, ECLI:EU:C:1982:335, ¶ 14 – *CILFIT* (D.E. 21-26, Dashwood Decl. Exhibit 26); *see also* D.E. 21 ¶ 31 n. 35 (also citing CJEU, Joined Cases 28 to 30/62, EU:C:1963:6, 38 – *Da Costa en Schaake v. Nederlandse Belastingadministratie* (D.E. 21-24, Dashwood Decl. Exhibit 24); CJEU, Case 68/74, EU:C:1975:11, Grounds of Judgment, ¶¶ 5-7 – *Alaimo v. Préfet du Rhône* (D.E. 21-25, Dashwood Decl. Exhibit 25)). When the CJEU clarifies the legal content of a rule or principle of EU law, this interpretation must be observed with *ex tunc* effect.  *See, e.g.*, CJEU, Case C-292/04, ECLI:EU:C:2007:132, ¶ 34 – *Meilicke, et al. v. Finanzamt Bonn-Innenstadt* (Exhibit 5).

30.     Dashwood claims that the CJEU in *Achmea* was "developing its case law on novel issues."  D.E. 21 ¶ 54.  To the contrary, the CJEU's ruling in *Achmea* expressly indicates

---

[8] The phrasing of the question by the EU Member State's court may limit the CJEU's ruling to the specific provision(s) of EU law applicable to the question.  However, the question does not have any limiting effect on the scope of application of EU law, interpreted by the CJEU in the preliminary ruling, to other situations absent an explicit pronouncement by the CJEU.

that it is a continuation of a long-standing line of case law, which the CJEU carefully applied to the situation of intra-EU investment arbitration in *Achmea*.  In arriving at its conclusions in *Achmea* the CJEU cites prior cases in which it had rejected dispute settlement clauses in proposed treaties because they did not respect the EU Treaties.  CJEU, Opinion 1/91, ECLI:EU:C:1991:490, ¶¶ 40, 70 – *EEA* (D.E. 18-26, Hindelang Decl. Exhibit 19); Opinion 1/09, ECLI:EU:C:2011:123, ¶¶ 74, 76 – *European and Community Patents Court* (D.E. 18-41, Hindelang Decl. Exhibit 34) (Agreement creating a unified patent litigation system); and Opinion 2/13, ECLI:EU:C:2014:2454, ¶¶ 182-83 – *ECHR* (Accession of the EU to the ECHR; "Opinion 2/13") (D.E. 18-44, Hindelang Decl. Exhibit 37).  Therefore, it would be an "extravagant conclusion," in the words of Dashwood, to suggest that the reasoning advanced in *Achmea* does not apply to the ECT in an intra-EU context in light of decisions showing a consistent application the principles of EU law enshrined in the EU Treaties.  *See* D.E. 21 ¶ 52.

### D.      It Is Irrelevant that the ECT Is a Multilateral Treaty

31.     Dashwood argues that because the ECT is a multilateral treaty, and not a bilateral treaty between two EU Member States (as the one involved in *Achmea*), the *Achmea* ruling does not affect the application of Article 26 to intra-EU disputes.  Dashwood's declaration argues that the inclusion of Article 26 in a multilateral agreement to which individual EU Member States are parties in their own right, alongside the EU and third countries, cannot "be seen as a betrayal of the mutual trust Member States are required to display towards each other nor as a matter of Member States colluding in order to circumvent the EU judicial system."  D.E. 21 ¶ 70.  He further argues that the creation of the arbitration mechanism in Article 26 by the "collective will" of all the parties to the ECT, including the EU, cannot be regarded as an act of Member States contrary to Article 344 TFEU.  D.E. 21 ¶ 72.  However, these conclusions hinge on a mistaken

reading of the *Achmea* ruling and ignore the foundational principles of EU law upon which it is based, such as the mutual trust embedded in Article 344 of the TFEU.

32.     *First,* the Achmea judgment is not limited to "bilateral" treaties.  That term does not appear in the main holding of the judgment:

> Articles 267 and 344 TFEU must be interpreted as precluding *a provision in an international agreement concluded between Member States*, *such as* Article 8 of the Agreement on encouragement and reciprocal protection of investments between the Kingdom of the Netherlands and the Czech and Slovak Federal Republic, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept.

