# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| INFRASTRUCTURE SERVICES LUXEMBOURG S.A.R.L. and ENERGIA TERMOSOLAR B.V., | ) ) ) ) ) |
| *Petitioners*, | ) ) |
| v. | ) Civil Action No. 1:18-cv-1753-EGS ) ) |
| THE KINGDOM OF SPAIN, | ) ) |
| *Respondent*. | ) ) ) |

# BRIEF FOR THE EUROPEAN COMMISSION
# ON BEHALF OF THE EUROPEAN UNION AS *AMICUS CURIAE*
# IN SUPPORT OF THE KINGDOM OF SPAIN

R. Stanton Jones (D.C. Bar No. 987088)
Sally L. Pei (D.C. Bar No. 1030194)
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC  20001-3743
T: (202) 942-5000
stanton.jones@arnoldporter.com
sally.pei@arnoldporter.com

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................. iii

INTEREST OF AMICUS CURIAE .................................................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................................. 2

RELEVANT BACKGROUND ......................................................................................... 5

    A.    The nature and special characteristics of the EU legal order ................................. 5

    B.    The Energy Charter Treaty ("ECT") .................................................................... 9

ARGUMENT ................................................................................................................... 10

I.    Article 26 of the Energy Charter Treaty must be interpreted as not applying to intra-EU disputes. ......................................................................................................... 10

    A.    The CJEU has confirmed that intra-EU arbitration under Article 26 of the ECT conflicts with the EU Treaties and fundamental principles of EU law ................. 11

    B.    The CJEU's judgment applies as an interpretation of international law binding on all EU Member States ......................................................................................... 16

II.    The CJEU's authoritative decision regarding the incompatibility of intra-EU arbitration under the ECT with the EU Treaties merits deference .................................... 18

    A.    This Court has the authority and obligation to determine whether an arbitration agreement between Spain and Petitioners existed. ............................................... 18

    B.    The Court should accord deference to the CJEU's decision in *Komstroy*. ........... 21

III.    Even if the Court had jurisdiction, permitting enforcement of the award would improperly intrude on EU law. ....................................................................................... 23

CONCLUSION ............................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Animal Sci. Prods. Inc. v. Hebei Welcome Pharm. Co.*,
  138 S. Ct. 1865 (2018) .........................................................................................22

*Balkan Energy Ltd. v. Republic of Ghana*,
  302 F. Supp. 3d 144 (D.D.C. 2018) .....................................................................19

*Blue Ridge Investments, L.L.C. v. Republic of Argentina*,
  735 F.3d 72 (2d Cir. 2013) ...................................................................................20

*Breard v. Greene*,
  523 U.S. 371 (1998) (per curiam) ........................................................................21

*CEF Energia, B.V. v. Italian Republic*,
  2020 WL 4219786 (D.D.C. July 23, 2020) ..........................................................11

*Creighton Ltd. v. Gov't of Qatar*,
  181 F.3d 118 (D.C. Cir. 1999) .............................................................................19

*Foremost-McKesson v. Islamic Republic of Iran*,
  905 F.2d 438 (D.C. Cir. 1990) .............................................................................19

*F.T.C. v. Compagnie de Saint-Gobain-Pont-à-Mousson*,
  636 F.2d 1300 (D.C. Cir. 1980) ...........................................................................24

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
  139 S. Ct. 524 (2019) ...........................................................................................19

*Hilton v. Guyot*,
  159 U.S. 113 (1895) .............................................................................................22

*InfraRed Environmental Infrastructure GP Ltd. v. Kingdom of Spain*,
  No. 20-817 (JDB), 2021 WL 2665406 (D.D.C. June 29, 2021) ...........................12

*Khochinsky v. Republic of Poland*,
  1 F.4th 1 (D.C. Cir. 2021) ...............................................................................19, 20

*Laker Airways Ltd. v. Sabena, Belgian World Airlines*,
  731 F.2d 909 (D.C. Cir. 1984) .............................................................................22

*LLC SPC Stileks v. Republic of Moldova*,
  985 F.3d 871 (D.C. Cir. 2021) .............................................................................19

*Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*,
    397 F. Supp. 3d 34 (D.D.C. 2019) .........................................................12

*Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*,
    850 F.2d 756 (D.C. Cir. 1988) .............................................................19

*Novenergia II – Energy & Environment (SCA) v. Kingdom of Spain*,
    2020 WL 417794 (D.D.C. Jan. 27, 2020) ............................................12

*O.N.E. Shipping Ltd. v. Flota Mercante Grancolombiana S.A.*,
    830 F.2d 449 (2d Cir. 1987) ................................................................23

*Process & Indus. Dev. v. Fed. Republic of Nigeria*,
    962 F.3d 576 (D.C. Cir. 2020) ............................................................20

*Rivers v. Roadway Exp., Inc.*,
    511 U.S. 298 (1994) .............................................................................15

*Sisso v. Islamic Republic of Iran*,
    448 F. Supp. 2d 76 (D.D.C. 2006) ......................................................19

*Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct.*,
    482 U.S. 522 (1987) .............................................................................22

*Tatneft v. Ukraine*,
    771 F. App'x 9 (D.C. Cir. 2019) .........................................................20

*Tatneft v. Ukraine*,
    301 F. Supp. 3d 175 (D.D.C. 2018) ....................................................20

**Statutes**

22 U.S.C. § 1650a ..........................................................................3, 19, 23

28 U.S.C.
    § 1605(a)(1) ....................................................................................19, 21
    § 1605(a)(6) ..........................................................................................21

**Treaties and International Agreements**

Convention on Settlement of Investment Disputes between States and Natioals of Other
    States, Mar. 18, 1965, 17 U.S.T. 1270, 575 U.N.T.S. 159 ...................19, 20, 23, 25

Energy Charter Treaty and its Protocol on Energy Efficiency and Related Environmental
    Aspects, *adopted* Dec. 17, 1994, *entered into force* April 16, 1998,
    2080 U.N.T.S 95 (1995) .................................................................... *passim*

Treaty establishing the European Atomic Energy Community, Oct. 26, 2012,
2012 O.J. (C 327) 1 ..................................................................................................3, 5

Treaty on European Union, Oct. 26, 2012,
2012 O.J. (C 326) 13 ..........................................................................................1, 5, 6, 15

Treaty on the Functioning of the European Union, Oct. 26 2012,
2012 O.J. (C 326) 47 .......................................................................................... *passim*

Vienna Convention on the Law of Treaties, *opened for signature* May 23, 1969,
1155 U.N.T.S. 331 ....................................................................................................14

**European Union Authorities**

*Bundesgerichtshof* Order, *Slovak Republic v. Achmea B.V.*
(Oct. 31, 2018), I ZB 2/15............................................................................... 15-16

Case 6-64, *Costa v. E.N.E.L.*,
15 July 1964, EU:C:1964:66........................................................................................7

Case 24/86, *Blaizot v. University of Liège*,
2 Feb. 1988, EU:C:1988:43 .......................................................................................15

Case 26-62, *Van Gend & Loos v. Netherlands Inland Revenue Administration*,
5 Feb. 1963, EU:C:1963:1 ..........................................................................................16

Case C-275/06, *Productores de Música de España v. Telefónica de España SAU*,
29 Jan. 2008, EU:C:2008:54 .................................................................................. 7-8

