IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Infrastructure Services Luxembourg S.A.R.L.
and Energia Termosolar B.V.,

_Petitioners_,

_v._

Kingdom of Spain,

_Respondent._

Civil Action No. 1:18-cv-01753-EGS

**Petitioners' Supplemental Brief in Response to the
European Commission's _Amicus_ Brief in Support of the
<u>Kingdom of Spain's Motion to Dismiss the Petition or Stay the Proceeding</u>**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................... ii

GLOSSARY ......................................................................................................... v

INTRODUCTION ................................................................................................. 1

ARGUMENT ........................................................................................................ 2

    I.    The Commission's *Amicus* Brief Does Not Impact This Case ................................... 2

    II.    The Tribunal Correctly Determined That Spain Consented To Arbitration ................ 4

        A.    The ECT's Plain Text And Context Provide For Intra-EU Arbitration .............. 4

        B.    Spain's Consent To Intra-EU Arbitration Is Valid Under International Law ................................................................................................... 7

        C.    EU Law Does Not Justify "Interpreting" The ECT Contrary To Its Plain Text ...................................................................................................... 10

    III.    The Commission's State-Aid Arguments Fail For The Same Reasons As Spain's ................................................................................................... 13

CONCLUSION .................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*,
   138 S. Ct. 1865 (2018)......................................................................................... 3, 11, 12

*BCB Holdings Ltd. v. Gov't of Belize*,
   650 F. App'x 17 (D.C. Cir. 2016) ......................................................................15

*Bowen v. Georgetown Univ. Hosp.*,
   488 U.S. 204 (1988) ...............................................................................................3

*Breard v. Greene*,
   523 U.S. 371 (1998) .............................................................................................11

*CEF Energia, B.V. v. Italian Republic*,
   2020 WL 4219786 (D.D.C. July 23, 2020)......................................................12

*Chevron Corp. v. Republic of Ecuador*,
   795 F.3d 200 (D.C. Cir. 2015) ..........................................................................2, 3

*Choctaw Nation of Indians v. United States*,
   318 U.S. 423 (1943) ...............................................................................................5

*In re Grant*,
   635 F.3d 1227 (D.C. Cir. 2011) ...........................................................................3

*Hicks v. Miranda*,
   422 U.S. 332 (1975) ...............................................................................................3

*Hilton v. Guyot*,
   159 U.S. 113 (1895) .............................................................................................12

*Laker Airways Ltd. v. Sabena, Belgian World Airlines*,
   731 F.2d 909 (D.C. Cir. 1984) ...........................................................................12

*LLC SPC Stileks v. Republic of Moldova*,
   985 F.3d 871 (D.C. Cir. 2021) ..........................................................................2, 15

*Newco Ltd. v. Gov't of Belize*,
   650 F. App'x 14 (D.C. Cir. 2016) ....................................................................13, 15

*Novenergia II – Energy & Env't (SCA) v. Kingdom of Spain*,
   2020 WL 417794 (D.D.C. Jan. 27, 2020) ..........................................................12

# TABLE OF AUTHORITIES (*CONTINUED*)

**Page**

*Owner-Operator Indep. Drivers Ass'n, Inc. v. U.S. Dep't of Transp.*,
   724 F.3d 230 (D.C. Cir. 2013) .............................................................................9

*PPL Corp. v. Comm'r*,
   569 U.S. 329 (2013) ...........................................................................................3

*Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*,
   962 F.3d 576 (D.C. Cir. 2020) .............................................................................3

*Tatneft v. Ukraine*,
   771 F. App'x 9 (D.C. Cir. 2019) ..........................................................................2

*Tatneft v. Ukraine*,
   21 F.4th 829 (D.C. Cir. 2021) ............................................................................15

*Tethyan Copper Co. PTY Ltd. v. Islamic Republic of Pakistan*,
   2022 WL 715215 (D.D.C. Mar. 10, 2022)............................................................2

*TMR Energy Ltd. v. State Prop. Fund of Ukraine*,
   411 F.3d 296 (D.C. Cir. 2005) ...........................................................................15

*United States v. Ali*,
   718 F.3d 929 (D.C. Cir. 2013) .............................................................................5

*In re Vitamin C Antitrust Litig.*,
   810 F. Supp. 2d 522 (E.D.N.Y. 2011) ................................................................15

*Whitman v. American Trucking Assns., Inc.*,
   531 U.S. 457 (2001) ...........................................................................................7

**Foreign Judicial and Administrative Decisions**

European Commission, Decision on State Aid SA.54155 (2021/NN), ¶ 94 (July
   19, 2021)...........................................................................................................14

European Commission, Decision on State Aid S.A. 38517 (2014/C) (ex
   2014/NN), Arbitral Award, *Micula v. Romania*, 2015 O.J. L 232/43 ¶ 79
   (Sept. 4, 2015)...................................................................................................14

*Matthews v. United Kingdom*, 28 EHRR 361, ¶¶ 26-35 (1999) ...................................8

