IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Infrastructure Services Luxembourg S.A.R.L.,
Energia Termosolar B.V.,

        *Petitioners*,

    v.

Kingdom of Spain,

        *Respondent*.

**Civil Action No. 1:18-cv-01753-EGS**

<u>**Second Expert Declaration of Conor Quigley**</u>

## I.    INTRODUCTION

1.      I, Conor Quigley K.C., make this declaration based upon my personal knowledge, except as to those statements made upon information and belief, and I believe all such statements, and the information upon which they are based, to be true.

2.      This is my second declaration in this matter.  I affirm all the statements made in my first Expert Declaration in support of the Petitioners' claim to enforce the Award issued on June 15, 2018 in *Antin Infrastructure Services Luxembourg S. à. r.l. and Antin Energia Termosolar B.V. v. The Kingdom of Spain*, ICSID Case No. ARB/13/31 ("the Award") (ECF No. 1-1, Ex. A).  My professional title Q.C. (Queen's Counsel) changed to K.C. (King's Counsel) on September 8, 2022 on the accession of King Charles III.

3.      My second declaration addresses the issues of State aid raised in the *amicus* brief of the European Commission filed on September 17, 2021.

4.      As stated in my first declaration, I was asked to address solely the State aid issues. I was not asked to address the other European law issues.  I, accordingly, did not address those

issues at all.  Equally, in this declaration, I address solely the issues concerning State aid.  Contrary to assertions in Spain's reply brief, nothing in this declaration should be taken as rejecting or declining to endorse the position of any of Petitioners' other experts.

## II.    EXECUTIVE SUMMARY

5.     Like Spain, the Commission claims that the Award constitutes unlawful State aid under EU law.  This is incorrect.  The Award cannot be construed as State aid, let alone unlawful or incompatible State aid, that Spain is precluded from paying.

6.     First, notwithstanding the Commission's representations as an *amicus*, there has been no definitive decision of the Commission finding that the compensation under the Award amounts to State aid.  Second, State aid entails a gratuitous advantage, which is absent in the case of an award of compensation for damages.  Third, for aid to fall within the scope of Article 107(1) TFEU, the purported economic advantage must be imputable to the State, i.e., Spain.  However, the CJEU has explicitly held that any advantage derived from an award of an international tribunal such as an ICSID tribunal is attributable to the Tribunal, not to the State.  Payment of compensation for breach of the ECT required by the Award cannot, therefore, be imputable to Spain.  In any case, even if the Award could be imputed to Spain, according to the CJEU's *Asteris* judgment, compensation for damages could be regarded as State aid only if it compensates for the grant of unlawful or incompatible aid.  But here, the Award compensates for a grant issued to Petitioners at the latest in 2009 (the "2009 Grant") under the subsidy scheme governed by Royal Decrees 661/2007 and 1578/2008 (the "2007-2008 Scheme"), and the 2009 Grant does not constitute State aid, or at most constitutes existing aid, and may in any event ultimately be found by the Commission to be compatible aid.  The 2009 Grant therefore does not constitute unlawful or

incompatible aid, and thus the Award cannot constitute State aid (let alone unlawful or incompatible State aid) either.  Finally, Petitioners are correct in describing as "remote" and "speculative" the chance that Spain's failure to comply with the Commission's contention not to pay the Award would result in an infringement action before the EU Court of Justice and monetary penalties, because the mere enforcement of the Award at this stage does not itself directly expose Spain to an infringement action or, in particular, to monetary penalties.  Merely paying the Award while the formal investigation is pending would not be a basis for a penalty action should it ultimately be determined that the Award does not constitute State aid or is compatible with the internal market.  And even if the Award is deemed to be incompatible aid, Spain may be able to avoid penalties by seeking to recoup the payment, even if Spain is ultimately unsuccessful in doing so.

## III.  NO FINDING HAS BEEN MADE THAT THE AWARD IS STATE AID

7.     The Commission has not made any finding that the underlying scheme and Award are State aid.  Neither (i) the Commission's decision of November 10, 2017 on the Spanish renewable energy regulatory scheme (cited by the Commission),[1] nor (ii) the Commission's *Micula* decision (cited by Professor Hindelang),[2] nor (iii) the Commission's decision to open a formal investigation into the Award (cited by the Commission)[3] make any definitive finding as to

---

[1]     Decision on State Aid, SA.40348, ¶ 84 (Nov. 10, 2017)

[2]     Decision on State Aid, SA.38517 (2014/C) (ex 2014/NN), Arbitral Award, *Micula v. Romania*, 2015 O.J. L 232/43 (Mar. 30, 2015).

[3]     Decision on State Aid, SA.54155 (2021/NN) – Arbitration award to Antin – Spain, 2021 O.J. C 450/5 (Nov. 5, 2021).

whether the compensation at issue amounts to State aid or whether any such compensation is incompatible with the EU's internal market.