*Achmea*, ¶ 62 (emphasis added).  As explained below, this holding is preceded by the Court's references to a line of cases involving multilateral agreements that reach the same conclusion as *Achmea* regarding the invalidity of dispute resolution clauses that do not respect the autonomy of the EU legal order as provided for in the EU Treaties.  *See id.*, ¶ 57.

33.     *Second,* the application of the principle of "mutual trust" is not limited to bilateral treaties between EU Member States.  Article 344 encapsulates the Member States' undertaking, irrespective of the character of a particular agreement or treaty by which they make this undertaking: "[EU] Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein."  This rule would be deprived of meaning if the Member States could circumvent it by "collectively" agreeing to submit certain disputes to the methods of settlement other than as provided for in the TFEU.  *See* CJEU, Case C-459/03, ECLI:EU:C:2006:345 – *Commission v. Ireland (Mox Plant),* ¶¶ 169-171 (D.E. 18-36, Hindelang Decl. Exhibit 29) (involving the multilateral UN Convention on the Law of the Sea) ("The obligation devolving on

Member States, set out in Article 292 EC [now Article 344], to have recourse to the Community judicial system and to respect the Court's exclusive jurisdiction, which is a fundamental feature of that system, must be understood as a specific expression of Member States' more general duty of loyalty resulting from Article 10 EC.").  To conclude otherwise would infer into EU law the option for EU Member States to collectively circumvent their obligations arising out of the EU Treaties, especially by encroaching on the exclusive jurisdiction of the CJEU.  That option is not available to EU Member States.

34.    Moreover, while the ECT is a multilateral treaty, the specific provision at issue, Article 26, just like Article 8 of the Dutch-Slovak BIT, is premised on bilateral undertakings among the contracting parties, whereby one "Contracting Party" and "another Contracting Party," the home of an investor, agree to submit investment disputes between the first Party and the investor to arbitration.[9]  The CJEU found that Article 8 of the BIT was precluded by EU law because:

> the Member States parties to it established a mechanism for settling disputes between an investor and a Member State which could prevent those disputes from being resolved in a manner that ensures the full effectiveness of EU law, even though they might concern the interpretation or application of that law.

*Achmea*, ¶ 56 (D.E. 18-48, Hindelang Decl. Exhibit 41).  This is precisely what Article 26 does.

35.    Further, the key factors that caused the Court to declare inoperative the dispute resolution provision of Article 8 of the Dutch-Slovak BIT apply to Article 26 of the ECT: it

---

[9] The CJEU has previously addressed the situation where a multilateral treaty contains bilateral relationships whereby Member States make certain undertakings *inter se.  See, e.g.,* CJEU, Case 10/61, ECLI:EU:C:1962:2 – *Commission v. Government of the Italian Republic* (D.E. 18-16, Hindelang Decl. Exhibit 9) (addressing the situation of bilateral rights and obligations in a multilateral treaty in respect of the General Agreement on Tariffs and Trade (GATT); holding that GATT tariffs rules cannot be applied between the EU Member States to the extend they contradict obligations in EU law).

creates arbitral tribunals that are plainly not courts or tribunals within the EU legal system; these tribunals "may be called on" to interpret and apply EU law; but they cannot refer questions of EU law to the EU Court of Justice under Article 267 of the TFEU. *Achmea*, ¶¶ 42, 49, 56 (D.E. 18-48, Hindelang Decl. Exhibit 41).

36.     Whether a treaty is bilateral or multilateral was irrelevant to the Court's analysis. The CJEU confirmed that Article 344 of the TFEU is not only applicable to proceedings between EU Member States, but also to proceedings between individuals and EU Member States that circumvent the preliminary ruling procedure. *Achmea*, ¶ 60 (D.E. 18-48, Hindelang Decl., Exhibit 41). This includes Article 26 of the ECT.