Case C-275/13, *Elcogás SA v. Administración del Estado*,
22 Oct. 2014, EU:C:2014:2314 .................................................................................24

Case C-284/16, *Slovak Republic v. Achmea B.V.*,
6 March 2018, EU:C:2018:158................................................................................ *passim*

Case C-400/99, *Italian Republic v. Commission*,
9 Oct. 2001, EU:C:2001:528 .....................................................................................25

Case C-459/03, *Commission v. Ireland* ("*Mox Plant*"),
30 May 2006, EU:C:2006:345 ................................................................... 8, 16-17, 21

Case C-676/19 P, *Gollnisch v. European Parliament*,
12 Nov. 2020, EU:C:2020:916 ..................................................................................14

Case No. C-741/19, Opinion of Advocate General Maciej Szpunar,
*Republic of Moldova v. Komstroy*, 3 March 2021, EU:C:2021:164........................14

Case C-741/19, *Republic of Moldova v. Komstroy*,
2 Sept. 2021, EU:C:2021:655 .......................................................................... *passim*

Commission Communication to the European Parliament and Council on
   Protection of intra-EU investment (July 19, 2018), COM(2018) 547 .....................................6

Court of Justice Opinion 2/13,
   18 Dec. 2014, EU:C:2014:2454.................................................................................6, 8

Declaration of the Government of Hungary, of 16 January 2019, on the Legal
   Consequences of the Judgment of the Court of Justice in *Achmea* and on
   Investment Protection in the European Union ...........................................................11

Declaration of the Representatives of the Governments of the Member States, of
   15 January 2019, on the Legal Consequences of the Judgment of the Court of
   Justice in *Achmea* and on Investment Protection in the European Union ........................ 10-11

Declaration of the Representatives of the Governments of the Member States, of
   16 January on the Enforcement of the Judgment of the Court of Justice in
   *Achmea* and on Investment Protection in the European Union ...............................10

Decision on State Aid, SA.40171 (Nov. 28, 2016)..........................................................17

Decision on State Aid, SA.40348 (Nov. 10, 2017)..........................................................24

Decision on State Aid, SA.54155 (July 19, 2021)..........................................................25

Final Act of the European Energy Charter Conference,
   1998 O.J. (L69) 5 .................................................................................................9

Joined Cases C-402/05 P & C-415/05 P, *Kadi v. Council & Commission*,
   3 Sept. 2008, EU:C:2008:461 ...............................................................................7

## Other Authorities

*Access to German Minority Schools in Upper Silesia*,
   1931 P.C.I.J. Series A/B, No. 40 ...............................................................................14

Albert Bleckmann, *The Mixed Agreements of the EEC in Public International Law*,
   *in* David O'Keeffe & Henry G. Schermers, *Mixed Agreements* 155 (1983) ..........................10

*Barcelona Traction, Light & Power Co., Ltd.* (Belg. v. Spain),
   1970 I.C.J. 3 (Feb. 5) .....................................................................................14, 17

*BayWa r.e. Renewable Energy GmbH v. Kingdom of Spain*, Decision on
   Jurisdiction, Liability, and Directions on Quantum, ICSID Case No.
   ARB/15/16 (2 Dec. 2019) .....................................................................................17

Campbell McLachlan, *The Principle of Systemic Integration and Article 31(3)(c) of the
   Vienna Convention*, 54 Int'l & Comp. L.Q. 279 (2005).........................................................18

Danae Azaria, *Treaties on Transit of Energy via Pipelines and Countermeasures* (2015)...........18

*Draft Articles on Responsibility of States for Internationally Wrongful Acts, with commentaries*, U.N. Doc. A/56/10 (2001) ................................................................18

Eleftheria Neframi, *The Duty of Loyalty*,
47 Common Market L. Rev. 323 (2010) ......................................................................10

Joost Pauwelyn, *Conflict of Norms in Public International Law* (2003) ......................................18

Julian Scheu & Petyo Nikolov, *The Incompatibility of Intra-EU Investment Treaty Arbitration with European Union Law*, 62 German Y.B. Int'l L. 475 (2021) ........................18

Report of the Study Group of the International Law Commission, *Fragmentation of International Law: Difficulties Arising from the Diversification and Expansion of International Law*, UN Doc. No. A/CN.4/L.682 (2006) ..................................18

Thomas W. Wälde, *International Investment Law: An Overview of Key Concepts and Methodology*, Transnat'l Disp. Mgmt., July 2007 ............................................18

Vera Rodenhoff, *Die EG und ihre Mitgliedstaaten als völkerrechtliche Einheit bei umweltvölkerrechtlichen Übereinkommen* (2008) ..................................................10

## INTEREST OF AMICUS CURIAE

The European Commission is an institution of the European Union (the "EU" or "Union"), a treaty-based international organization composed of 27 Member States.[1] The Commission is an independent institution and acts in the interests of the Union as a whole, rather than individual Member States. Article 17(1) of the Treaty on European Union ("TEU"), Oct. 26, 2012, 2012 O.J. (C 326) 13, provides that the Commission "shall ensure the Union's external representation"—*i.e.*, it is responsible for, inter alia, representing the Union in proceedings outside the EU. The Commission submits this amicus brief in this function on behalf of the European Union.

The EU has a substantial interest in this case and in ensuring that this Court proceeds based on a correct understanding of the principles and questions of EU law that it raises. Petitioners Infrastructure Services Luxembourg S.A.R.L. and Energia Termosolar B.V., entities formed under the laws of Luxembourg and the Netherlands respectively, and hence EU companies, seek enforcement of an investment arbitration award they have obtained against Spain, an EU Member State, on the basis of the Energy Charter Treaty ("ECT"), an investment protection treaty initiated and negotiated by the EU in the early 1990s as part of the EU's external energy policy. Because the EU is a party to the ECT, the ECT forms part of EU law.

Petitioners' award is premised on a fundamental misinterpretation of the ECT. The arbitral tribunal found—contrary to Spain's arguments—that the ECT's dispute-resolution provision, Article 26, which provides for investor-State arbitration, applies in the relationship between an investor from one EU Member State and another EU Member State. The Commission has long

---

[1] These Member States are Austria, Belgium, Bulgaria, Croatia, Cyprus, the Czech Republic, Denmark, Estonia, Finland, France, Germany, Greece, Hungary, Ireland, Italy, Latvia, Lithuania, Luxembourg, Malta, the Netherlands, Poland, Portugal, Romania, Slovakia, Slovenia, Spain, and Sweden.

1

adhered to the position that Article 26 does not authorize intra-EU arbitration. The Court of Justice of the European Union ("CJEU") recently confirmed in its judgment in Case C-741/19, *Republic of Moldova v. Komstroy*, 2 September 2021, EU:C:2021:655, that Article 26 ECT does not apply to intra-EU disputes.

Under Article 344 of the Treaty on the Functioning of the European Union ("TFEU"), Oct. 26, 2012, 2012 O.J. (C 326) 47, the EU Member States, *i.e.*, including Spain as well as the Netherlands and Luxembourg, have entrusted the CJEU with the task of rendering authentic, final and binding interpretations of EU law. Crucially for this case, that includes the interpretation of international agreements to which the EU and its Member States are party, insofar as their application between two EU Member States is concerned. As a result of the direct application of EU law in the legal orders of the EU Member States, the interpretation the CJEU set forth in its judgment in *Komstroy* is also binding on companies incorporated in the EU.