*Republic of Moldova v. Komstroy LLC*,
   ECLI:EU:C:2021:655 (Sept. 2, 2021) ...................................................................4

## TABLE OF AUTHORITIES (*CONTINUED*)

**Page**

**Arbitration Decisions**

Decision on Jurisdiction, Liability and Directions on Quantum ¶ 502(16), *Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*, ICSID Case No. ARB/15/42 (Mar. 9, 2020) .................................................................... 9

*Vattenfall AB v. Fed. Republic of Germany*, ICSID Case No. ARB/12/12, Decision on Achmea Issue ¶ 195 (Aug. 31, 2018) ............................................... 10

**Treaties**

Optional Protocol Concerning the Compulsory Settlement of Disputes, art. 1 (Apr. 24, 1963) .......................................................................................................... 12

Vienna Convention, art. 31 ......................................................................... 3, 5, 11

**Statutes and Rules**

22 U.S.C. § 1650a ...................................................................................... 1, 2, 13

28 U.S.C. § 1605 ..................................................................................................... 2

D.C. Cir. R. 32.1(b)(1)(B) ..................................................................................... 2

**Other Authorities**

Sir Humphrey Waldock (Special Rapporteur on the Law of Treaties), *Sixth Report on the Law of Treaties*, UN Doc. A/CN.4/186 and Add.1-7, [1966] ................................. 4, 5

Statement Submitted by the European Communities to the Secretariat of the ECT Pursuant to Art. 26(3)(b)(ii) of the ECT, [1998] ................................................... 6

## GLOSSARY

**CJEU** ....................................................... Court of Justice of the European Union

**ECT** ......................................................... Energy Charter Treaty

**EU** ........................................................... European Union

**FAA** ........................................................ Federal Arbitration Act

**FSIA** ....................................................... Foreign Sovereign Immunities Act

**ICSID** ..................................................... Convention on the Settlement of Investment Disputes between States and Nationals of Other States

**TFEU** ...................................................... Treaty on the Functioning of the European Union

## INTRODUCTION

Petitioners Infrastructure Services Luxembourg S.A.R.L. and Energia Termosolar B.V. brought this proceeding against Spain to confirm an arbitral award, ECF No. 1-1, Ex. A (the "Award"), entered pursuant to the Energy Charter Treaty, ECF No. 1-3 (the "ECT"), and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, ECF No. 1-2 (the "ICSID Convention").  Although Congress enacted a streamlined process for confirming ICSID awards without any substantive defenses, 22 U.S.C. § 1650a, this action has now generated more than 100 pages of briefs by the parties and six expert declarations on issues of European Union ("EU") and international law that, as Petitioners have shown, have no bearing on Petitioners' express statutory right to enforce the Award, ECF No. 19 ("MTD Opp."), at 9-22.

On top of this mountain of largely irrelevant paper, the European Commission—the executive arm of the EU, of which Spain is a member—offers an *amicus* brief supporting Spain's claim that its consent to arbitrate in the ECT was inconsistent with EU law and thus unenforceable under international law.  ECF No. 50-1 ("EC Br.").  The Court need not consider this new brief because the issues it raises could be relevant only if Section 1650a permitted substantive defenses to enforcement.  It does not.  Further, the Commission's brief cannot revive arguments that Spain itself forfeited by not raising them here.  And as an executive body, the Commission speaks with no special authority on EU law, let alone international law.  Its views warrant no special solicitude.

In any event, the Commission's arguments are meritless.  They merely reflect the Commission's renewed effort to obtain through litigation what it failed to obtain in negotiating the ECT: a "disconnection" clause that precludes investors from one EU member from enforcing the treaty against other members ("intra-EU arbitration").  The ECT expressly provides otherwise, and its drafters decidedly rejected disconnection.  The EU itself and all of its members signed the ECT anyway.  For more than a decade, the Commission has nonetheless tried to convince arbitration

tribunals to read intra-EU arbitration out of the ECT based on either a flawed reading of the treaty or an illusory conflict with EU law. *Every* ICSID tribunal to consider this issue has rejected the Commission's arguments. Should the Court reach these issues, it should do the same here.

## ARGUMENT

### I.    The Commission's *Amicus* Brief Does Not Impact This Case

This Court need not reach the Commission's arguments for at least three reasons.

*First*, as Petitioners have explained, U.S. law does not permit any defense to enforcing an ICSID award. MTD Opp. 8-10. Congress mandated that once jurisdiction is established, the Award must be "enforced" and "given the same full faith and credit" as a state court judgment. 22 U.S.C. § 1650a(a). And the Foreign Sovereign Immunities Act's ("FSIA") waiver and arbitration exceptions, 28 U.S.C. § 1605(a)(1), (6), each independently confer that jurisdiction without regard to any challenge to the Tribunal's conclusion that Spain agreed to arbitration. When a foreign state joins a treaty that "contemplate[s] arbitration-enforcement actions in other signatory countries, including the United States"—as the ICSID Convention plainly does—it "waives its immunity from arbitration-enforcement actions" under the FSIA. *Tatneft v. Ukraine*, 771 F. App'x 9, 10 (D.C. Cir. 2019). And under the FSIA's arbitration exception, "arbitrability of a dispute"—including the existence, scope, and validity of the arbitration agreement—"is not a jurisdictional question." *LLC SPC Stileks v. Republic of Moldova*, 985 F.3d 871, 878 (D.C. Cir. 2021); *see also Chevron Corp. v. Republic of Ecuador*, 795 F.3d 200 (D.C. Cir. 2015); *Tethyan Copper Co. PTY Ltd. v. Islamic Republic of Pakistan*, 2022 WL 715215 (D.D.C. Mar. 10, 2022). The Commission's efforts to relitigate and distinguish these binding precedents fail for the same reasons as Spain's virtually identical arguments. MTD Opp. 10-22; ECF No. 48, at 4-9; ECF No. 55, at 1-3. [1]