(i)      *The Commission's decision of November 10, 2017*

8.      In support of Spain's position, the European Commission contends that the Commission has "determined" that "compensation awarded by an arbitral tribunal in connection with Spain's support scheme" constitutes unlawful State aid, and enforcing the Award could "subject Spain to conflicting legal obligations."[4]  But, as my first declaration explained, the Commission's decision of November 10, 2017, imposes no legal obligations on Spain.[5]  Without a formal assessment, the Commission's statement in this regard "lacks legal force as a matter of EU law."[6]  The Commission makes no attempt whatsoever to address those arguments.

9.      In addition, the Commission's decision of November 10, 2017 does not entail any formal assessment of the 2007-2008 Scheme, or any grant issued thereunder, including the 2009 Grant.  This is confirmed by the EU General Court ("General Court," or "GCEU") in paragraph 55 of its Judgment of 25 March 2019 in Case T-190/18, *Solwindet las Lomas v. Commission*, in which the General Court ruled on an application for the annulment of the Commission's decision of November 10, 2017:  "[A]s regards the previous scheme, taken as a whole, and the originally foreseen payments under the previous scheme supporting the production of electricity which were ultimately not paid to the applicant, it is clear from the contested decision that the *Commission did*

---

[4]      EC Br. 24-25 (citing Decision on State Aid, SA.40348, ¶ 84 (Nov. 10, 2017)).

[5]      ECF No. 22, ¶¶ 21-28.

[6]      *Id.* ¶ 28.

*not make any assessment of the compatibility of the previous scheme or of those payments with the internal market*."[7]  Thus the Commission's decision of November 10, 2017 does not entail any assessment of the 2007-2008 Scheme, including the 2009 Grant, or the Award.

(ii)     *The Commission's* Micula *decision*

10.     The Commission's decision in the *Micula* case is equally inapposite for determining whether the 2007-2008 Scheme (including the 2009 Grant) or the Award constitutes State aid.  I have already distinguished the *Micula* decision in my first declaration, on the ground that the amounts at issue in that case had in earlier investigations been classified as aid.[8]  It follows that the Commission's decision on *Micula* was only binding with respect to the actual aid assessed in that decision—the *Micula* award.  It does not constitute a Commission decision with respect to the Award in the present enforcement proceedings or any other arbitral award.  It may be noted that the Commission's decision was annulled in its entirety by the European Union General Court.[9]  While that judgment, in turn, was subsequently overturned by the CJEU, the CJEU referred the case back to the General Court to consider further arguments.[10]  Thus, even the *Micula* case has not yet resulted in any definitive finding of State aid being unlawfully granted.

11.     In the *Micula* cases, the Romanian authorities had adopted legislation in 1998 granting certain investors in disadvantaged regions various tax incentives.  The Romanian Competition Council subsequently found that these tax incentives amounted to State aid and had

---

[7]     *Solwindet Las Lomas v. Commission*, Case T-190/18, ECLI:EU:T:2019:205,  ¶ 55 (emphasis added).

[8]     ECF No. 22, ¶ 26.

[9]     *European Food SA v. Comm'n*, Cases T-624/15, T-694/15 & T-704/15, ECLI:EU:T:2019:423 (June 18, 2019), https://bit.ly/3DuVMeb.

[10]     *Comm'n v. European Food SA*, Case C-638/19 P ECLI:EU:C:2022:50 (Jan. 25, 2022).

to be revoked.  Ioan Micula and Viorel Micula, Swedish citizens residing in Romania, were the majority shareholders of the European Food and Drinks Group which made investments in the relevant area in 2000-2002.

12.     In 2004, Romania repealed the tax incentives, leading to a claim under the Bilateral Investment Treaty between Romania and Sweden.  The claim in question was therefore directly related to damages for the loss of the tax incentives which had, since 2000, been designated as State aid by the Romanian Competition Council.  On December 11, 2013, the arbitral award found that, by repealing the tax incentives, Romania had violated the legitimate expectations of the claimants and failed to ensure their fair and equitable treatment and ordered payment of damages.  The European Commission adopted, on May 26, 2014, its decision obliging Romania to suspend any action that might lead to the implementation or execution of the award, on the ground that such action appeared to constitute unlawful State aid.  On March 30, 2015, the Commission adopted its final decision finding that the compensation awarded by the arbitral tribunal amounted to State aid which was incompatible with the internal market and ordered its recovery.[11]

13.     On an application for judicial review of the Commission's decision, the EU General Court, reiterating the *Asteris* judgment discussed below, held that compensation for damage suffered cannot be regarded as aid unless it has the effect of compensating for the withdrawal of unlawful or incompatible aid.[12]  However, the GCEU then held that the aid in question was not in fact incompatible with EU law because it arose prior to Romania joining the EU in 2004.