**E.     The EU's Participation in the ECT Does Not Save Article 26 of the ECT from Being Inoperative in Accordance with *Achmea***

37.     The Court's reasoning in *Achmea* does not limit its legal conclusions on EU law to the treaties to which the EU is not a party. Dashwood's narrow conclusion that *Achmea*'s holding is confined to "intra-EU BITs, not multilateral treaties or treaties to which the EU is party such as the ECT" is based on a misreading of paragraphs 56 and 58 of *Achmea*. *See* D.E. 21 ¶¶ 43-50. The CJEU did *not* hold that an agreement to arbitrate is precluded by the TFEU only "when contained in an international agreement between EU Member States." *Id*., ¶ 4. To the contrary, the CJEU's reasoning in *Achmea* supports its application to any international agreement, such as the ECT, regardless of whether "a large number of third countries" or the EU itself is a signatory. *Id*., ¶ 50.

38.     In the paragraphs leading to the final holding in paragraph 62 of *Achmea*, the CJEU explains that the EU can provide for a dispute resolution mechanism in an international agreement. *Achmea*, ¶ 57 (D.E. 18-48, Hindelang Decl. Exhibit 41) ("It is true that, according to settled case-law of the Court, an international agreement providing for the establishment of a

court responsible for the interpretation of its provisions and whose decisions are binding on the institutions, including the Court of Justice, is not in principle incompatible with EU law."). However, this capacity is subject to a critical qualification, specifically that the rules of EU law cannot be violated:

> The competence of the EU in the field of international relations and its capacity to conclude international agreements necessarily entail the power to submit to the decisions of a court which is created or designated by such agreements as regards the interpretation and application of their provisions, *provided that the autonomy of the EU and its legal order is respected.*

*Id.* (emphasis added).  The Court cites three cases for this general rule: CJEU, Opinion 1/91, ECLI:EU:C:1991:490, ¶¶ 40, 70 – *EEA* ("Opinion 1/91") (D.E. 18-26, Hindelang Decl. Exhibit 19); Opinion 1/09, ECLI:EU:C:2011:123, ¶¶ 74, 76 – *European and Community Patents Court* ("Opinion 1/09") (D.E. 18-41, Hindelang Decl. Exhibit 34) (Agreement creating a unified patent litigation system); and Opinion 2/13, ¶¶ 182-83 (D.E. 18-44, Hindelang Decl. Exhibit 37).

39.     All of the treaties at issue in these cases were multilateral and the EU was a party to each one.  The participation of the EU did not affect the CJEU's finding that they were in breach of EU law – precisely because those agreements failed to respect "the autonomy of the EU and its legal order."

40.     Opinion 1/91, referred to above, addressed the compatibility of the dispute settlement bodies established by a draft international agreement between the EU and its Member States, on the one hand, and the four countries of the European Free Trade Association, on the other, relating to the creation of the European Economic Area.  The CJEU found such bodies to be "incompatible" with the TFEU because they would impinge on the CJEU's exclusive jurisdiction to make final determinations of EU law.  *See* Opinion 1/91, ¶¶ 31-36, 40, 70-72 (D.E. 18-26, Hindelang Decl. Exhibit 19).

41.     Opinion 1/09 involved a multilateral agreement intending to create a European and Community Patent Court to which the EU was a party.  There, too, the CJEU found that the envisaged European and Community Patent Court was not compatible with EU law.  The CJEU focused on the fact that the European and Community Patent Court had the effect of removing disputes from the domestic judiciary of the EU Member States.  Precisely because the European and Community Patent Court deprived domestic courts of the EU Member States of their rights and obligations to request preliminary rulings from the CJEU under Article 267 of the TFEU, the CJEU concluded that the agreement in question was in violation of the principle of autonomy of the EU legal order. Opinion 1/09, ¶¶ 80, 83, 89 (D.E. 18-41, Hindelang Decl. Exhibit 34).

42.     Finally, in Opinion 2/13, the CJEU addressed the draft agreement of the EU's accession to the European Convention for the Protection of Human Rights and Fundamental Freedoms ("ECHR"), another multinational international agreement to which the EU was supposed to become a party.  Again, the CJEU found that the accession agreement's dispute resolution provisions were not compliant with EU law.  Opinion 2/13, ¶ 258 (D.E. 18-44, Hindelang Decl. Exhibit 37).  It reasoned that the agreement interfered with the judicial dialogue established by Article 267 of the TFEU, and was therefore "liable adversely to affect the specific characteristics of EU law and its autonomy." *Id*., ¶¶ 199-200, 236-248.  The CJEU also concluded that it was "liable to affect Article 344 of the TFEU in so far as it does not preclude the possibility of disputes between Member States or between Members States and the EU" concerning matters of EU law. *Id*., ¶¶ 214, 224, 258.