As the Commission explains in this brief, the CJEU's decision has dispelled any uncertainty as to the question at the core of this case: The CJEU held that Article 26 of the ECT must be interpreted to preclude intra-EU arbitration, and therefore the standing offer to arbitrate made by Spain in the ECT is extended only to other contracting parties to the ECT, not to EU Member States or their investors. The absence of an arbitration agreement means that the award at issue here cannot be recognized and is unenforceable anywhere in the EU. It also precludes enforcement in this Court.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Petitioners brought this suit to enforce an award rendered in their favor against Spain by a private investment arbitration tribunal in 2018 under the ECT, an investment protection treaty initiated, negotiated, and signed in the 1990s by the EU and its Member States, on the one hand,

and third countries, in particular of the former Communist bloc, on the other hand. The Commission understands Spain's position in these proceedings to be that the ECT contains no standing offer of arbitration from the EU and its Member States to investors of other EU Member States. Rather, the standing offer from the EU and its Member States to arbitrate contained in Article 26 of the ECT applies only to investors from third countries outside the EU. That conclusion deprives this Court of subject-matter jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"). It also means that the arbitral award is not entitled to full faith and credit, thus precluding enforcement under 22 U.S.C. § 1650a.

The CJEU recently issued a conclusive and authoritative judgment confirming the correctness of Spain's position. In *Republic of Moldova v. Komstroy*, the CJEU held that Article 26(2)(c) ECT must be interpreted as not applying to disputes between a Member State and an investor of another Member State. That conclusion flowed from the unique nature of the EU legal order, as well as the need to ensure the integrity of the EU judicial system and consistency and uniformity in the interpretation and application of EU law. It is based on the premise, set out by the CJEU in its earlier judgment in Case C-284/16, *Slovak Republic v. Achmea BV*, 6 March 2018, EU:C:2018:158, that intra-EU arbitration is impermissible because it would violate core elements of EU law, in particular the principles of autonomy of EU law and of mutual trust between the EU Member States, as well as the fundamental tenets of the EU judicial system.

In *Komstroy*, the CJEU resolved the tension between the core principles of the EU legal order and intra-EU investment arbitration by applying the technique of "interpretation in conformity," *i.e.*, by interpreting Article 26 of the ECT so as to conform with the EU Treaties (i.e., the TEU, TFEU, and the Treaty establishing the European Atomic Energy Community, Oct. 26, 2012, 2012 O.J. (C 327) 1 ("EURATOM Treaty")). That interpretation ensures respect for the

hierarchy of norms within the EU legal order, in which international agreements to which the EU is a party stand below the EU Treaties and general principles of EU law.

The CJEU's judgment in *Komstroy* is an authentic and final interpretation of the ECT as international law as it applies between EU Member States. It is also binding in the legal orders of all EU Member States. Notably, Article 26 of the ECT, despite being part of a multilateral international agreement, creates a bundle of bilateral and reciprocal international obligations. As a result, any dispute between an investor from one EU Member State and another EU Member State is entirely "encapsulated" within the EU legal order. The judgment in *Komstroy* therefore does not affect the rights and obligations of third countries that are contracting parties to the ECT. But the CJEU has left no doubt that *intra-EU awards*, rendered in violation of *Achmea* and *Komstroy*, are unenforceable anywhere in the EU because they violate fundamental rules of EU law.

In finding that the ECT does not permit intra-EU arbitration, the CJEU directly addressed the question at the heart of this case, *i.e.*, whether Spain's offer of arbitration in Article 26 extended to Petitioners, who are EU companies—a question that this Court has the authority and obligation to examine, in order to determine whether it has subject-matter jurisdiction under the FSIA to entertain this action. And the CJEU's answer to that question warrants the highest degree of deference as a matter of international comity. The CJEU is the highest judicial authority in the EU, with exclusive competence to issue authoritative interpretations of EU law, including the EU Treaties and the ECT as it applies between EU Member States. For this Court to second-guess the CJEU's decision on a question of immense importance to the institutional structure of the EU legal order—and to allow enforcement of awards that are now unenforceable in any EU Member State—

would contradict the principles of comity and mutual respect that govern U.S. courts' approach to legal issues that affect the interests of foreign governments.

Finally, even if the Court had jurisdiction, enforcement would still be improper. The Commission, in its capacity as the entity responsible for enforcing EU competition law, has determined—applying established principles of EU law—that the arbitral award at issue here constitutes "State aid" (*i.e.*, a public subsidy) that Spain may not pay absent the Commission's approval. The Commission has launched a formal investigation into the matter and ordered Spain to suspend any payment of the award until that investigation has concluded. An order from this Court requiring Spain to pay the award absent final approval from the Commission under EU State aid law would amount to ordering Spain to violate its EU law obligations. Rather than compel Spain to violate its EU law obligations, this Court should allow these issues to be resolved within the EU legal system.

## RELEVANT BACKGROUND

### A.     The nature and special characteristics of the EU legal order

The EU is a treaty-based international organization of 27 Member States. At present, the EU Treaties are the TFEU, TEU, and EURATOM Treaty. While the EU retains an international character—the 27 Member States remain the "masters of the Treaties" and have collectively determined the terms of their membership in the Union—the EU also represents the most ambitious project of economic, political, legal and social integration hitherto known in international law. European integration began in the 1950s as a reaction to the economic, political and military destruction of World War II. Under the EU Treaties, the EU Member States have, in stages, transferred legislative, regulatory, and enforcement competences to the Union and its institutions.

EU Member States owe each other and the Union expansive duties of loyalty and mutual trust, and the process of European integration under the EU Treaties has "given rise to a structured network of principles, rules and mutually interdependent legal relations linking the EU and its Member States, and its Member States with each other." Court of Justice Opinion 2/13 ("Accession of the European Union to the European Convention on Human Rights"), 18 Dec. 2014, EU:C:2014:2454, ¶ 167; *Achmea*, ¶ 33; *Komstroy* ¶ 43.

One of the original and central purposes of the EU Treaties was the establishment and proper functioning of the "internal market," defined in the TFEU as "an area without internal frontiers in which the free movement of goods, persons, services and capital is ensured." TFEU art. 26(2). The EU's internal market rules are contained in the EU Treaties and EU legislation, as interpreted by the case law of the CJEU. These rules cover all cross-border economic activities in the EU, including investment activities. Internal market rules secure to EU investors fundamental and directly enforceable rights throughout the investment cycle, but also impose obligations, including the obligation to comply with EU law as interpreted by the CJEU and various regulatory standards that are designed to ensure that the internal market functions as a level, integrated playing field.[2] Importantly for present purposes, under Article 17(1) TEU, the Commission serves as the "Guardian of the Treaties."  The Commission is responsible for ensuring the proper application of the EU Treaties and of measures EU institutions adopt under those treaties.  Among other things, the Commission issues decisions enforcing EU competition law, including by ensuring that public subsidy or subsidy-like schemes enacted by Member States (known as "State aid") do not distort or threaten to distort competition in the EU internal market.  TFEU arts. 107 & 108.

---

[2] For an overview of how the EU internal market rules achieve complete and comprehensive investment protection, see Commission Communication to the European Parliament and Council on Protection of intra-EU investment (July 19, 2018), COM(2018) 547, at 3-4, https://bit.ly/2XtniBb.