---

[1]    Though *Tatneft I* is "unpublished," EC Br. 20, it is binding on this Court. Unpublished decisions that postdate January 1, 2002 "may be cited as precedent" in this circuit, D.C. Cir. R.

*Second*, several of the Commission's arguments—including the Commission's attempt to reframe Spain's EU-law objections to intra-EU arbitration as a matter of "interpretation" of the ECT, *see infra* at 10-13—are not properly before this Court because Spain failed to raise them in its motion to dismiss, and thus forfeited them, *see PPL Corp. v. Comm'r*, 569 U.S. 329, 343 n.6 (2013) (refusing to consider argument first raised by *amicus*). Once Petitioners met their "initial burden" of showing that Spain agreed to arbitrate under the ECT, it was Spain's burden to prove that no "valid arbitration agreement" existed. *Chevron*, 795 F.3d at 204-05; MTD Opp. 19-20. The Commission's new arguments cannot cure Spain's failure to meet that burden.

*Third*, while the Commission purports to advance an official position "on behalf of the European Union," EC Br. 1, the Commission speaks with no special authority on EU law, let alone international law. As an executive body, not a court, the Commission's views of EU law—much less its "litigating positions" as an *amicus*, *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988)—lack "conclusive effect," *Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865, 1869 (2018). Regardless, even the most authoritative statement of the EU's views would not control interpretation of the ECT or its effect under international law. Only collective action by all parties to a treaty can modify its plain meaning and effect. Vienna Convention, art. 31(2)(b), (3)(a); *see* MTD Opp. 32; Decl. of Andrea K. Bjorklund ("Bjorklund Decl. I") ¶¶ 91-92; Second Declaration of Andrea Bjorklund ("Bjorklund Decl. II") ¶¶ 37-38.

---

32.1(b)(1)(B), and have the same "precedential value" that "the Supreme Court grants to its own . . . summary affirmances," *In re Grant*, 635 F.3d 1227, 1232 (D.C. Cir. 2011), which are binding on "lower courts," *Hicks v. Miranda*, 422 U.S. 332, 344-45 (1975). Citing the D.C. Circuit's recent decision in *Process & Industrial Developments Ltd. v. Federal Republic of Nigeria*, 962 F.3d 576 (D.C. Cir. 2020), the Commission asserts that *Tatneft* "lack[s] precedential effect." EC Br. 19. But *Process & Industrial Developments* states only that *Tatneft*—like all unpublished decisions—"does not bind future panels" *of the D.C. Circuit*. 962 F.3d at 584. This Court, by contrast, is duty-bound to follow the D.C. Circuit's command, including its unpublished decisions.

## II.    The Tribunal Correctly Determined That Spain Consented To Arbitration

For the reasons just stated, this Court need not and should not reach the merits of the Commission's improper collateral attack on the Tribunal's determination that Spain validly consented to arbitration.  Should the Court nonetheless revisit arbitrability afresh as the Commission urges, it should reject the Commission's arguments.

Like Spain, the Commission does not seriously dispute that the plain terms of the ECT's arbitration provision apply to intra-EU disputes, as the Tribunal held in a binding ruling.  Award ¶¶ 204-30.  The Commission instead regurgitates Spain's EU-law objections, and attempts to recast the EU Court of Justice's ("CJEU") decision in Case No. C-741/19, *Republic of Moldova v. Komstroy LLC*, ECLI:EU:C:2021:655 (Sept. 2, 2021) ("*Komstroy*"), as offering an "interpretation" of the ECT to which this Court must "defer."  EC Br. 14, 21.

But the Commission's EU-law arguments fail for the same reason as Spain's:  The scope of the Tribunal's jurisdiction is governed not by *EU law*, but by *public international law*, and the EU's internal law cannot override Spain's consent and duty under international law to arbitrate the dispute.  Nor are the Commission's EU-law arguments improved when reframed as a matter of "interpretation."  The Commission's strained "interpretation" cannot be squared with the ECT's text and history.  *See* Bjorklund Decl. I ¶¶ 70-110.  Interpretation cannot stretch a treaty beyond its text merely to avoid a conflict with other treaties, and there is no basis for deferring to the CJEU's interpretation of a *multilateral* treaty as a matter of *international* law.  Unsurprisingly, then, all but one arbitral tribunal to consider the Commission's intra-EU objection has rejected it. *See* Bjorklund Decl. II ¶ 93.  Should this Court reach the issue, it should do the same.