---

[11]     *Id.* ¶¶ 13-33.

[12]     Cases T-624/15, T-694/15 & T-704/15, *European Food SA v. Commission*, ECLI:EU:T:2019:423, ¶ 103.

14.     On appeal, the CJEU overturned the GCEU's judgment in this narrow respect.  The CJEU, in examining the question of when State aid is granted, agreed with the GCEU that the compensation granted by the arbitral tribunal was intended to compensate for the damage suffered as a result of the repeal of the tax incentives, but held, contrary to the GCEU, that "the decisive factor for establishing the date on which the right to receive State aid was conferred on its beneficiaries by a particular measure is the acquisition by those beneficiaries of a definitive right to receive that aid and to the corresponding commitment, by the State, to grant [it]."[13]  Since Romania was a Member State of the EU on the date of the award, the right to receive the purported aid was granted when EU State aid law applied in Romania.  In reaching that determination, however, the CJEU emphasized that "the question whether the compensation granted by [the arbitration] award may constitute 'State aid' . . . is not the subject matter of the present appeal and is therefore outside the Court's jurisdiction in this context."[14]  The CJEU thus limited its discussion to the question of *when* the purported State aid was granted, rather than whether the measure at issue constituted State aid.

15.     The reasoning of both the GCEU and the CJEU is based on the specific facts which include, in particular, the finding by the Romanian Competition Council that the tax incentives amounted to State aid.  No equivalent finding has been made in the present case.  The Tribunal made no such finding, and indeed, did not even consider the issue of State aid in its legal reasoning for the Award.  On the contrary, the Tribunal found that there had been breaches of ECT, Article 10(1) which caused damage to the Petitioners and which Spain was bound to compensate.

---

[13]     Case C-638/19P, *Commission v. European Food S.A.*, ECLI:EU:2022:50, ¶ 123.

[14]     *Id.* ¶ 131; *see also id.* ¶¶ 80, 130, 133.

16.     The main difference of judgment as between the General Court and the CJEU was the determination of when that aid might be awarded.  The General Court held that it was, at least partially, for a period prior to Romania being a Member State of the European Union, a point which the Commission had not taken into account in its decision declaring the aid illegal, whereas the CJEU held that the aid would be awarded following the determination of the compensation award which definitively established the right to receive the compensation.[15]

(iii)     *The Commission's decision to open a formal investigation into the Award*

17.     The European Commission adds in its *amicus* brief that Spain has notified the Commission of the Award as State aid and that the Commission has opened a formal investigation pursuant to Article 108(2) TFEU by decision of July 19, 2021.

18.     But the Commission's mere opening of a formal investigation does not entail any definitive finding that the Award constitutes State aid, or that the State aid is incompatible with the internal market.  As my first declaration explained, EU State aid law is encapsulated in Articles 107 and 108 TFEU, with Article 108 setting forth relevant procedures.  Under Article 108(2), the Commission opens a formal investigation if it simply harbors doubt as to whether a measure is State aid or as to the compatibility of the aid.  At the conclusion of the formal investigation, however, the Commission may still find that the measure does not amount to State aid.

19.     Regardless, as described below, the Commission's decision to open a formal investigation is, in my opinion, based on an incorrect analysis of State aid law that has in any event

---

[15]     *Id.* ¶¶ 115-125.

been superseded by recent case law of the CJEU relating specifically to the notion of imputability to the State.

20.     Moreover, the mere fact that the Commission takes a particular view of a matter and proffers its interpretation of EU law does not mean that it is necessarily correct or that it must be followed by national courts.  There are countless instances of judgments in the European Courts where the legal opinion of the Commission has been found wanting.  These judgments include many where the Commission's decisions on State aid have been overturned.[16]

21.     National courts in the EU are bound to apply decisions of the European Courts, but they are not necessarily bound by opinions expressed by the European Commission, which have no special legal status, including in matters of State aid law.

## IV.     THE AWARD IS NOT STATE AID

22.     In any event, the Award is not State aid.  State aid entails a gratuitous advantage granted by and imputable to the State, which is fundamentally different from the award by the Tribunal of damages for breach of obligations under Article 10(1) of the Energy Charter Treaty.  Payment of the Award or a judgment enforcing the Award is not imputable to the State (Spain) and does not constitute incompatible and/or unlawful State aid.

---

[16]     In relation to renewable energy and State aid, for instance, the CJEU has rejected some or all of the Commission's arguments in the following cases:  *PreussenElektra AG v. Schleswag AG*, Case No. C-379/98, ECLI:EU:C:2001:160 (Mar. 13, 2001), https://bit.ly/3UdHW5R; *ENEA S.A. v. Prezes Urzędu Regulacji Energetyki*, Case No. C-329/15, ECLI:EU:C:2017:671 (Sept. 13, 2017), https://bit.ly/3LjGNWm; *Germany v. Comm'n*, Case No. C-405/16 P, ECLI:EU:C:2019:268 (Mar. 28, 2019), https://bit.ly/3BnYAa6.