43.     *Achmea* simply applies these precedents.  It extends their holdings on the preclusive power of Articles 344 and 267 of the TFEU to any investor-state dispute resolution clauses that would operate between EU Member States.  *Achmea*, ¶ 58 (D.E. 18-48, Hindelang

Decl. Exhibit 41).  The holdings in *Achmea* and the preceding cases extend to *any* international

agreement which contains dispute settlement mechanisms incompatible with Articles 267 and

344 of the TFEU, including the ECT.  *Achmea*, ¶ 62 (D.E. 18-48, Hindelang Decl. Exhibit 41).

44.    The EU's participation in the ECT is irrelevant to the question of whether the EU

Member States violated the principles of autonomy and primacy of EU law by circumventing the

preliminary ruling procedure of Article 267 of the TFEU when providing for intra-EU

investment arbitration in Article 26 of the ECT.  This is because the EU does not have the power

to derogate from, override, or grant leave from the provisions in the EU Treaties.

45.    *First*, the EU Treaties provide that any action of the EU must take place on the

"basis, . . . framework and . . . bounds" of the EU Treaties.  CJEU, Case C-26/78,

ECLI:EU:C:1978:172, ¶ 9 – *Viola* (D.E. 18-20, Hindelang Decl. Exhibit 13).  Article 218(11) of

the TFEU expressly provides that the EU Treaties represent the standard for legality of any

international agreement to which the EU is a party.  Indeed, the EU Treaties and, with them, the

principle of autonomy of EU law, are the *higher-ranking law* which bind the EU in all its acts.

*Kadi*, ¶¶ 306-308 (D.E. 18-38, Hindelang Decl. Exhibit 31).

46.    *Second*, Dashwood's declaration asserts that because of the EU's participation in

the ECT, "[b]y no stretch of language or logic could this be regarded as an act of Member States

contrary to Article 344."  D.E. 21 ¶ 72.  But the EU – either alone or together with the EU

Member States – cannot alter the EU Treaties by means of an international agreement.  *See*

CJEU, Case C-459/03, ECLI:EU:C:2006:345, ¶ 123 –*Commission v. Ireland* ("*Commission v.

Ireland*") (D.E. 18-36, Hindelang Decl. Exhibit 29).  Any change to the fundamental principle of

autonomy of EU law would require a formal amendment of the EU Treaties pursuant to specific

procedures set forth in Article 48 of TEU, procedures which were not applied during the conclusion of the ECT.

47.     Thus, the EU may not and cannot alter the EU Treaties by means of an international treaty.  The EU can neither derogate from the EU Treaties nor relieve the EU Member States from the principles of autonomy and primacy of EU law.  *See Kadi*, ¶¶ 306-308 (D.E. 18-38, Hindelang Decl. Exhibit 31); *Commission v. Ireland*, ¶ 123 (D.E. 18-36, Hindelang Decl. Exhibit 29).

48.     *Third*, the CJEU recognized the limitations on the EU's competence in *Achmea* explaining that while "in principle" the EU may become party to treaties which create a dispute settlement body tasked with the interpretation and application of "their" provisions, such dispute settlement body must respect "the autonomy of the EU and its legal order."  *Achmea*, ¶ 57 (D.E. 18-48, Hindelang Decl. Exhibit 41).

49.     It is legally irrelevant that "[n]o direct legal challenge has ever been made to the compatibility of the [Energy Charter] Treaty with EU law."  D.E. 21 ¶ 99.  The Commission has consistently maintained as its primary position that Article 26 of the ECT does not apply to intra-EU disputes.  *See, e.g.,* European Commission, *Amicus Curiae* Submission ¶¶ 77-81, *Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/36 – Annulment Proceedings (Nov. 12, 2018) (Exhibit 11); European Commission, Application for Leave to Intervene as a Non-Disputing Party ¶¶ 16-23 (July 19, 2018), *Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/36 – Annulment Proceedings (Exhibit 9).  The Commission's failure to call this provision "illegal" under the EU Treaties at the time of its ratification does not change anything.

The ruling in *Achmea* authoritatively sets forth EU law with retroactive effects, and any steps taken or not taken by the Commission are beside the point.