As the CJEU has explained, the EU Treaties have created "[their] own legal system which, on the entry into force of the Treat[ies], became an integral part of the legal systems of the Member States and which their courts are bound to apply." Case 6/64, *Costa v. E.N.E.L.*, 15 July 1964, EU:C:1964:66, at 593. By entering into the EU Treaties, "the Member States have limited their sovereign rights, albeit within limited fields, and have created a body of law which binds both their nationals and themselves." *Id.* The concept of a self-standing, independent legal order is often referred to as the principle of "autonomy."

This autonomous EU legal system rests on a clear hierarchy of norms. At the top of the hierarchy is primary EU law, *i.e.*, the EU Treaties and general principles of EU law. International agreements that are an integral part of the EU legal order, like the ECT, *Komstroy*, ¶ 23, come below primary EU law in the hierarchy of EU legal norms, *see* Joined Cases C-402/05 P & C-415/05 P, *Kadi v. Council & Commission*, 3 Sept. 2008, EU:C:2008:461, ¶ 285.

The relationship between EU law and national law, including international agreements to which only the EU Member States, but not the EU, are a party, is governed by the principle of "primacy" of EU law. Primacy is a rule mandating that conflicts between EU and national law must be resolved by setting aside or disapplying provisions of national law, including international agreements to which only the EU Member States, but not the EU, are a party, that are inconsistent with EU law. *See* Spain's Mem. in Supp. of Mot. to Dismiss at 5 (discussing primacy), ECF No. 18-1; Hindelang Decl., ¶¶ 20-24, ECF No. 18-7; Hindelang Reply Decl., ¶¶ 22-24, ECF No. 26.

It is a general principle of EU law that both lower-ranking norms in the EU legal order and rules of national law must be interpreted, so far as is possible, to avoid a conflict between those rules and the rules of primary EU law. Case C-275/06, *Productores de Música de España v. Telefónica de España SAU*, 29 Jan. 2008, EU:C:2008:54, ¶ 68 (dealing both with the interpretation

of secondary EU law, here a directive, in conformity with primary EU law, and with the interpretation of national law in conformity with EU law). This interpretive principle, known as "conformity through interpretation" or "interpretation in conformity," is designed to discern whether a conflict between primary EU law and lower-ranking rules, such as international agreements, exists in the first place. *See* Hindelang Reply Decl. ¶¶ 15, 20-21.

The autonomy—and the integrity—of the EU legal order is safeguarded by the EU judicial system, which consists of Member State courts and the CJEU. *See, e.g.*, *Komstroy*, ¶¶ 43-46. The keystone of that judicial system is the preliminary ruling procedure set forth in Article 267 of the TFEU. National courts may (and, where they are courts of final instance, must) refer any relevant question of interpretation of EU law raised in proceedings before them to the CJEU for a preliminary ruling.  In addition, Article 344 of the TFEU prohibits Member States from creating dispute-settlement mechanisms other than those set out in the EU Treaties on any matters implicating EU law. This includes the application of international agreements to which the EU and its Member States are a party, insofar as their intra-EU application is concerned. *See* Case C-459/03, *Commission v. Ireland* ("*Mox Plant*"), 30 May 2006, EU:C:2006:345, ¶¶ 121-133. Articles 267 and 344 grant the CJEU exclusive jurisdiction to issue final and binding interpretations of EU law and thus guarantee the correct and uniform application of EU law in all the numerous areas in which it is applicable. Articles 267 and 344 of the TFEU thus "ensure that the specific characteristics and the autonomy of [the EU] legal order are preserved." Opinion 2/13, ¶ 174; *Achmea*, ¶ 35; *Komstroy*, ¶ 45.

Finally, relations between EU Member States are governed by the principle of "mutual trust," including the trust in each others' judiciaries, which, in the words of the CJEU, is what "allows an area without internal borders to be created and maintained." Opinion 2/13, ¶ 191.

The principles of autonomy, primacy, conformity through interpretation, effective implementation of EU law, and mutual trust are central to a proper understanding of the issues in dispute in this case.

### B.      The Energy Charter Treaty ("ECT")

The purpose of the ECT[3], concluded as part of a conference convened at the initiative of the EU, was to create a framework for energy cooperation between the EU on the one hand, and the former communist countries of Central and Eastern Europe on the other.[4] The ECT was intended to facilitate those countries' transition to the market economy, prepare them for eventual accession to the EU, and enhance energy security, efficiency and cooperation throughout Europe and its immediate vicinity by extending the free-market principles of the EU's existing internal market and energy policy—governed by the EU Treaties and secondary law—beyond the EU's borders. The ECT was thus an instrument of the EU's external energy policy, in which the EU and its Member States acted together as a single block.[5]

The ECT expressly provides that, in addition to states, "Regional Economic Integration Organizations" may accede to the treaty and consent to be bound by it. ECT art. 1(2), (3), (10). The technique of the EU acceding to a treaty as a Regional Economic Integration Organization has long been accepted and understood by the international community as allowing the EU and its Member States to act as a single entity of public international law, bound by treaty obligations to

---

[3] Energy Charter Treaty and its Protocol on Energy Efficiency and Related Environmental Aspects, *adopted* Dec. 17, 1994, *entered into force* April 16, 1998, 2080 U.N.T.S 95 (1995) ("ECT").

[4] As noted in the Final Act of the European Energy Charter Conference: "Following discussion of the Commission's proposal in the Council of the European Communities, the *European Communities* invited the *other* countries of western and eastern Europe, of the Union of Soviet Socialist Republics and the non-European members of the Organization for Economic Cooperation and Development to attend a conference in Brussels in July 1991 to launch negotiations on the European Energy Charter." 1998 O.J. (L69) 5 (emphasis added).

[5] The ECT was signed by the EU as well as its Member States because at the time, the EU did not possess full, exclusive external competence over all matters to which the ECT applied.

other contracting parties but not as between themselves.[6] It signals the acknowledgement by the ECT's contracting parties of the EU's special features, including the fact that the EU and its Member States assume no *inter se* obligations when they enter into that treaty together.

## ARGUMENT

### I.      Article 26 of the Energy Charter Treaty must be interpreted as not applying to intra-EU disputes

The question whether intra-EU arbitration under the ECT and its dispute-resolution provision, Article 26, is compatible with EU law has been an issue of substantial controversy in arbitral and academic circles in recent years. In 2018, the CJEU issued a landmark judgment in *Slovak Republic v. Achmea BV*, confirming that Articles 267 and 344 of the TFEU "must be interpreted as precluding a provision in an international agreement concluded between Member States" that permits "an investor from one of those Member States … in the event of a dispute concerning investments in the other Member States, [t]o bring proceedings against the latter Member State before an arbitral tribunal … ." *Achmea*, ¶ 60. While the Commission and the vast majority of EU Member States understood that those same principles also preclude intra-EU arbitration under the ECT,[7] a few EU Member States refrained from taking a position, considering that the issue would need to be resolved in "a specific judgment on this matter."[8]

---

[6] *See, e.g.*, Albert Bleckmann, *The Mixed Agreements of the EEC in Public International Law*, *in* David O'Keeffe & Henry G. Schermers, *Mixed Agreements* 155, 158 (1983) (noting "the general presumption that when the EEC and its Member States cooperate in the conclusion of … mixed agreements … [they] act as a unity vis-à-vis the third States"); *id.* at 163; Vera Rodenhoff, *Die EG und ihre Mitgliedstaaten als völkerrechtliche Einheit bei umweltvölkerrechtlichen Übereinkommen* [*The EC and its member states as entity of public international law in international environmental agreements*] 26-27 (2008) (referring to the concept of the "entity of public international law"); Eleftheria Neframi, *The Duty of Loyalty*, 47 Common Market L. Rev. 323, 335 n.45 (2010) ("the European group (EU and Member States) appears as a single contracting party").