### A.    The ECT's Plain Text And Context Provide For Intra-EU Arbitration

It is canon that "the starting point of interpretation is the elucidation of the meaning of the text."  Sir Humphrey Waldock (Special Rapporteur on the Law of Treaties), *Sixth Report on the*

*Law of Treaties*, UN Doc. A/CN.4/186 and Add.1-7, [1966] 2 Y.B. Int'l L. EC 220 ("Waldock Report").  "Basic principles of treaty interpretation—both domestic and international—direct courts to construe treaties based on their text before resorting to extraneous materials."  *United States v. Ali*, 718 F.3d 929, 939 (D.C. Cir. 2013).  As a result, "treaties cannot be rewritten or expanded beyond their clear terms," even "to achieve the asserted understanding of the parties." *Choctaw Nation of Indians v. United States*, 318 U.S. 423, 432 (1943).

As Petitioners have explained—and the Commission apparently agrees, *see* EC Br. 14 n.10—the ECT must be interpreted pursuant to the Vienna Convention, ECF No. 19-7.  *See* MTD Opp. 29.  The Convention adopts a "textual approach" to "treaty interpretation," Waldock Report, at 220, but also requires consideration of certain specified "context," including the treaty's "pre-amble" and "annexes," and interpretations agreed to or accepted by "*all* the parties," Vienna Con-vention, art. 31(2), (2)(a) (emphasis added).  Unilateral interpretations by "one or more parties," by contrast, are not relevant unless "accepted by the other parties."  *Id.*, art. 31(2)(b).  And other sources—such as the "preparatory work of the treaty and the circumstances of its conclusion"—cannot even be considered unless the text "[l]eaves the meaning ambiguous or obscure" or "[l]eads to a result which is manifestly absurd or unreasonable."  *Id.*, art. 32.

Neither Spain nor the Commission seriously dispute that intra-EU disputes like this one fall squarely within the plain text of the ECT's arbitration provision, Article 26(1).  That provision unambiguously expresses each Contracting Party's consent to arbitrate all "[d]isputes between a Contracting Party and an Investor of another Contracting Party" concerning investments covered by the treaty.  ECT, art. 26(1).  Any "state . . . bound by th[e] Treaty" is a separate "Contracting Party," *id.*, art. 1(2), and each EU state was separately represented in negotiating the treaty and signed the treaty separately in its own name, Bjorklund Decl. II ¶ 21. The Commission and Spain

thus do not and cannot deny that Spain is one "Contracting Party," ECT, art. 26(1), Luxembourg and the Netherlands are each "another," *id.*, and Petitioners are "Investors of" the latter two countries, *id.* art. 1(7).  Under the ECT's text, therefore, Spain plainly consented to arbitrate this dispute.

These clear provisions undercut the Commission's passing assertion—in its Background section—that the EU and its members joined the treaty as a "single entity of public international law, bound by treaty obligations to other contracting parties but not as between themselves," EC Br. 9-10.  Not even Spain endorsed this argument, and it is meritless.  Indeed, the only textual support the Commission purports to offer is the treaty's definition of "Regional Economic Integration Organisation" ("REIO"), ECT, art. 1(2), (3), (10), which permits regional organizations like the EU to join the ECT as an additional "Contracting Party," *id.*, art. 1(2).  But the EU's joining of the ECT as an REIO means only that it takes on *its own* duties under the treaty.  The ECT contemplates that a regional organization may exercise "competence over . . . matters . . . governed by th[e] Treaty," *id.*, art. 1(3), so by acceding to the treaty, it may bind itself in exercising that competence.  But the organization's members remain bound by their own commitments, too, and where appropriate, investors may "initiate proceedings against *both the [EU] and [its] [m]ember[s]*," as the EU's signing statement confirms. Statement Submitted by the European Communities to the Secretariat of the ECT Pursuant to Art. 26(3)(b)(ii) of the ECT, [1998] O.J. L69/115, n.1, bit.ly/3vjcnMc (emphasis added); *see* Bjorklund Decl. II ¶¶ 23-25.  Nothing in the ECT's text purports to limit the obligations to each other of Member States within a single REIO.

With no plausible textual argument, the Commission turns to the ECT's historical purpose. EC Br. 9.  Because the treaty's text is clear, however, there is no basis to consider historical context.  And the Commission account of the ECT's origin is wrong in any event.  Early EU-driven efforts quickly gave way to broad, multilateral negotiations between more than 50 countries.

6

Bjorklund Decl. II ¶ 22.  The resulting treaty thus reaches much farther than the Commission's account of it as a narrow agreement "between the EU . . . and . . . former communist countries." EC Br. 9,  Instead, the treaty's stated goal is "to promote long-term cooperation in the energy field" generally, not just between specific Contracting Parties.  ECT, art. 2.