(i)     *An award of damages is not a gratuitous advantage*

23.     As my first declaration explained, relying, in particular, on the statements at paragraphs 23-24 of the judgment of the CJEU in Case 106-120/87, *Asteris v. Greece*, the award of compensation for breach of legal obligations is not an economic advantage within the meaning and scope of Article 107(1) TFEU.[17]

24.     The payment of compensation to remedy or counteract the effects of unlawful action which has caused damage is wholly consistent with the operation of normal market conditions.  Unlike the grant of financial aid which is gratuitously conferred by a public authority, compensation or damages to remedy unlawful behavior merely seeks to put the claimant in the position he would have been in absent such behavior.  Compensation is, therefore, a legal right, not a gratuitous benefit.  As my first declaration explained, compensation for damage caused by the unlawful breach of legal obligations reinstates the normal market conditions which would have existed had the damage not been caused in the first place.[18]

25.     Moreover, whilst the recipient of such compensation is clearly better off financially, such improvement in his finances does not result in any "economic advantage" within the meaning of Article 107(1) TFEU.  "Advantage" in that respect must involve at least some element of "aid," i.e., help or assistance.  Compensation for damage caused by a breach of legal rights cannot be classified as help or assistance.

---

[17]     *See* ECF No. 22, ¶ 44.

[18]     *Id.* ¶ 47.

26.     Indeed, the approach advanced in *Asteris* was confirmed by the CJEU in *Commission v. Aer Lingus and Ryanair*:

> "The … reimbursement to an undertaking of an amount of tax which it was required to pay in breach of EU law or the damages which national authorities are ordered to pay to undertakings to compensate for the damage they have caused them does not constitute State aid."[19]

(ii)     *Aid must be imputable to the state*

27.     The Award also is not State aid for another, independent reason.  As I stated in my first declaration, it is inherent in Article 107(1) TFEU that the aid measure must be imputable to the State for it to be regarded as being granted by the State.[20]  Essentially, this requirement means that a public authority of the State, of its own volition, must grant the aid.  Where, however, a State measure is taken pursuant to an overriding and binding legal obligation imposed on the State, it cannot be concluded that the measure is imputable to the State.

28.     The CJEU has explicitly confirmed in its recent decision in *Commission v. European Food* that an arbitral tribunal, such as under ICSID, is not "a court or tribunal of a Member State."[21]  Whilst this was in the context of jurisdiction in the light of the *Achmea* and *Komstroy* judgments, it must be generally applicable as a principle of EU law.  It follows that the grant of compensation pursuant to a binding Award of an Arbitral Tribunal cannot be imputable to Spain.

---

[19]     *Commission v. Aer Lingus*, Case Nos. C-164/15P & C-165/16P, ECLI:EU:C:2016:990, ¶ 72 (Dec. 21, 2016), https://bit.ly/3QM1UBU.

[20]     *See* ECF No. 22, ¶ 48.

[21]     Case C-638/19P, *Commission v. European Food S.A.*, ECLI:EU:2022:50, ¶ 142.

29.     This was a central distinction between the judgments of the General Court and the CJEU in *Commission v. European Food*.  The General Court had held that the award in question constituted the mere recognition of a right which arose at the time of the repeal of the tax incentives, whereas the payments made subsequently represented only the enforcement of that right.  By contrast, the CJEU held that, whilst it could not be ruled out that such a right to compensation arises on the date of the repeal of the system, the decisive factor for establishing the date on which the right to receive the aid was conferred on its beneficiaries is the acquisition by those beneficiaries of a definitive right to receive the aid and to the corresponding commitment, by the State, to grant that aid.  The CJEU then definitively held that the right to compensation was granted only by the arbitration award and that it was only upon the conclusion of the arbitral proceedings that the arbitration applicants were able to obtain actual payment of that compensation.[22]

30.     Moreover, this distinction between aid being financed by a public body, but being imputable to a court or tribunal has recently been developed by the CJEU in other case law.  In *Alouminion v. Commission*, the applicant entered into a contract in 1960 with the public electricity company DEI, under which it was granted a preferential tariff for the supply of electricity, with the contract subject to automatic renewal every five years unless terminated by one of the parties. In 2004, when DEI informed Alouminion of its intention to terminate the contract as of April 2006, the latter challenged that termination before the Greek courts.  The national court, as an interim measure, suspended the effects of the termination on the ground that it was not consistent with the

---

[22]     *Id.* ¶¶ 115-125.