50.     Finally, Bjorklund opines that "the European Union itself continues to conclude treaties that have dispute settlement options similar to the ones offered in the Energy Charter Treaty."  D.E. 21 ¶ 115.  But as she herself acknowledges, those treaties are easily distinguishable because they do not contain agreements between EU Member States to submit to arbitration investment disputes between an investor from one EU Member State and another EU Member State.  Similarly, the fact that the European Commission has a negotiating mandate to establish a "multilateral investment court," which may provide dispute settlement external to the courts of the European Union and its Member States, is also of no consequence.   The Commission's negotiating mandate does not relate to intra-EU disputes but only to disputes with third-country investors.  Regardless, the viability of such a "multilateral investment court" would depend on whether it respects the autonomy and primacy of EU law, which the ECT does not.

51.     In sum, *any* international agreement or treaty concluded between EU Member States – whether the EU is a party or not – must be in line with the EU Treaties.  Here, the application of the investor-state arbitration provision of Article 26 of the ECT between EU Member States produces exactly the same conflict with the EU Treaties as the arbitration provision in the BIT in *Achmea*.  Therefore, Article 26 of the ECT is incompatible with Articles 267 and 344 TFEU, which preclude its application to disputes between investors of EU Member States against another EU Member State under the ECT.

**F.     The Absence of A Disconnection Clause Is Irrelevant for the Question of the Conflict between Article 26 of the ECT and the EU Treaties**

52.     Dashwood's declaration argues that "if the EU had considered the application of Article 26 ECT to be problematic in the case of disputes between its Member States, it could and

would have insisted on the inclusion in the treaty of a clearly drafted disconnection clause designed to prevent such application." D.E. 21 ¶ 14. Such an inference is unwarranted and legally irrelevant.

53.     The lack of a disconnection clause in the ECT does not mean the EU held Dashwood's position at the time of the ECT's ratification. Indeed, the European Commission's own statements disproves that contention. *See, e.g.,* European Commission, *Amicus Curiae* Brief ¶¶ 11-45, *Novenergia II – Energy & Environment (SCA) v. Kingdom of Spain*, SCC Case No. 2015/063 (May 2, 2017) (Exhibit 8) (explaining that at the time of the ECT's conclusion, "the EU Member States did not intend to create *inter se* obligations between them, just as in the case of the WTO agreement" and that Article 26 of the ECT was not intended to be applied in the intra-EU context).

54.     Further, even if the EU had taken the position advanced in Dashwood's declaration, the EU's ratification of the ECT without a disconnection clause would not cure Article 26's incompatibility with the EU Treaties. The CJEU has authoritatively determined that the EU Treaties prohibit investor-state arbitration clauses agreed to between Member States such as the one in Article 26 of the ECT. As noted above, the EU cannot by its "agreement" override the EU Treaties.

55.     Moreover, the absence of a disconnection clause in the ECT does not save Article 26 of the ECT from violating Articles 267 and 344 of the TFEU. For example, the absence of a "disconnection clause" in the draft accession agreement of the EU to the ECHR did not cure the breach of EU law. Rather, it rendered the agreement *irreconcilable* with Article 344 TFEU. In Opinion 2/13 the CJEU held:

> the procedure for the resolution of disputes provided for in Article 33 of the ECHR could apply to any Contracting Party and, therefore,

> also to disputes between the Member States, or between those
> Member States and the EU, even though it is EU law that is in issue
> . . . The very existence of such a possibility undermines the
> requirement set out in Article 344 TFEU [CJEU, Opinion 2/13,
> ECLI:EU:C:2014:2454, ¶ 208 – *ECHR* (D.E. 18-44, Hindelang
> Decl. Exhibit 37)] . . . In those circumstances, only the express
> exclusion of the ECtHR's jurisdiction under Article 33 of the ECHR
> over disputes between Member States or between Member States
> and the EU in relation to the application of the ECHR within the
> scope ratione materiae of EU law would be compatible with Article
> 344 TFEU.

Opinion 2/13, ¶¶ 205-13 (D.E. 18-44, Hindelang Decl. Exhibit 37).  Similarly, here, the non-existence of a disconnection clause only underscores the arbitration clause's incompatibility with EU law.