[7] Declaration of the Representatives of the Governments of the Member States, of 15 January 2019, on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union, https://bit.ly/2QXx36m;

[8] Declaration of the Representatives of the Governments of the Member States, of 16 January on the Enforcement of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union,

On September 2, 2021, the CJEU, sitting as a Grand Chamber of fifteen distinguished judges—a configuration reserved for matters of high importance—issued just such a judgment in *Republic of Moldova v. Komstroy*, dispelling any remaining doubt. The Court held: "*Article 26(2)(c) ECT* must be interpreted as *not being applicable* to disputes between a *Member State* and an *investor of another Member State* concerning an investment made by the latter in the first Member State." *Komstroy*, ¶ 66 (emphasis added).

As Spain has argued, *see* Notice of Suppl. Authority, ECF No. 47, at 3, that holding means that this Court lacks subject-matter jurisdiction under the FSIA. It also means that the arbitral award is not entitled to full faith and credit, thus precluding enforcement under 22 U.S.C. § 1650a.

### A. The CJEU has confirmed that intra-EU arbitration under Article 26 of the ECT conflicts with the EU Treaties and fundamental principles of EU law

*Komstroy* was a case referred to the CJEU by the Paris Court of Appeal, which requested a preliminary ruling on several questions relating to the interpretation of the term "investment" in the ECT. Several EU Member States and the Commission urged the CJEU to also address whether Article 26 applies intra-EU, particularly given the significant number of pending arbitration proceedings and enforcement proceedings in the courts and tribunals of third countries, including in the United States, that implicated this issue. Numerous such courts had recognized that considerations of judicial efficiency and international comity supported allowing the question of the intra-EU applicability of Article 26 to be decided within the EU, because "the issue is of importance to the EU and better suited for initial review in their courts." *CEF Energia, B.V. v. Italian Republic*, No. 19-cv-3443 (KBJ), 2020 WL 4219786, at *7 (D.D.C. July 23, 2020) (quoting

---

https://bit.ly/2Xi4C7H; Declaration of the Government of Hungary, of 16 January 2019, on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union, https://bit.ly/3hFXcWg.

*Novenergia II – Energy & Env't (SCA) v. Kingdom of Spain*, No. 18-cv-1148 (TSC), 2020 WL 417794, at *4 (D.D.C. Jan. 27, 2020)); *see also Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, 397 F. Supp. 3d 34, 40 (D.D.C. 2019) (discussing international comity); *InfraRed Environmental Infrastructure GP Ltd. v. Kingdom of Spain*, No. 20-817 (JDB), 2021 WL 2665406, at *5 (D.D.C. June 29, 2021) ("the CJEU's decision may provide further persuasive authority to guide this Court's eventual resolution of these sensitive international questions").

In its judgment, the CJEU addressed the issue and held that "Article 26(2)(c) ECT must be interpreted as not being applicable to disputes between a Member State and an investor of another Member State concerning an investment made by the latter in the first Member State." *Komstroy* ¶ 66. That conclusion flowed from two important principles.

The first is the settled principle, "enshrined … in Article 344 TFEU," that "an international agreement cannot affect the allocation of powers laid down by the Treaties, and hence the autonomy of the EU system, observance of which is ensured by the Court." *Id.* ¶ 42. The CJEU noted that, "in order to ensure that th[e] specific characteristics [of the EU legal framework] and the autonomy of the legal order thus created are preserved, the Treaties have established a judicial system intended to ensure consistency and uniformity in the interpretation of EU law." *Id.* ¶ 45. The CJEU explained that "it is for the national courts and tribunals and the Court to ensure the full application of that law in all the Member States and to ensure effective judicial protection of the rights of individuals under that law, the Court having exclusive jurisdiction to give the definitive interpretation of that law." *Id.* The procedure set forth in Article 267 of the TFEU, by which national courts refer questions of interpretation and application of EU law raised in proceedings before them to the CJEU for a preliminary ruling, is the "keystone of th[at] judicial system." *Id.* ¶ 46.

The CJEU went on to note that arbitral tribunals convened under Article 26 of the ECT are required to interpret and even apply EU law, not least because the ECT itself—as an agreement to which the EU and its Member States are party—forms part of EU law. However, such tribunals are not located within the EU judicial system and cannot be regarded as a court or tribunal of a Member State within the meaning of Article 267 of the TFEU, and as a consequence are not "subject to mechanisms capable of ensuring the full effectiveness of the rules of the European Union." *Id.* ¶ 51; *see id.* ¶¶ 48-59. "[T]he exercise of the European Union's competence in international matters cannot extend to permitting, in an international agreement, a provision according to which a dispute between an investor of one Member State and another Member State concerning EU law may be removed from the judicial system of the European Union such that the full effectiveness of that law is not guaranteed." *Id.* ¶ 62.

In other words, if Article 26 of the ECT were to apply intra-EU, it would enable EU investors to opt out of the EU judicial system and seek resolution of questions pertaining to EU law outside that system. Allowing such a result would violate the obligation, flowing from Article 344 of the TFEU, to submit all disputes concerning the interpretation and application of EU law to the EU judicial system and would radically alter the institutional setting laid down in the EU Treaties. Thus, the CJEU held that intra-EU investment arbitration under the ECT violates the essential features of the EU legal order described above—effectively clarifying that the logic of its previous judgment in *Achmea* (which concerned intra-EU bilateral investment treaties) applies equally to intra-EU arbitration under the ECT. *Id.* ¶¶ 42-63.

The second important principle underlying the *Komstroy* judgment is the recognition that "despite the multilateral nature of the international agreement of which it forms part, a provision such as Article 26 ECT is intended, in reality, to govern bilateral relations between two of the

Contracting Parties, in an analogous way to the provision of the bilateral investment treaty at issue in the case giving rise to the judgment of 6 March 2018." *Id.* ¶ 64. The CJEU's recognition in this regard echoed the analysis provided by Advocate-General Maciej Szpunar,[9] who, in reaching the conclusion that intra-EU application of Article 26 is incompatible with EU law, noted that the ECT's investment-protection obligations "apply only bilaterally, between two Contracting Parties" Case C-741/19, Opinion of Advocate General Maciej Szpunar, *Republic of Moldova v. Komstroy*, 3 March 2021, EU:C:2021:164, ¶ 42 & n.22 (citing the judgment of the International Court of Justice in *Barcelona Traction, Light & Power Co., Ltd.* (Belg. v. Spain), 1970 I.C.J. 3, 32-33 ¶¶ 33, 35 (Feb. 5)).