Far from supporting the Commission's narrow reading, the ECT's history firmly undermines it.  The ECT's drafters explicitly rejected the Commission's proposal to include a "disconnection clause" in the treaty that would have exempted intra-EU disputes from the ECT's scope. MTD Opp. 34; *see also* Bjorklund Decl. I ¶¶ 76, 80-81.  The EU has used similar disconnection clauses in at least 17 other multilateral agreements to preclude their application between members, MTD Opp. 34, yet the Commission failed to persuade other drafters to include such a clause in the ECT, and the Commission still signed the treaty anyway.  As the Tribunal concluded, it is simply implausible that the ECT's drafters meant to include such a sweeping implied exclusion of intra-EU disputes—going to the "essence of [the] treaty"—yet failed to make any "formal warning" to that effect through the ordinary mechanisms available to treaty makers for doing so.  Award ¶ 215 (quotation marks and citation omitted).  Treaty drafters, like Congress, do not "hide elephants in mouseholes."  *Whitman v. American Trucking Assns., Inc.*, 531 U.S. 457, 468 (2001).

Nor can the Commission claim that it modified the treaty's plain language through a common understanding embraced by the "majority of EU Member States" in a later-submitted "[d]eclaration."  EC Br. 10 & n.7.  The ECT generally prohibits Contracting Parties from modifying the treaty's effect through written "reservations" of their rights.  ECT, art. 46; Award ¶ 215; Bjorklund Decl. I ¶ 144.  There is no basis, therefore, to read into the ECT the disconnection clause that the Commission failed to achieve through negotiation.

**B.    Spain's Consent To Intra-EU Arbitration Is Valid Under International Law**

Unable to deny the ECT's plain terms, the Commission seeks to avoid them by arguing

that EU law invalidates the ECT's application to intra-EU disputes.  But the Commission's arguments add nothing to Spain's, and fail for the same reason:  Irrespective of EU law, Spain's consent was valid under international law.

The main EU-law principle that the Commission purports to derive from its authorities is "the principle of 'primacy,'" which "mandat[es] that conflicts between EU and national law must be resolved by setting aside" national law or "international agreements" that are "inconsistent with EU law."  EC Br. 7.  But this principle, much like the Supremacy Clause in the United States, operates only *internally* to the EU legal system.  Bjorklund Decl. II ¶¶ 64-65.  By the Commission's own lights, primacy is a principle "of EU law," EC Br. 7.  And the Commission cites no *international* law authority that could sap the ECT of force outside of EU courts.

Just as a U.S. treaty that violates the U.S. Constitution, or a foreign treaty that violates a foreign nation's constitution, may remain enforceable externally under international law, *see* MTD Opp. 28-29, the EU courts' refusal to enforce a treaty under EU law does not relieve the EU or its members of their international treaty responsibilities.  The Commission fails to identify a single non-EU court or tribunal that has invoked the so-called "primacy" of EU law to excuse any EU member from an international treaty.  To the contrary, non-EU courts such as the European Court of Human Rights have held that complying with EU law is not a defense to violating an international treaty.  *See* Bjorklund Decl. II ¶ 90 (citing *Matthews v. United Kingdom*, 28 EHRR 361, ¶¶ 26-35 (1999)).  If "primacy" applied outside of the EU, the EU and its members could never reliably bind themselves to any treaty, not just intra-EU but with any nation, because the EU courts could nullify the treaty at any time by purporting to discover a latent conflict with EU law.  This is precisely the problem that Vienna Convention Articles 27 and 46 sought to avoid by barring states from invoking their "internal law" to invalidate their treaty commitments.  MTD Opp. 29.

The Commission counters that any "distinction between international law and EU law" is "false," because EU law "*is* international law applicable between EU Member States." EC Br. 16-17 (emphasis added). But ample authority recognizes the distinction between a State's internal law and international law. *See* MTD Opp. 29-30. And while "[i]t is true that EU law is international law because it is rooted in international treaties, . . . it does not follow that all of EU law is international law for all purposes, or that it will necessarily be the applicable law in all circumstances." Decision on Jurisdiction, Liability and Directions on Quantum ¶ 502(16), *Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*, ICSID Case No. ARB/15/42 (Mar. 9, 2020), bit.ly/3eTr986. Here, the applicable law is the ECT and principles of customary international law—not EU law. *See* ECT, art. 26(6) (governed by "international law"). And no principle of customary international law permits EU law to supersede the ECT's plain text.

To the contrary, as Petitioners have explained, the ECT's dispute resolution provisions supersede any contrary provision of EU law. MTD Opp. 33-35. Article 16 of the ECT specifically provides that the ECT prevails our a "prior" or "subsequent" treaty concerning the same subject matter as the ECT's dispute resolution provisions. ECT, art. 16(2). If the ECT's provisions are "more favourable to the Investor" than the other agreement, the ECT controls. *Id.* Just so here. MTD Opp. 33. And even absent Article 16 of the ECT, the rule of *lex posteriori* provides that in a "conflict between two treaties," "the more recent . . . controls." *Owner-Operator Indep. Drivers Ass'n, Inc. v. U.S. Dep't of Transp.*, 724 F.3d 230, 233 (D.C. Cir. 2013). Because the ECT was signed and ratified after the relevant provisions of the TFEU, it controls to the extent of conflict. MTD Opp. 33. To conclude otherwise effectively would allow EU Member States to unilaterally restore the disconnection clause expressly rejected during the ECT's negotiation process. *See supra*, at 7. That result cannot be squared with basic duties of "good faith" under international law.