1960 contract.  The General Court annulled the decision, holding that the interim measure could not be regarded as new aid or an extension of existing aid, but merely followed from the finding that the contract had not been lawfully terminated in accordance with its terms.[23]  On appeal, however, in *DEI v. Commission*, the CJEU, contradicting the finding that the national court was merely interpreting the provisions of the 1960 contract, held that the interim measure constituted a State aid intervention by reinstating the application of the preferential tariff such as to alter the time limits set out in the contract.[24]  It was, accordingly, the action of the court itself, not the public company, to which the aid was imputable.

31.     The CJEU followed the judgment in *DEI v. Commission* in *Mytilinaios AE v. Commission*.[25]  In *Simet v. Commission*, compensation ordered by judgment of the Italian Council of State to be paid by the government was notified to the Commission as State aid.[26]  In *Alz-Chem v. Commission*, the General Court held that it could not be ruled out that a measure may be regarded as a decision attributable to the State because of a decision of a national court.[27]  In *ARFEA v. Commission*, where the right to receive aid was retroactively established through national court proceedings, the General Court held that the grant of the aid took effect only at the date of the relevant national judgments.[28]  In further proceedings between DEI and the Commission, concerning the electricity tariff for subsequent periods, the General Court held that a Greek public

---

[23]     Case T-542/11, *Alouminion AE v. Commission*, ECLI:EU:T:2014:859, ¶¶ 55-56.

[24]     Case 590/14P, *DEI v. Commission*, ECLI:EU:C:2016:797, ¶¶ 58-59.

[25]     Case C-332/18P, *Mytilinaios AE v. Commission*, ECLI:EU:C:2019:1065, ¶ 68.

[26]     Case C-232/16P, *Simet SpA v. Commission*, ECLI:EU:T:2017:200, ¶¶ 19-21; Case T-15/14, *Simet SpA v. Commission*, ECLI:EU:T:2016:124, ¶ 38.

[27]     Case T-284/15, *AlzChem AG v. Commission*, ECLI:EU:C:2018:950, ¶¶ 107-108.

[28]     Case T-720/16, *ARFEA v. Commission*, ECLI:EU:T:2018:853, ¶ 185

arbitral tribunal granted State aid through a binding award.  However, it was emphasised that, in accordance with the Greek legislation establishing the arbitration tribunal and its powers, the tribunal exercised a judicial function identical to that of the ordinary courts.  Those proceedings were governed by the Greek Code of Civil Procedure as well as arbitration rules of the Greek Energy Regulatory Authority.  Accordingly, the arbitral tribunals were considered an integral part of the Greek judicial system and, as such, were classified as a body exercising a power falling within the prerogatives of the public authority.[29]

32.     That is clearly not the case with the present Award, in which no national law played any part.

33.     Equally, enforcement of the Award by this honourable Court cannot give rise to aid that is imputable to Spain.

34.     In fact, Spain is required, as a matter of international law, to fulfill its obligations under the ECT and the ICSID Convention[30] to pay the compensation ordered by the Tribunal. Thus, the compensation cannot be regarded as State aid, but is instead simply the consequence of Spain's obligations voluntarily accepted through accession to these treaties.

35.     The Commission asserts a contrary view in paragraphs 82-83 of its decision (SA.54155) to open the formal investigation on the Award: "As Spain voluntarily agreed to enter the ICSID Convention and the ECT, and incorporated it in its national law, the payment of the compensation on the basis of the award would be imputable to Spain," and "the payment of the

---

[29]     Cases T-639/14 RENV, T-352/15 & T-740/17, *DEI v. Commission*, ECLI:EU:T:2021:624, ¶¶ 151-159.

[30]     Convention on the Settlement of Investment Disputes between States and Nationals of Other States, 17 U.S.T. 1270 (Mar. 18, 1965), ECF No. 1-2.

award may require a decision to be taken by Spain." As explained, this analysis of imputability is, in my opinion, incorrect. Spain's decision to accede to the ICSID Convention and the ECT cannot render the Award imputable to Spain. Any decision taken by Spain to comply with the Award is made pursuant to its international law obligations. Moreover, under EU law neither of these treaties could be regarded as aid schemes under which the Award has been granted. The Commission does not argue otherwise.

(iii)     *The Award does not constitute State aid because the 2009 Grant is either not State aid or it is existing aid*

36.     Even if the Award were somehow imputable to Spain, the Award could constitute State aid only if the underlying measure for which the Award compensates is incompatible or unlawful State Aid. As mentioned above, in the *Micula* case, the EU General Court, reiterating the CJEU's *Asteris* judgment, held that compensation for damages can be regarded as aid only if it compensates for the grant of unlawful or incompatible aid.[31] The Award, however, does not compensate for unlawful or incompatible aid because the 2009 Grant—for which the Award would compensate—does not constitute State aid. The 2009 Grant is not State aid because it does not involve State resources. And even if the 2009 Grant constitutes aid, it is existing aid, and existing aid is neither unlawful nor incompatible aid.