### III.   THE ARBITRAL AWARD RENDERED UNDER ARTICLE 26 OF THE ECT IN A DISPUTE BETWEEN AN EU MEMBER STATE AND A NATIONAL OF ANOTHER EU MEMBER STATE IS WITHOUT LEGAL FORCE

56.   As explained above, no arbitration agreement could have formed under Article 26 of the ECT in an intra-EU investor-state dispute and any award there under is invalid under the EU Treaties.  That is precisely the ruling of the German Federal Court of Justice in its recent *Achmea* Decision, concluding that "[a]ccording to the decision of the European Court of Justice [CJEU] . . . there is no arbitration agreement between the parties" and thus "[t]he absence of an arbitration agreement is equivalent to its invalidity."  *Slovak Republic v. Achmea B.V.* Bundesgerichtshof [BGH] [Federal Court of Justice] Oct. 31, 2018, I ZB 2/15, ¶¶ 14-15 (D.E. 18-55, Exhibit 48).

57.   Dashwood's declaration states that "the principle of legal certainty appears to me to demand that any ruling on the invalidity of applying Article 26 ECT in intra-EU disputes be not given *ex tunc* effect from 1998, but that it should apply exclusively to future purported acceptances of the offer to arbitrate."  D.E. 21 ¶ 95 (internal citation omitted).  This position is untenable under the CJEU's prior rulings.  Notably, in *Meilicke*, the Court ruled that:

- 24 -

> [R]egard must be had to the settled case-law of the Court to the effect that the interpretation which, in the exercise of the jurisdiction conferred on it by Article 234 EC [now Article 267 of the TFEU], the Court gives to a rule of Community law [now EU law] clarifies and defines the meaning and scope of that rule *as it must be or ought to have been understood and applied from the time of its entry into force*. It follows that the rule as thus interpreted may, and must, be applied by the courts even to legal relationships which arose and were established before the judgment ruling on the request for interpretation …,
>
> [A]s the Court has consistently held, such a restriction *may be allowed only in the actual judgment ruling upon the interpretation sought* […]. Indeed, there must necessarily be a single occasion when a decision is made on the temporal effects of the requested interpretation, which the Court gives of a provision of Community law [now EU law]. In that regard, the principle that a restriction may be allowed only in the actual judgment ruling upon that interpretation guarantees the equal treatment of the Member States and of other persons subject to Community law, under that law, fulfilling, at the same time, the requirements arising from the principle of legal certainty."

CJEU, Case C-292/04, ECLI:EU:C:2007:132 ¶¶ 34-37– *Meilicke, et al. v. Finanzamt Bonn-Innenstadt* (Exhibit 5). *See also* CJEU, Case 309/85, ECLI:EU:C:1988:42, ¶¶ 12-13 – *Bruno Barra v Belgian State and City of Liège* (Exhibit 1).  Since the Court in *Achmea* has not restricted the *ex tunc* effect of its preliminary ruling, restricting it in any later case is not an option.

## IV.    SPAIN WOULD BE IN VIOLATION OF EU LAW IF IT PAID ANY AMOUNT IN SATISFACTION OF THE AWARD

58.    The EU Commission has already stated that "*any compensation* which an Arbitral Tribunal were to grant to an investor on the basis that Spain has modified the *premium* economic scheme by the [revised] schedule would constitute in and of itself State aid."  Commission Decision 7384 of 10 November 2017 on State aid SA.40348(2015/NN) – Spain Support for electricity generation from renewable energy sources, cogeneration and waste ("State Aid Decision 7384"), ¶ 156 (emphasis added) (D.E. 18-50, Hindelang Decl. Exhibit 43).  Further,

any such compensation would be "notifiable State aid pursuant to Article 108(3) TFEU and be subject to the standstill obligation." *Id.*

59.    In my first declaration, I demonstrated that the Award here does exactly what the Commission found to be unlawful under the EU law; it seeks to compensate the Petitioners for the changes in the premium economic scheme brought about by the revised scheme without prior review and approval of this State aid measure by the Commission.  D.E. 18-7 ¶¶ 56-58.