The bilateral nature of the obligations set forth in Article 26 of the ECT means that when, in a given dispute, the intra-EU interpretation of that provision is at stake, the matter may be resolved between those contracting parties alone. In other words, the question of the intra-EU application of Article 26 of the ECT is a matter internal to the EU legal system and does not implicate the rights of third countries that are also contracting parties to the ECT.

As explained above, *supra* pp. 7-8, within the EU legal order, international agreements to which the EU is a party must be interpreted to be consistent, rather than in conflict, with higher-ranking norms and principles of EU primary law. While the interpretation the CJEU set forth by in *Komstroy* may not be the only possible interpretation of Article 26 of the ECT, it is the only interpretation that prevents a conflict with primary law (*i.e.*, the EU Treaties) and therefore must be preferred as an expression of the principle of conformity through interpretation.[10]

---

[9] Advocates General are officials appointed to the CJEU who are tasked with providing impartial, independent submissions in certain cases before the CJEU. TFEU art. 252.

[10] *See also* Benvenisti & Waibel Decl., ECF No. 27 ¶¶ 32-37 (reaching the same conclusion as a matter of treaty interpretation under Article 31(3)(a) of the Vienna Convention on the Law of Treaties, *opened for signature* May 23, 1969, 1155 U.N.T.S. 331).

Thus, the CJEU has now confirmed in a binding and authoritative manner that intra-EU arbitration under Article 26 of the ECT is incompatible with the EU Treaties. Importantly, that interpretation has effect from the moment EU law entered into force for the Parties involved. It is well-established that the CJEU's judgments apply *ex tunc*. Case 24/86, *Blaizot v. University of Liège*, 2 Feb. 1988, EU:C:1988:43, ¶ 27; Case C-676/19 P, *Gollnisch v. European Parliament*, 12 Nov. 2020, EU:C:2020:916, ¶ 48; *cf. Access to German Minority Schools in Upper Silesia*, 1931 P.C.I.J Series A/B, No. 40, at 19 (making a similar point in the context of decisions of international courts and stating that "in accordance with the rules of law, the interpretation given by the Court to the terms of the Convention has retrospective effect—in the sense that the terms of the Convention must be held to have always borne the meaning placed upon them by this interpretation"); *Rivers v. Roadway Exp., Inc.*, 511 U.S. 298, 312-13 (1994) ("A judicial construction of a statute is an authoritative statement of what the statute meant before as well as after the decision of the case giving rise to that construction."). Only "exceptionally" will the CJEU impose temporal limitations on an interpretation of EU law, *Blaizot* ¶ 28, and no such circumstances existed in *Komstroy*.

Finally, the CJEU's decisions on the interpretation and application of EU law, including the ECT, are binding in the legal orders of all EU Member States. *See* TFEU art. 344. Accordingly, the CJEU's ruling in *Komstroy* means that the arbitral award that Petitioners obtained was rendered in violation of Article 26 of the ECT (because the arbitral tribunal wrongly interpreted that provision) and violates fundamental rules of EU law (the general principles of autonomy and mutual trust as well as Article 19(1) of the TEU and Articles 267 and 344 of the TFEU). This means that it cannot be recognized or enforced in any EU court. *See* Bundesgerichtshof Order, *Slovak Republic v. Achmea B.V.* (Oct. 31, 2018), I ZB 2/15 (English translation) (attached as

Exhibit A) (order of German court annulling the *Achmea* award in light of the CJEU's judgment in *Achmea*).

### B.   The CJEU's judgment applies as an interpretation of international law binding on all EU Member States

Petitioners cannot evade the conclusion that *Komstroy* precludes enforcement of their award by arguing that EU law is merely "internal law" that does not affect Spain's international law obligations under the ECT. *See* Pet'rs' Resp. to Spain's Mot. to Dismiss and Reply in Supp. of Pet. To Enforce Arbitral Award at 28, ECF No. 19. EU law is itself public international law binding on all EU Member States. The EU legal order derives from international treaties that create binding obligations between their Member States on the international plane. While the CJEU has treated the EU legal order as special given the far-reaching goals of the EU treaties, the CJEU has never denied its international character. *See, e.g.*, Case 26-62, *Van Gend & Loos*, 5 Feb. 1963, EU:C:1963:1, at p. 12 ("the Community constitutes a new order of international law"); *Achmea*, ¶ 41 (EU law "deriv[es] from an international agreement between the Member States").

EU law—including as articulated in decisions of the CJEU—is international law applicable between EU Member States. The EU Member States have entrusted the CJEU with the authority to interpret that international law in a final and binding manner. TEU art. 19; TFEU art. 344. That authority includes the interpretation of international agreements to which the EU is a party, insofar as their application between EU Member States is concerned. *See Mox Plant*, EU:C:2006:345, ¶¶ 121-133; *id.* ¶ 132 (recognizing that "an international agreement … cannot affect the exclusive jurisdiction of the [CJEU] in regard to the resolution of disputes between Member States concerning the interpretation and application of Community law"); *id.* ¶ 82 (noting that international agreements to which the European Community and its Member States are party "form an integral part of the Community legal order").

As an arbitral tribunal presided over by Judge James Crawford put it,

> For just as the European treaties are part of international law, so the CJEU, which exercises jurisdiction as between EU Member States, is an international court whose decisions are binding on those states *inter se*. International law allows the states parties to a regime treaty to establish their own international courts with jurisdiction over and authority to bind the Member States on issues of international law affecting them.

*BayWa r.e. Renewable Energy GmbH v. Kingdom of Spain*, Decision on Jurisdiction, Liability, and Directions on Quantum, ICSID Case No. ARB/15/16 (2 Dec. 2019), ¶ 280 (emphasis added).[11]

Petitioners' false distinction between international law and EU law further relies on the assumption that the ECT creates only multilateral international obligations that necessarily supersede Spain's EU-law obligations. *See* ECF No. 19, at 23. But as explained above, *supra* p.13-14, the CJEU squarely rejected that assumption in *Komstroy*, noting that "despite the multilateral nature of the international agreement of which it forms part, a provision such as Article 26 ECT is intended, in reality, to govern bilateral relations between two of the Contracting Parties, in an analogous way to the provision of the bilateral investment treaty at issue in the case giving rise to the [*Achmea*] judgment." *Komstroy*, ¶ 64 (citation omitted). International law authorities confirm the point. The International Court of Justice, for example, has recognized the "essential distinction … between the obligations of a State towards the international community as a whole, and those [like protections for foreign investments or foreign nationals] arising vis-à-vis another State in the field of diplomatic protection." *Barcelona Traction*, 1970 I.C.J. ¶ 33; *id.* ¶ 35; *see also* Report of the Study Group of the Int'l Law Comm'n, *Fragmentation of International Law*, UN Doc. No. A/CN.4/L.682 (2006), ¶¶ 295-313; *Draft Articles on Responsibility of States for Internationally*

---

[11] James Crawford was an eminent academic and practitioner in the field of public international law, who served on the International Court of Justice from 2015 until his death in 2021.

*Wrongful Acts, with commentaries*, art. 42, cmts. 5-10, U.N. Doc. A/56/10 (2001).[12] Numerous scholars have explained that Article 26 of the ECT creates bilateral relationships. *See, e.g.*, Julian Scheu & Petyo Nikolov, *The Incompatibility of Intra-EU Investment Treaty Arbitration with European Union Law*, 62 German Y.B. Int'l L. 475, 492-493 (2021); Danae Azaria, *Treaties on Transit of Energy via Pipelines and Countermeasures* 132 (2015), ECF No. 27-11; Thomas W. Wälde, *International Investment Law: An Overview of Key Concepts and Methodology*, Transnat'l Disp. Mgmt., July 2007, at 48-49 n. 104, ECF No. 28-1.