Bjorklund Decl. I ¶¶ 150, 159-60; Bjorklund Decl. II ¶¶ 26, 92.  Accordingly, as a matter of international law, the EU treaties *cannot* be construed to "derogate from an Investor's right to dispute resolution" under the ECT.  *Vattenfall AB v. Fed. Republic of Germany*, ICSID Case No. ARB/12/12, Decision on Achmea Issue ¶ 195 (Aug. 31, 2018), bit.ly/3Kqecxo.

## C.   EU Law Does Not Justify "Interpreting" The ECT Contrary To Its Plain Text

Nor can these international law principles be evaded by reframing the Commission's EU law arguments as grounds for re-"interpret[ing]" the ECT, as the Commission attempts to do.  *See* EC Br. 12, 15, 21-24.  The plain text of the ECT provides for arbitration of intra-EU disputes.  *See supra*, at 4-6.  The Commission's failed attempt to add a disconnection clause confirms that the actually enacted text did not *already* carve out intra-EU disputes from arbitration.  *See supra*, at 7.  The Commission cannot achieve through "interpretation" what it failed to achieve through negotiation.

The linchpin of the Commission's position is that the ECT really creates only a series of "bilateral relationships" between contracting parties, and EU law must govern bilateral agreements between EU member states.  EC Br. 14, 17-18.  But, again, Spain did not make (and thus forfeited) this argument, and it is wrong in any event.  The ECT is not a "bilateralizable" treaty; it is a multilateral treaty reflecting the interests of all ECT state parties.  Bjorklund Decl. II ¶ 37.  Two or more ECT parties cannot simply amend the treaty only as between themselves without complying with the amendment process specified in the treaty.  *Id*. ¶¶ 38-39.  For good reason—differing obligations between member states "is not a matter of indifference to other Contracting Parties," as it can distort the levels of treatment available to nationals of the third-party states.  *Id*. ¶¶ 40-47.  Regardless, nothing about the supremacy of international law turns on whether the obligations it creates are multilateral or bilateral.  The relevant principle is simply that the EU may not invoke

its internal law to invalidate its own international-law commitments under the ECT—even commitments between its members.  *See supra*, at 8.

The Commission further contends that its interpretation is necessary to prevent conflict with primary (EU) law.  EC Br. 15.  But "interpretation" cannot stretch a treaty beyond its text merely to avoid a conflict with other treaties.  Bjorklund Decl. II ¶¶ 6, 26.  It is a basic canon that a treaty's text must be interpreted in "good faith," *id.* ¶ 15, and "interpreting" the ECT to render Article 26 "void *ab initio*" would violate that principle—nullifying one of the ECT's key provisions through an implicit limitation to which no contracting party ever agreed, through a mechanism that in fact was expressly rejected during the negotiation process, *id.* ¶¶ 26, 71, 92.

The Commission also casts *Komstroy* as an "interpretation of the ECT," to which this Court should "defer."  EC Br. 12, 21-24.  But there is no basis for such deference.  The EU is merely one party to the ECT.  Under the Vienna Convention, only collective action by all parties to a treaty can modify its plain meaning and effect.  Vienna Convention, art. 31(2)(b), (3)(a); Bjorklund Decl. I ¶¶ 91-92.  And because the ECT is not "bilateralizable," *see supra*, at 10, the CJEU cannot use the guise of "interpretation" to give the treaty one effect as between EU members and another as between other members, Bjorklund Decl. II ¶ 37.  Whatever *Komstroy*'s effect in EU courts, its interpretation of the ECT is entitled to no deference in *this* Court.  *See supra*, at 3, 5.

The Commission's cited cases are not to the contrary.  The Commission recites passing language in *Breard v. Greene*, 523 U.S. 371 (1998) (per curiam), noting the "respectful consideration" owed to the views of "an international court with jurisdiction" to interpret a treaty.  *Id.* at 375.  But "'respectful consideration'" does *not* mean deference or "controlling weight," *Animal Sci. Prods.*, 138 S. Ct. at 1874, and the Court in *Breard* in fact did *not* defer to the views of the tribunal there, the International Court of Justice ("ICJ"), 523 U.S. at 374, 378 (declining to follow

order discouraging petitioner's execution pending ICJ proceedings).  Further, the "respectful con-

sideration" referenced in *Breard* owed only to the ICJ's "jurisdiction" under the relevant treaty—

there, the Vienna Convention on Consular Relations—to give the last word on treaty disputes.  *See*

Optional Protocol Concerning the Compulsory Settlement of Disputes, art. 1 (Apr. 24, 1963),

bit.ly/3voO2oh.  Here, by contrast, the ECT assigns that jurisdiction to arbitral tribunals—not the