37.     First, the 2007-2008 Scheme (and thus all individual grants made under this scheme) is indistinguishable from a similar scheme deemed by the CJEU not to constitute State aid in the *EEG* case. There, the Court of Justice found that Germany's financing of a company

---

[31]     Cases T-624/15, T-694/15 & T-704/15, *European Food SA v. Commission*, ECLI:EU:T:2019:423, ¶ 103.

through an intermediary consisting of the German Transmission System Operators (TSOs) did not constitute State aid because the funds were not at the state's disposal.[32]  Although the funds were administered by the State through the TSOs, they were earmarked for the renewable energy producers based on pre-existing legislation that did not allow the State (through the TSOs) to use the funds for other purposes.  Similarly, while a Spanish governmental body financed renewable energy producers under the 2007-2008 Scheme, that body merely managed the funds based on pre-existing rules, with no ability to change the level or the distribution of the funds.  The individual grants made under the 2007-2008 Scheme, including the 2009 Grant, are thus not State aid.

38.    Second, even if the 2009 Grant constituted aid, it would constitute *existing* aid, which is neither unlawful nor incompatible aid.  EU courts have confirmed the point, holding that the TFEU provides for separate procedures for new and existing aid: while under Articles 108(2) and 108(3) TFEU, new aid is unlawful if not notified to and authorized by the Commission before it is implemented (the "standstill obligation"),[33] under Article 108(1) TFEU, existing aid is instead subject to constant review by the Commission, in cooperation with the Member States, and may be implemented without being notified to and authorized by the Commission, meaning that

---

[32]    Case C-405/16, *Germany v. Commission*, ECLI:EU:C:2019:268, ¶ 76.

[33]    Article 108(3) TFEU provides: "The Commission shall be informed, in sufficient time to enable it to submit its comments, of any plans to grant or alter aid.  If it considers that any such plan is not compatible with the internal market having regard to Article 107, it shall without delay initiate the procedure provided for in paragraph 2.  The Member State concerned shall not put its proposed measures into effect until this procedure has resulted in a final decision." Article 108(2) TFEU provides: "If, after giving notice to the parties concerned to submit their comments, the Commission finds that aid granted by a State or through State resources is not compatible with the internal market having regard to Article 107, or that such aid is being misused, it shall decide that the State concerned shall abolish or alter such aid within a period of time to be determined by the Commission."

existing aid is not subject to the standstill obligation.[34]  In paragraphs 26 and 34 of her opinion in case C-6/12, Advocate General Sharpston stated that "the standstill obligation applies to new aid but not to existing aid"[35] and the Commission's notice on the enforcement of the State aid rules by national courts reflects the same view, stating that "existing aid is not subject to the standstill obligation."[36]  In the same vein, EU Courts have held that the Commission's practice of refusing to open formal investigations for existing aid makes clear that such aid need not to be notified under Article 108(3) TFEU (i.e., it is not subject to the standstill obligation), and the failure to notify therefore cannot render the aid unlawful.[37]  The fact that the Commission refuses to open the formal investigation procedure for existing aid also means that existing aid cannot constitute incompatible aid.[38]

39.    The 2009 Grant constitutes existing aid.  Under Articles 1(b)(iv) and 17 of the State Aid Procedural Regulation,[39] existing aid is aid with regard to which the 10-year limitation period has expired.  The limitation period starts to run when the aid has been granted, i.e., when a legally binding act is adopted by which the competent national authority undertakes to unconditionally

---

[34]    Case C-262/11, *Kremikovtzi*, ECLI:EU:C:2012:760, ¶ 49.

[35]    Opinion of Advocate General Sharpston delivered on 7 February 2013, C-6/12, P, EU:C:2013:69, ¶¶ 26, 34.

[36]    Commission notice on the enforcement of State aid law by national courts, OJ C 85, 9.4.2009, p. 1–22.

[37]    Case C-390/06, *Nuova Agricast Srl v. Ministero delle Attività Produttive*, ECLI:EU:C:2008:224, ¶¶ 58-59 (the CJEU stated that *"where [the Commission] receives a complaint relating to allegedly unlawful aid, the Commission, in classifying the measure as existing aid, subjects it to the procedure provided for by Article [108](1) EC [on the review of existing aid] and thus refuses by implication to initiate the [formal investigation] procedure provided for in Article [108](2) [TFEU]"*).

[38]    Case C-322/09 P, *NDSHT v. Commission*, ECLI:EU:C:2010:701, ¶ 52.

[39]    Council Regulation (EU) 2015/1589 of 13 July 2015 laying down detailed rules for the application of Article 108 of the Treaty on the Functioning of the European Union (codification) (OJ L 248, 24.9.2015, p. 9–29).

grant the aid.[40]  Existing aid can become "new aid" only if the original binding act is substantially altered in a way that changes the European Commission's compatibility assessment.[41]  Since Petitioners received an individual grant in 2009 (i.e., the 2009 Grant) under the 2007-2008 Scheme by registering their plants for electricity production in 2009,[42] the limitation period expired in 2019.