60.    Under the TFEU, only the EU Commission has the authority and power to investigate State aid measures and to make decisions on whether such measures can be implemented.  *See* TFEU, arts 107, 108  (D.E. 18-11, Hindelang Decl. Exhibit 4).  EU Member States may not implement State aid measures without the Commission's approval.  Quigley agrees that "[a]id put into effect without having been first approved by the Commission as being compatible with the internal market is 'unlawful aid.'" (D.E. 22, ¶ 18).  I am not aware of any decision by the Commission allowing Spain to implement the said State aid measure, *i.e.* the payment of the Award.  Quigley cites none.  Mr. Quigley's opinion that the Commission errs in its State Aid Decision 7384 does not change this fact.[10]  *See* (D.E. 22, ¶¶ 41, 44 *et seq*,)

61.    The standstill obligation contained in Article 108(3) of the TFEU to not pay the Award is, furthermore, triggered independently of the Commission's statements as the Award constitutes unlawful State aid.  D.E. 18-7 ¶¶ 56-58.  Moreover, Spain requested the Commission's confirmation that payment of a similar award issued in another arbitration matter involving the same regulatory scheme addressed in State Aid Decision 7384, would be unlawful under the EU law.  *See Communication from the Legal Service of the European Commission to*

---

[10] I am also not aware that the Petitioners have challenged the State Aid Decision 7384, and I note that they do not claim to be challenging it.

*the Attorney General of the Kingdom of Spain* 2-3 (October 26, 2018) [hereinafter "EC Legal Service Communication"] (Exhibit 10).  The Commission confirmed that it would, in fact, be unlawful.  *Id.* ("[Under Article 108(3) of the Treaty on the Functioning of the European Union (TFEU), Member States cannot put the State aid measures into effect without prior approval by the Commission of the State aid in question as aid compatible with the internal market.").  The Commission also recalled that "the payment of compensation before the Commission rules on its compatibility would be contrary to Union Law, in particular to Article 108(3) TFEU."  *Id.*, p. 2.

62.     Paying the Award in contravention of Spain's obligations under Article 108 (3) of the TFEU would make it subject to sanctions under EU law.  The Commission has the power to compel Spain to recover any amounts paid under the Award without the Commission's approval.  It can also commence an infringement proceeding against Spain before the CJEU if Spain is unable to recover such payments, and, eventually, may seek the imposition of monetary penalties.  For example, in CJEU, Case C-93/17, EU:C:2018:903 – *Commission v. Greece* (Exhibit 7), the EU Court of Justice ordered Greece to pay 10 million euros as well as a periodic penalty payment of 7,294,000 euros for every six month period in which the unlawful State aid granted by Greece to Hellenic Shipyards had not yet been recovered.[11]

---

[11] I also respectfully disagree with Quigley's analysis and conclusions.  For example, he argues that the compensation ordered in the Award does not confer any "economic advantage on the investors."  However, such ordered compensation undoubtedly confers an economic advantage upon the Petitioners that would not otherwise have been available to them under normal market conditions.  *See* CJEU Case C-39/94, EU:C:1996:285, ¶ 60– *SFEI and Others* (D.E. 18-28, Hindelang Decl., Exhibit 21); CJEU, Case C-342/96, EU:C:1999:210 ¶ 41 – *Spain v. Commission* (Exhibit 6).  Further, the advantage is selective because the obligation to pay damages did not arise from the application of a general rule of law for government liability.  *See* Commission Decision 2015/1470, ¶¶ 109 *et seq*. (D.E. 18-49, Hindelang Decl., Exhibit 42).  The criteria for state aid is therefore satisfied.

63.     Finally, Quigley's argument that the tribunal did not "encroach on the Commission's competence to review State aid" because the Tribunal did not make any "specific finding relating to State aid" misses the obvious.  *See* (D.E. 22, p. 9, ¶ 30).  It is one thing to *review* State aid issues, and fundamentally another to issue and compel payment in violation of the EU State aid rules.  *See* Commission Decision 2015/1470 (D.E. 18-49, Hindelang Decl. Exhibit 42) (determining that payment by Romania of an arbitral award rendered by a tribunal for breaches of an intra-EU investment treaty constituted unlawful State aid even though the arbitral tribunal did not review State aid).  Regardless of the tribunal's reasoning and findings in the underlying arbitration, it awarded State aid by issuing the Award, which Spain cannot pay without violating the EU Treaties and being subjected to serious sanctions under EU law.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Signed on February 19, 2019
Berlin, Germany