## II. The CJEU's authoritative decision regarding the incompatibility of intra-EU arbitration under the ECT with the EU Treaties merits deference

As noted, the CJEU's decision in *Komstroy* means that intra-EU arbitral awards like the one at issue in this case cannot be recognized and are unenforceable in the courts of any EU Member State. But the CJEU's decision, by confirming that Spain had not offered to arbitrate its dispute with Petitioners here—and therefore that no arbitration agreement existed—also precludes enforcement of the award in this Court.

### A. This Court has the authority and obligation to determine whether an arbitration agreement between Spain and Petitioners existed

The arbitral tribunal that issued the award being contested here held that it had jurisdiction to hear Petitioners' ECT claims.  But that determination is not binding on this Court, which has an "affirmative" and "independent obligation" to assure itself that it has subject-matter jurisdiction under one of the FSIA's enumerated exceptions to immunity. *Sisso v. Islamic Republic of Iran*, 448 F. Supp. 2d 76, 80-81 (D.D.C. 2006); *see also, e.g. Balkan Energy Ltd. v. Republic of Ghana*,

---

[12] *See also* Joost Pauwelyn, *Conflict of Norms in Public International Law* 74-75 (2003) (discussing the bilateral nature of obligations created by international treaties), ECF No. 27-4; Campbell McLachlan, *The Principle of Systemic Integration and Article 31(3)(c) of the Vienna Convention*, 54 Int'l & Comp. L.Q. 279, 315 (2005) (discussing the interpretation of such bilateral obligations), ECF No. 27-5.

302 F. Supp. 3d 144, 150-152 (D.D.C. 2018). Where, as here, petitioners have invoked the FSIA's arbitration exception, 28 U.S.C. § 1605(a)(6), that obligation means that the Court must decide whether petitioners have established "the existence of an arbitration agreement." *LLC SPC Stileks v. Republic of Moldova*, 985 F.3d 871, 877-78 (D.C. Cir. 2021) (noting that while arbitrators may determine questions of "arbitrability," *i.e.*, whether an arbitration agreement applies to a given dispute, "the existence of an arbitration agreement" is a "jurisdictional fact[] that must be established" in order to invoke the FSIA's arbitration exception). That is a question for this Court, not the arbitral panel, to decide. *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019) ("the court determines whether a valid arbitration agreement exists"); *Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*, 850 F.2d 756, 761 (D.C. Cir. 1988).

Petitioners try to bypass this inquiry by invoking the FSIA's waiver exception, 28 U.S.C. § 1605(a)(1). But as Spain has argued, that exception does not apply here. ECF No. 18-1, at 24-28; ECF No. 25, at 16-19. Petitioners contend that Spain's ratification of the ICSID Convention[13] constitutes an implied waiver of immunity from enforcement actions for the purposes of § 1605(a)(1). ECF No. 19, at 2. But it is well-established that the FSIA's implied-waiver exception is to be construed narrowly, and applies only where there is "strong evidence" that the foreign state "intended to waive its sovereign immunity." *Khochinsky v. Republic of Poland*, 1 F.4th 1, 8 (D.C. Cir. 2021); *Creighton Ltd. v. Gov't of Qatar*, 181 F.3d 118, 122 (D.C. Cir. 1999); *Foremost-McKesson v. Islamic Republic of Iran*, 905 F.2d 438, 444 (D.C. Cir. 1990). Accordingly, as the D.C. Circuit recently explained, it has "found the requisite evidence of a foreign state's intent to qualify as an implied waiver of sovereign immunity 'in only three circumstances': (i) the state's

---

[13] Convention on Settlement of Investment Disputes between States and Nationals of Other States, Mar. 18, 1965, 17 U.S.T. 1270, 575 U.N.T.S. 159.

'executing a contract containing a choice-of-law clause designating the laws of the United States as applicable; (ii) the state's 'filing a responsive pleading without asserting sovereign immunity; or (iii) the state's 'agreeing to submit a dispute to arbitration in the United States.'" *Khochinsky*, 1 F.4th at 8-9. "[C]ourts have been reluctant to stray beyond these examples when considering claims that a nation has implicitly waived its defense of sovereign immunity." *Id.* at 9 (citation omitted).

A foreign sovereign's ratification of the ICSID Convention does not fall into any of these three recognized categories; nor does it otherwise evince that sovereign's intent to waive immunity from an action to enforce an award that was not premised on valid consent to arbitration. Indeed, the ICSID Convention itself, by its terms, applies only where the contracting party has validly consented to arbitrate the dispute.  ICSID Convention art. 25. The fact that the very existence of an arbitration agreement is disputed here distinguishes this case from the Second Circuit's decision in *Blue Ridge Investments, L.L.C. v. Republic of Argentina*, 735 F.3d 72 (2d Cir. 2013), where there was no question that the foreign sovereign had entered into a valid arbitration agreement.

The unpublished per curiam decision in *Tatneft v. Ukraine*, 771 F. App'x 9 (D.C. Cir. 2019), cited in Petitioners' notice of supplemental authority, beyond lacking precedential effect, *see Process & Indus. Dev. v. Fed. Republic of Nigeria*, 962 F.3d 576, 584 (D.C. Cir. 2020), is inapposite for the same reason. In *Tatneft*, there was no question regarding the existence of a valid arbitration agreement between Ukraine and the investor—the only question was whether the investor's claims fell within the scope of that agreement. *See Tatneft v. Ukraine*, 301 F. Supp. 3d 175, 188, 192 (D.D.C. 2018). It would be illogical to hold that a foreign sovereign waives its immunity to the enforcement of an arbitral award where it never validly consented to arbitration in the first place.

Thus, whether for purposes of the arbitration exception, § 1605(a)(6), or the implied waiver exception, § 1605(a)(1), the Court has an independent obligation to inquire into the existence of an arbitration agreement.

### B.      The Court should accord deference to the CJEU's decision in *Komstroy*

In analyzing whether an arbitration agreement exists here, the Court should accord the highest level of deference to the CJEU's decision in *Komstroy* on the interpretation of the ECT and the EU Treaties. As the Supreme Court has indicated, U.S. courts "should give respectful consideration to the interpretation of an international treaty rendered by an international court with jurisdiction to interpret such." *Breard v. Greene*, 523 U.S. 371, 375 (1998) (per curiam).

The CJEU is the highest judicial authority in the EU, with exclusive competence to issue binding, authoritative interpretations of EU law. The CJEU is also the entity that EU Member States have charged with issuing authoritative interpretations of the ECT, at least insofar as it applies in intra-EU relations. *See* TFEU art. 344. The ECT itself does not entrust any particular international court with the authority to issue binding interpretations of it; instead, it foresees state-to-state arbitration. With respect to the intra-EU application of the ECT, therefore, the EU Treaties provide the mechanism for obtaining authoritative interpretations of the ECT. *See id.*; *Mox Plant*, EU:C:2006:345, ¶¶ 121-133 (explaining that, due to the European Community's accession to the UN Convention on the Law of the Sea, that Convention "form[ed] part of the Community legal order" and the CJEU therefore had exclusive jurisdiction to deal with disputes relating to the interpretation and application of the Convention as between Member States).