CJEU—so the only deference due is to the Tribunal.[2]

With no tenable legal argument, the Commission trumpets a parade of horribles about un-

dermining the "structure of the EU legal order" and "offending" international comity.  EC Br. 22-

23.  But nothing about enforcing the award here would undermine the "EU legal order"; the

CJEU's interpretation of EU law remains binding in its own internal plane.  But it cannot control

the central issue in this case—whether the Award can be enforced *in the United States* against

Spain's assets *here* under U.S. law implementing the ICSID Convention.  Ultimately, of course,

EU members remain free to withdraw from the ECT or renegotiate its provisions to reflect the

commitments the EU and its members states are willing to make.  Bjorklund Decl. II ¶ 70.

The Commission's concern about a "flood" of ICSID enforcement actions in federal courts

---

[2]  Cases requiring deference to another state's interpretation of its *own laws*—*see* EC Br. 22 (citing *Hilton v. Guyot*, 159 U.S. 113 (1895); *Animal Sci. Prods.*, 138 S. Ct. 1865; *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909 (D.C. Cir. 1984))—are similarly inapposite because the ECT is a multilateral treaty, not a uniquely EU creation.  The Commission likewise misses the mark in contending that other courts in this District have accorded deference to EU courts on "the intra-EU applicability of Article 26," EC Br. 11.  Those cases simply reflect decisions to stay U.S. arbitration enforcement proceedings under the New York Convention while courts in the seat of arbitration fulfilled the role assigned to them by that Convention—deciding whether to set aside the arbitral award.  *See CEF Energia, B.V. v. Italian Republic*, 2020 WL 4219786, at *2 (D.D.C. July 23, 2020); *Novenergia II – Energy & Env't (SCA) v. Kingdom of Spain*, 2020 WL 417794, at *4 (D.D.C. Jan. 27, 2020).  Under the ICSID Convention, that role is assigned to the ICSID-appointed annulment committee, not the EU courts, so those courts merit no special deference.  In any event, the Commission's cases each predate *Komstroy* and thus involve open questions of *EU law*.  None of them calls for deference to the EU courts on *international law*, on which the CJEU speaks with no special competence or authority.

likewise provides no basis for refusing to comply with the ICSID Convention and its implementing legislation.  EC Br. 23.  The Executive Branch (in joining the ICSID Convention) and Congress (in enacting Section 1650a) already made the decision to "open the doors of the federal courts" to enforcement of ICSID awards, *id*.  Congress's clear mandate that ICSID awards "shall" be enforced, 22 U.S.C. § 1650a(a), leaves no room for discretionary abstention for enforcement of ICSID awards in the name of "comity," EC Br. 23, which cannot "override 'the emphatic federal policy in favor of arbitral dispute resolution,'" *Newco Ltd. v. Gov't of Belize*, 650 F. App'x 14, 16 (D.C. Cir. 2016); *see also* Bjorklund Decl. I ¶¶ 3, 44-62.

The ECT's plain terms and bedrock principles of international law thus leave no doubt that Spain's agreement to arbitrate intra-EU disputes under Article 26 of the ECT is valid as a matter of international law, any purportedly contrary provisions of EU law notwithstanding.

## III.     The Commission's State-Aid Arguments Fail For The Same Reasons As Spain's

The Commission also repeats (at 23-25) Spain's meritless contention that paying the Award would constitute state aid, allegedly in violation of EU law, and that the foreign sovereign compulsion doctrine thus bars enforcement, *see* ECF No. 18 ("MTD"), at 32-35.  But, as Petitioners have explained, this argument fails regardless of whether paying the Award would constitute unauthorized state aid.  MTD Opp. 36-40.  *First*, allowing a foreign sovereign compulsion defense would violate the ICSID Convention and its implementing legislation, which make enforcement mandatory and preclude any defense.  *Id*. at 38-39.  *Second*, converting the Award into a U.S. judgment would not "require" Spain to "do" anything new; the ICSID Convention already compels it to pay the Award, and a judgment would merely facilitate enforcement against U.S. assets.  *Id*. at 39.  *Third*, the foreign compulsion doctrine applies only to private parties, not governments.  *Id*. *Fourth*, it is purely speculative to suggest that the Commission will actually sanction Spain for paying the Award—especially now that the Commission has declined the opportunity to state as

much in its amicus brief.  *Id*. at 39-40.  The Commission has no response to any of these points.