40.     Until the Commission's decision to open a formal investigation on July 19, 2021, the Commission never took any action to assess the 2007-2008 Scheme (including any individual grants issued under that scheme).[43]  Accordingly, the 10-year limitation period ran uninterrupted until, at the very latest, 2019.  Hence, even if the 2009 Grant does constitute State aid (and it does not), it at most constitutes existing aid.  The 2009 Grant is therefore neither unlawful nor incompatible aid.

41.     Given the principle set forth in *Asteris* and reiterated in *Micula*, any compensation for the 2009 Grant cannot constitute State aid either.  It follows that the Award is not State aid.

---

[40]     Case C-385/18, *Arriva Italia and Others,* ECLI:EU:C:2019:1121, ¶ 36; Case C-129/12, *Magdeburger Mühlenwerke*, ECLI:EU:C:2013:200, ¶ 40; Case T-561/18, *ITD and others v. Commission*, ECLI:EU:T:2021:240, ¶ 199; Case T-818/14, *BSCA v. Commission*, ECLI:EU:T:2018:33, ¶ 72

[41]     Article 1(c) of the Procedural Regulation provides that when an aid measure is 'altered' it becomes a new aid measure: "'*new aid*' *means all aid, that is to say, aid schemes and individual aid, which is not existing aid, including alterations to existing aid.*" However, as the Court of Justice recently confirmed in Joined Cases C-915/19 – C-917/19, *Eco Fox*, ECLI:EU:C:2021:887, in order for amendments to turn an existing aid measure into new aid, the amendments must be such that they change the outcome of the Commission's compatibility assessment.

[42]     Commission decision of 21 July 2021 in case State Aid SA.54155 (2021/NN) – Arbitration award to Antin – Spain, ¶ 37.

[43]     While Spain notified the Award on 17 April 2019 it did not notify the Old Scheme.

(iv)    *Even if State aid, the Award is not necessarily incompatible with the internal market*

42.     For similar reasons, as my first declaration explained, Spain would not necessarily be precluded from paying the Award even if the Award could be considered State aid.[44]  Rather, Spain would be required to notify the Commission of the Award, so that the Commission could investigate the compatibility of the Award with the internal market.   To find the Award incompatible with the internal market, the Commission would have to find the revoked subsidy scheme for which the Award compensates to be incompatible State aid.  But there is no basis to conclude that the Commission will reach that conclusion, and the Commission has never suggested that the underlying subsidy scheme is incompatible aid.

## V.   THE COMMISSION'S OPENING OF AN INVESTIGATION WILL NOT PREVENT SPAIN FROM ULTIMATELY PAYING THE AWARD OR A JUDGMENT

43.     The Commission's opening of a formal investigation into the Award may raise a question about the standstill clause in Article 108(3) TFEU.  Where the Commission has decided to open a formal investigation into a potential State aid measure, EU Member States ordinarily must refrain from putting that measure into effect until the Commission has assessed its compatibility with the internal market.[45]  Here, however, for the reasons given above, the Award does not constitute State aid.

44.     Even if the Award constituted State aid (*quod non*), it would be existing aid to which the standstill obligation does not apply.  As noted above, Advocate General Sharpston has

---

[44]     ECF No. 22, ¶ 53.

[45]     Case No. C-284/12, *Deutsche Lufthansa AG v. Flughafen Frankfurt-Hahn GmbH*, ECLI:EC:C:2013:755, ¶ 20 (Nov. 21, 2013), bit.ly/3RN34hD.

opined that "the standstill obligation applies to new aid but not to existing aid."[46] Indeed, if the 2009 Grant is existing aid, the Award should also be existing aid because otherwise the same benefit (i.e., the support that should have been granted as foreseen in the 2007-2008 Scheme) would not be subject to recovery if it would have been granted under the 2007-2008 Scheme, but would be subject to recovery if it would be granted in the form of the Award.

45.     At most, even if the Award were State aid and the standstill obligation applied (*quod non*), it would create only a *temporary* barrier to Spain's payment of the Award during the pendency of the Commission's formal investigation.   Should the Commission subsequently conclude that the Award does not constitute State aid, the standstill obligation does not apply. Alternatively, should the Commission subsequently conclude that the Award is compatible with the internal market, the effect of having breached the standstill obligation does not result in the imposition of monetary penalties.   In both scenarios Spain would ultimately be able to pay the Award.   Indeed, even if the Commission were to conclude that the Award were incompatible or unlawful State aid, that decision could—and, for all the reasons given above, *should*—be reversed by the EU courts.   In that event, too, Spain would ultimately be able to pay the Award.