_____
                Steffen Hindelang

# INDEX OF EXHIBITS

**Second Expert Declaration of Steffen Hindelang in Support of Respondent the Kingdom of Spain's Reply Memorandum of Law in Support of Motion to Dismiss Petition to Enforce Arbitral Award**

1. Cases before the Court of Justice of the European Union

   a. CJEU, Case 309/85, ECLI:EU:C:1988:42 – *Bruno Barra v Belgian State and City of Liège* (Exhibit 1)

   b. CJEU, Case 157/86, ECLI:EU:C:1988:62 – *Murphy* (Exhibit 2)

   c. CJEU, Case C-188/07, ECLI:EU:C:2008:359 – *Commune de Mesquer* (Exhibit 3)

   d. CJEU, Case C-266/16, ECLI:EU:C:2018:118 – *Western Sahara Campaign UK* (Exhibit 4)

   e. CJEU, Case C-292/04, ECLI:EU:C:2007:132 – *Meilicke, et al. v. Finanzamt Bonn-Innenstadt* (Exhibit 5)

   f. CJEU, Case C-342/96, EU:C:1999:210 – *Spain v. Commission* (Exhibit 6)

   g. CJEU, Case C-93/17, EU:C:2018:903 – *Commission v. Greece* (Exhibit 7)

2. European Commission Documents

   a. European Commission, *Amicus Curiae* Brief, *Novenergia II – Energy & Environment (SCA) v. Kingdom of Spain*, SCC Case No. 2015/063 (May 2, 2017) (Exhibit 8)

   b. European Commission, Application for Leave to Intervene as a Non-Disputing Party (July 19, 2018), *Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/36 – Annulment Proceedings (Exhibit 9)

   c. *Communication from the Legal Service of the European Commission to the Attorney General of the Kingdom of Spain* (Oct. 26, 2018) (Exhibit 10)

   d. European Commission, *Amicus Curiae* Submission (Nov. 12, 2018), *Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/36 – Annulment Proceedings (Exhibit 11) (excerpts)

   e. European Commission, Press Release – Daily News (Jan. 17, 2019) (Exhibit 12)

3. European Union Authorities

   a. Consolidated version of the Treaty on the Functioning of the European Union Declarations annexed to the Final Act of the Intergovernmental Conference which adopted the Treaty of Lisbon, signed on 13 December 2007 - A. Declarations Concerning Provisions of the Treaties - 17. Declaration concerning primacy, Official Journal 115, 09/05/2008 P. 0344 - 0344 (Exhibit 13)

b.  *Declaration of the Representatives of the Governments of the Member States on the Legal Consequences of the Judgment of the Court of Justice in Achmea and on Investment Protection in the European Union* (Jan. 15, 2019) (Exhibit 14)

c.  *Declaration of the Representatives of the Governments of the Member States on the Enforcement of the Judgment of the Court of Justice in Achmea and on Investment Protection in the European Union* (Jan. 16, 2019) (Exhibit 15)

d.  *Declaration of the Representative of the Government of Hungary on the Legal Consequences of the Judgment of the Court of Justice in Achmea and on Investment Protection in the European Union* (Jan. 16, 2019) (Exhibit 16)

4.  Other Foreign and International Court Decisions

a.  *Legal Consequences for States of the Continued Presence of South Africa in Namibia (South West Africa) notwithstanding Security Council Resolution 276 (1970), Advisory Opinion*, I.C.J. Reports 1971 (Exhibit 17)

b.  *Electrabel S.A. v. Republic of Hungary*, ICSID Case No. ARB/07/19, Award (Nov. 25, 2015) (Exhibit 18) (excerpts)

5.  Secondary Sources

a.  K. Schmalenbach, "Article 1: Scope of the Present Convention," VIENNA CONVENTION ON THE LAW OF TREATIES: A COMMENTARY 21 (Dörr & Schmalenbach eds. 2017) (Exhibit 19) (excerpts)

b.  O. Dörr, "Article 31: General rule of interpretation," VIENNA CONVENTION ON THE LAW OF TREATIES: A COMMENTARY 559 (Dörr & Schmalenbach eds. 2017) (Exhibit 20) (excerpts)