According deference to the CJEU's conclusions also comports with principles of international comity. Federal courts generally defer to the decisions of foreign courts on the meaning of the laws that such courts are charged with interpreting and applying, as a matter of the

mutual respect that characterizes relationships between sovereigns. *See, e.g.*, *Hilton v. Guyot*, 159 U.S. 113, 163-64, 202-03 (1895); *Animal Sci. Prods. Inc. v. Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865, 1874 (2018) (analogizing to the rule that "[i]f the relevant state law is established by a decision of the State's highest court, that decision is binding on the federal courts" (cleaned up)). Such deference "fosters international cooperation and encourages reciprocity, thereby promoting predictability and stability through satisfaction of mutual expectations." *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 937 (D.C. Cir. 1984). *See also Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct.*, 482 U.S. 522, 543 n.27 (1987) (discussing comity).

Respect and deference to the CJEU's decision are particularly warranted here given the importance of the issue to the interests of the EU. Whether arbitration of Petitioners' dispute with Spain pursuant to Article 26 of the ECT is compatible with the EU Treaties has consequences far beyond the four corners of this dispute. The question implicates not just EU law but also the structure of the EU legal order, including the role and jurisdiction of EU courts and the interpretation and application of EU law by non-EU adjudicatory bodies, and the future of the ECT and of investor-State arbitration within the EU. The CJEU's conclusion that Article 26 of the ECT must be interpreted to preclude intra-EU arbitration was the culmination of nearly two years of comprehensive proceedings and deliberations. Those proceedings included extensive briefing by the parties and submissions by multiple EU Member States (including Member States that expressed doubts as to whether the judgment in *Achmea* applied to Article 26 of the ECT), the Commission, and the Council of the EU,[14] as well as analysis and conclusions offered by an Advocate General of the CJEU.

---

[14] The Council of the EU is an institution composed of government ministers from each EU Member State.

For a U.S. court now to second-guess the CJEU's considered judgment on questions of such consequence to the EU legal order would greatly risk offending principles of international comity. It would also throw open the doors of the federal courts to a flood of actions brought by EU investors seeking to enforce arbitral awards they have obtained against EU Member States—awards that are unenforceable anywhere in the EU. That outcome would be particularly anomalous given that intra-EU arbitral awards by nature have little—if any—connection to the United States. This case illustrates the point: None of the parties to the underlying dispute between Petitioners and Spain are U.S. citizens, no U.S. property is at issue, and none of the underlying events took place on U.S. territory. U.S. law is only implicated to the extent that the Petitioners have asserted jurisdiction under the FSIA and seek to enforce the award in the United States under the ICSID Convention and 22 U.S.C. § 1650a. Rather than embroil itself in the EU's internal affairs, this Court should defer to the CJEU's interpretation of Article 26 of the ECT and its determination that intra-EU arbitration under the ECT is inconsistent with the EU Treaties, find that Spain did not consent to arbitration, and dismiss the petition.

## III. Even if the Court had jurisdiction, permitting enforcement of the award would improperly intrude on EU law

Finally, as Spain has argued, even if the Court had subject-matter jurisdiction and the award were entitled to full faith and credit (neither of which is so for the reasons already explained), the foreign sovereign compulsion doctrine would still bar enforcement. That doctrine holds that U.S. courts should abstain from granting relief that would compel entities to take actions that would violate the laws of a foreign sovereign. *See O.N.E. Shipping Ltd. v. Flota Mercante Grancolombiana S.A.*, 830 F.2d 449, 453 (1987). As the D.C. Circuit has explained, "[p]rinciples of international comity require that domestic courts not take action that may cause the violation of

another nation's laws." *F.T.C. v. Compagnie de Saint-Gobain-Pont-à-Mousson*, 636 F.2d 1300, 1327 n. 150 (D.C. Cir. 1980).

Enforcement of this intra-EU award would place Spain in violation of the EU Treaties' rules on government support, known as State aid. Petitioners' claims in the underlying arbitration concerned Spanish measures to support renewable energy, which were intended to achieve the renewable energy targets laid down in the EU's Renewable Energy Directive, which is part of the EU's internal market energy legislation. *See* Mem. Opinion & Order, ECF No. 36, at 2-3. Petitioners claimed that Spain "unfairly and inequitably" denied them a level of support to which they claimed to be entitled.

EU law prohibits Member States from providing undertakings with *any* public support (known as "State aid"), unless such support was first notified to the Commission and specifically approved by it on defined public policy grounds and in strict compliance with the principles of necessity and proportionality. TFEU art. 107. In its capacity as the EU's State aid regulator, the Commission investigates potential State aid measures and renders legally binding decisions for Member States and investors based on the EU Treaties. TFEU arts. 107 & 108.

The CJEU has held that the Spanish support scheme at issue in the underlying case constitutes State aid, which cannot be paid without the Commission's approval. Case C-275/13, *Elcogás SA v. Administración del Estado*, 22 Oct. 2014, EU:C:2014:2314. The Commission has confirmed that holding. Decision on State Aid, SA.40348, ¶¶ 84 (Nov. 10, 2017). The Commision has likewise determined that compensation awarded by an arbitral tribunal in connection with Spain's support scheme "would constitute in and of itself State aid" that Spain cannot pay unless the Commission authorizes such payment. *Id.* ¶¶ 160, 165; *see also* Decision on State Aid, SA.40171 (Nov. 28, 2016) (same regarding Czech Republic).

In compliance with Decision on State Aid, SA.40348, Spain has notified the Commission of the award issued in the arbitration underlying this case, and the Commission has opened a formal investigation to assess "the compatibility of the award with the internal market." *See* Decision on State Aid, SA.54155 (2021/NN), ¶ 94 (July 19, 2021) (attached as Exhibit B). The Commission "underline[d] Spain's obligation not to pay the compensation pending the Commission's formal investigation on the present measure. The Commission recalls that this obligation applies irrespective of Articles 53 to 55 of the ICSID Convention." *Id.* at 30. All interested parties—including Spain, Petitioners, and Member States and other interested third parties—will have an opportunity to submit comments on the issues raised in the Commission's investigation. *Id.* Petitioners may challenge the Commission's decision to open an investigation in EU courts. *See, e.g.*, Case C-400/99, *Italian Republic v. Commission*, 9 Oct. 2001, EU:C:2001:528. They may also seek redress in EU courts in the event the Commission ultimately declines to authorize payment of the award. Rather than subject Spain to conflicting legal obligations—or place Spain in violation of its EU law obligations—this Court should dismiss the petition so that these issues can be resolved in the EU legal system.

## CONCLUSION

For the foregoing reasons and those set forth in Spain's submissions, the Court should grant Spain's motion to dismiss.

Dated: September 17, 2021

Respectfully submitted,

*s/ R. Stanton Jones*

R. Stanton Jones (D.C. Bar No. 987088)
Sally L. Pei (D.C. Bar No. 1030194)
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC  20001-3743
T: (202) 942-5000
stanton.jones@arnoldporter.com
sally.pei@arnoldporter.com

*Counsel for Amicus Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 17, 2021, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system.

*/s/ R. Stanton Jones*
R. Stanton Jones