In any event, Spain has fallen far short of its burden of establishing that it cannot lawfully pay the Award—much less a judgment enforcing it—and the Commission's cursory discussion comes nowhere near overcoming Spain's failure of proof.  Neither the Award nor a judgment meet the definition of state aid, for multiple reasons that the Commission does not attempt to address. MTD Opp. 41; ECF No. 22 ("Quigley Decl. I") ¶ 48; Second Declaration of Conor Quigley ("Quigley Decl. II"), ¶¶ 22-42.  State aid refers to a "selective economic advantage" that "distort[s] competition," "affect[s] trade," and is "imputable to the state."  European Commission, Decision on State Aid S.A. 38517 (2014/C) (ex 2014/NN), Arbitral Award, *Micula v. Romania*, 2015 O.J. L 232/43 ¶ 79 (Sept. 4, 2015), bit.ly/3U6kFCE.  But the Award does not give Petitioners an "economic advantage," or affect competition or trade, because it merely *compensates* Petitioners for damages incurred as a result of Spain's violation of the ECT.  MTD Opp. 41; Quigley Decl. II ¶¶ 23-26.  Nor can payment of an Award or judgment *mandated* by a tribunal or court be "imputed" to Spain.  MTD Opp. 41; Quigley Dec. II ¶¶ 27-35.  And even if the Award or a judgment enforcing it were state aid, the Commission—or a reviewing EU court—may ultimately determine that it is compatible with the EU internal market, and thus lawful.  MTD Opp. 42; Quigley Decl. I ¶ 53.

Indeed, any argument that paying the Award or a judgment is unlawful must be premised upon proof that the underlying renewable energy incentives at issue in the Award were illegal state aid.  Quigley Decl. II ¶¶ 36-41.  But the Commission's chance to challenge those incentives has expired.  *Id.* ¶ 39.  And the Commission's own authorities approved a related renewable energy scheme as compatible with the EU market.  MTD Opp. 42.

The Commission adds that it has now opened a "formal investigation to assess 'the compatibility of the award with the internal market.'"  EC Br. 25 (citing *Decision on State Aid*,

SA.54155 (2021/NN), ¶ 94 (July 19, 2021)).  But that investigation has not reached a final deter-

mination.  Even if it had, the Commission does not speak authoritatively on EU law.  *See supra*,

at 3.  The CJEU does—and it has overturned the Commission's aid decisions a number of times.

*See* Quigley Decl. II ¶ 20.  At most, then, the Commission's investigation could delay, not prevent,

Spain's ability to pay the Award.  *Id.* ¶ 45.  Spain points to nothing suggesting the Commission

could realistically sustain a sanction against Spain—as required to invoke the foreign sovereign

compulsion doctrine—merely for paying the Award while  the investigation is pending.  *Id.* ¶¶ 47-

54; MTD Opp. 40.  And whatever effect the investigation may have on payment of *the Award*, it

would not prevent payment of *a judgment* from this Court, which raises distinct issues, and which

is not currently subject to any Commission state-aid investigation.  Quigley Decl. II ¶ 46.

The Commission ends with a plea to "dismiss the petition so that these issues can be re-

solved in the EU legal system."  EC Br. 25.  But the Commission identifies no legal principle that

permits dismissal on that basis.  The "burden of proof" for a "FSC [(foreign sovereign compul-

sion)] defense is on [the] defendants."  *In re Vitamin C Antitrust Litig.*, 810 F. Supp. 2d 522, 544

(E.D.N.Y. 2011).  Spain's inability to meet that burden without further EU proceedings means its

defense *fails*, not that it succeeds.  There is thus no basis for dismissal.[3]

## CONCLUSION

The Court should dismiss the arguments raised by the Commission, deny Spain's Motion

to Dismiss and enter judgment on the Award in Petitioners' favor in the amount and currency

specified in the Award.

---

[3]  The doctrine more commonly invoked for dismissing a lawsuit so that an issue can be decided in another court is *forum non conveniens*, but the D.C. Circuit has repeatedly reaffirmed that "'*forum non conveniens* is not available in proceedings to confirm a foreign arbitral award.'"  *Tatneft v. Ukraine*, 21 F.4th 829, 840 (D.C. Cir. 2021); *accord Stileks*, 985 F.3d at 876 n.1; *BCB Holdings Ltd. v. Gov't of Belize*, 650 F. App'x 17, 19 (D.C. Cir. 2016); *Newco*, 650 F. App'x at 16; *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 303-04 (D.C. Cir. 2005).

Dated: September 15, 2022

Respectfully submitted,

INFRASTRUCTURE SERVICES
LUXEMBOURG S.A.R.L AND ENERGIA
TERMOSOLAR B.V.

By its attorneys,

/s/*Matthew McGill*
Matthew McGill (D.C. Bar #481430)
mmcgill@gibsondunn.com
Matthew S. Rozen, D.C. Bar #1023209
mrozen@gibsondunn.com
Ankita Ritwik, D.C. Bar #1024801
aritwik@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539

*Attorneys for Infrastructure Services Luxembourg
S.A.R.L. & Energia Termosolar B.V.*

**CERTIFICATE OF SERVICE**

I hereby certify that, on September 15, 2022, I caused the foregoing Response to Spain's Motion to Dismiss, and exhibits thereto, to be filed with the Clerk for the U.S. District Court for the District of Columbia through the ECF system.  Participants in the case who are registered ECF users will be served through the ECF system, as identified by the Notice of Electronic Filing.

 /s/ Matthew McGill
Matthew McGill
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
mmcgill@gibsondunn.com