46.     Finally, whatever standstill obligation may apply to the Award itself, no such obligation would apply to a prospective *judgment* from this Court enforcing the Award.   Because a judgment creates a distinct legal obligation from the Award itself, it is not subject to any standstill obligation that may apply to the Award as a consequence of the Commission's formal investigation.   There is no reason to assume that the Commission would ultimately open a separate

---

[46]      *See supra*, ¶ 38.

formal investigation, should the Award be converted into an enforceable U.S. judgment.  And, of course, because no such judgment presently exists, no standstill obligation applies to a judgment by this Court enforcing the Award.  Accordingly, there is no present legal barrier to Spain's compliance with such a judgment.

## VI.   INFRINGEMENT ACTION AND MONETARY PENALTIES

47.     Petitioners describe as "remote" and "speculative" the chance that Spain's failure to comply with the Commission's contention not to pay the Award would result in an infringement action before the EU Court of Justice and monetary penalties.  In my opinion, Petitioners are correct in taking this stance.

48.     First, as explained in my first declaration and above, the Decision of November 10, 2017 contains no lawfully binding obligation on Spain not to pay the Award.  The contention that awards by arbitral tribunals would constitute State aid is no more than an assertion of opinion by the Commission, which lacks any legal authority.  Any payment on enforcement of the Award is not, therefore, in any way, an infringement of any legal obligation arising out of the Decision of November 10, 2017.

49.     Second, if Spain paid the Award, the Commission would then have to consider whether such payment constitutes State aid.  This would require the Commission to prove that the payment constituted State aid, that such aid was incompatible with the internal market and that it was paid illegally in breach of Article 108(3) TFEU.  The Commission would first have to open a formal investigation into the payment, consider all arguments raised by interested parties, and come to a final decision requiring the aid to be suspended or recovered.  No such final decision has been taken, so Spain could not be regarded as being presently in breach of any such obligation.

21

However, even if the Commission would subsequently decide that Spain has breached the standstill obligation during the pendency of the formal investigation, the Commission cannot for that reason alone impose any monetary penalties on Spain.

50.     Any such decision finding that Spain paid unlawful State aid would be subject to judicial review pursuant to Article 263 TFEU in the EU Courts, first in the General Court and subsequently in the Court of Justice.  Such an action could be brought by Spain itself, or by any interested party that is directly and individually concerned, which could include Petitioners.  If the Court of Justice holds that the Commission had acted lawfully in deciding that the payment constituted aid that was unlawful, in breach of Article 108(3) TFEU, and incompatible with the internal market, then Spain is required to effect recovery of the aid.  In that event, Spain would be likely to take the necessary steps to attempt to recover the aid.  On the other hand, if the judicial review annuls the decision, the decision, including the recovery obligation, would be annulled and become void.

51.     If the decision is lawful and Spain subsequently fails to comply with the decision to recover the aid, the Commission may refer the matter directly to the Court of Justice, pursuant to Article 108(2) TFEU.  Since this step is within the discretion of the Commission, it follows that it is not automatic and the Commission may decide not to proceed in tis manner.  Moreover, if an infringement action is commenced, Spain is entitled to argue in its defence that recovery is, for any reason, absolutely impossible.

52.     It is only where Spain subsequently fails to comply with a judgment of the Court of Justice upholding the Commission's decision that the Commission may, pursuant to Article 260(2) TFEU, bring separate further proceedings before the Court of Justice to request a

declaration that Spain has failed to take the necessary steps to comply with the earlier judgment of the Court of Justice and to seek a penalty.  Again, the decision to bring such proceedings lies within the discretion of the Commission, and it is not at all bound to do so.

53.    It follows that the mere enforcement of the Award at this stage does not itself directly expose Spain to an infringement action or, in particular, to monetary penalties.  Instead, several separate stages are involved before Spain might face any risk of an infringement action, let alone monetary penalties.  Moreover, any monetary penalty would not be linked to the Award, as such, but rather is solely consequent on Spain failing to take good faith steps to comply with a subsequent judgment of the Court of Justice requiring recovery of the aid.

54.    Petitioners are therefore correct, in my opinion, in arguing that, at present, any such risk of a monetary penalty against Spain for paying the Award is remote and speculative.

## VII.    CONCLUSION

55.    In conclusion, I reiterate the conclusions of my first Expert Declaration that:

i.    the Tribunal did not encroach on the European Commission's competence to review State aid; and

ii.    payment of the Award or a judgment enforcing the Award does not constitute incompatible State aid within the scope of Article 107(1) TFEU.

I declare under the penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed on September 15, 2022

London, United Kingdom

Conor Quigley KC

Serle Court

**CERTIFICATE OF SERVICE**

I certify that this Second Expert Declaration Conor Quigley was filed through the ECF system, and will be served electronically on the registered participants as identified by the Notice of Electronic Filing on September 15, 2022.

/s/ Matthew McGill
Matthew McGill