**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| INFRASTRUCTURE SERVICES LUXEMBOURG S.A.R.L. *et al.*, | |
| Petitioners, | |
| v. | Case No. 1:18-cv-1753-LLA |
| KINGDOM OF SPAIN, | |
| Respondent. | |

**SUPPLEMENTAL BRIEF IN SUPPORT OF THE KINGDOM OF SPAIN'S
<u>MOTION TO DISMISS</u>**

Jonathan M. Landy (D.C. Bar No. 467847)
Benjamin W. Graham (D.C. Bar No. 1044724)
Noah C. McCullough (D.C. Bar No. 1672590)
Ayoub Ouederni (D.C. Bar No. 90005248)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, S.W.
Washington, DC  20024
Tel.:    (202) 434-5000
Fax:    (202) 434-5029
Email:   jlandy@wc.com

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 2

    A.    The Energy Charter Treaty ................................................................... 2

    B.    European Union Law ........................................................................... 2

            1.    The legal order of the European Union ...................................... 3

            2.    EU Law Prohibiting Member States from Arbitrating with Each Other's Nationals ................................................................................. 3

            3.    EU Law Prohibiting Member States from Providing "State Aid" ............. 7

    C.    U.S. Proceedings ................................................................................. 8

ARGUMENT ..................................................................................................................... 10

I.    THE AWARD IS NOT ENTITLED TO FULL FAITH AND CREDIT BECAUSE THE ARBITRATORS LACKED JURISDICTION. ............................................................. 10

    A.    There Was No Agreement to Arbitrate Between Spain and BayWa. ................... 11

            1.    It is the Court's role to determine whether the Arbitral Tribunal had jurisdiction based on a valid agreement to arbitrate. ............................... 11

            2.    EU law governs Spain's capacity to extend an offer to arbitrate............. 13

            3.    EU law barred any arbitration agreement here. ......................................... 15

            4.    General treaty interpretation principles yield the same result. ................ 16

    B.    The Arbitrators Exceeded Any Authority They Did Have by Awarding State Aid. .................................................................................................. 17

II.    THE FOREIGN SOVEREIGN COMPULSION DOCTRINE BARS ENFORCEMENT OF THE AWARD..................................................................................................... 19

CONCLUSION.................................................................................................................. 20

# TABLE OF AUTHORITIES

**European Cases**

*Budějovický Budvar v. Rudolf Ammersin GmbH,*
    ECLI:EU:C:2009:521 ....................................................................................3, 14

*Comm'n v. Eur. Food SA,*
    ECLI:EU:C:2022:50 ........................................................................................6, 15

*Comm'n v. Ireland,*
    ECLI:EU:C:2006:345 ..............................................................................4, 5, 14, 15

*In re ECHR,*
    ECLI:EU:C:2014:2454 ......................................................................................3, 4

*Elcogás SA v. Administración del Estado,*
    ECLI:EU:C:2014:2314 ........................................................................................8

*Kadi v. Council*, ECLI:EU:C:2008:461 ............................................................................3

*Poland v. PL Holdings Sàrl,*
    ECLI:EU:C:2021:875 ..............................................................................4, 14, 16

\* *Republic of Moldova v. Komstroy LLC,*
    ECLI:EU:C:2021:655 ................................................................................. passim

\* *Slovak Republic v. Achmea B.V.,*
    ECLI:EU:C:2018:158 ................................................................................. passim

*Slovak Republic v. Achmea B.V.* (*Achmea II*),
    Case No. I ZB 2/15 (2018) (Ger.) ....................................................................5, 16

**Federal Cases**

*Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.,*
    138 S. Ct. 1865 (2018) ..................................................................................14, 15

*BG Grp., PLC v. Republic of Argentina,*
    572 U.S. 25 (2014) ............................................................................................16

*Blasket Renewable Invs., LLC v. Kingdom of Spain,*
    2024 WL 4298808 (D.D.C. Sept. 26, 2024) ...................................................................19

*Blinder, Robinson & Co. v. SEC,*
    837 F.2d 1099 (D.C. Cir. 1988) ............................................................................12

*Caremark, LLC v. Chickasaw Nation,*
  43 F.4th 1021 (9th Cir. 2022) ................................................................. 12

*China Minmetals Materials Imp. & Exp. Co. v. Chi Mei Corp.,*
  334 F.3d 274 (3d Cir. 2003) ............................................................. 12, 13

*City of Harper Woods Emps.' Ret. Sys. v. Olver,*
  589 F.3d 1292 (D.C. Cir. 2009) .............................................................. 14

*Danforth v. Minnesota,*
  552 U.S. 264 (2008) ................................................................................ 16

*Dist. No. 1 v. Liberty Mar. Corp.,*
  998 F.3d 449 (D.C. Cir. 2021) ............................................................... 12

*Dr.'s Assocs., Inc. v. Alemayehu,*
  934 F.3d 245 (2d Cir. 2019) ................................................................... 12

*Durfee v. Duke,*
  375 U.S. 106 (1963) ................................................................................ 11

*Field Intel. Inc. v. Xylem Dewatering Sols. Inc.,*
  49 F.4th 351 (3d Cir. 2022) ................................................................... 12

*First Options of Chi., Inc. v. Kaplan,*
  514 U.S. 938 (1995) ................................................................................ 13

*F.T.C. v. Compagnie de Saint-Gobain-Pont-à-Mousson,*
  636 F.2d 1300 (D.C. Cir. 1980) ............................................................. 19

*Granite Rock Co. v. Int'l Bhd. of Teamsters,*
  561 U.S. 287 (2010) ................................................................................ 12

*Hilton v. Guyot,*
  159 U.S. 113 (1895) ................................................................................ 19

*Lamps Plus, Inc. v. Varela,*
  139 S. Ct. 1407 (2019) ............................................................................ 17

*Medellín v. Texas,*
  552 U.S. 491 (2008) ................................................................................ 17

\* *NextEra Energy Glob. Holdings B.V. v. Kingdom of Spain,*
  112 F.4th 1088 (D.C. Cir. 2024) ..................................................... passim

*In re Sealed Case,*
  825 F.2d 494 (D.C. Cir. 1987) ............................................................... 19

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*,
  559 U.S. 662 (2010)..................................................................................................17

*Taylor v. Fannie Mae*,
  839 F. Supp. 2d 259 (D.D.C. 2012) .........................................................................18

*TECO Guat. Holdings, LLC v. Republic of Guatemala*,
  414 F. Supp. 3d 94 (D.D.C. 2019) ...........................................................................10

*Underwriters Nat'l Assur. Co. v. N. Carolina Life & Acc. & Health Ins. Guar. Ass'n*,
  455 U.S. 691 (1982)..................................................................................................11

*Usoyan v. Republic of Turkey*,
  6 F.4th 31 (D.C. Cir. 2021).......................................................................................19

*Valores Mundiales, S.L. v. Bolivarian Republic of Venezuela*,
  87 F.4th 510 (D.C. Cir. 2023) .............................................................................10, 11

**Statutes**

22 U.S.C. § 1650a(a)........................................................................................9, 10, 11

**Treaties**

Consolidated Version of the Treaty on the Functioning of the EU ...............................4, 8, 18, 19

* Energy Charter Treaty.......................................................................................... passim

ICSID Convention ......................................................................................................12

**Other Authorities**

*Declaration on the Legal Consequences of the Judgment of the Court of Justice in* Komstroy *and Common Understanding on the Non-Applicability of Article 26 of the Energy Charter Treaty as a Basis for Intra-EU Arbitration Proceedings* (June 26, 2024) ................................................................................................................6, 15, 17

*Declaration of the Representatives of the Governments of the Member States on the Legal Consequences of the Judgment of the Court of Justice in* Achmea *and on Investment Protection in the European Union* (Jan. 15, 2019)................................................................5

Eur. Comm'n Brief in *NextEra Energy Glob. Holdings B.V. v. Kingdom of Spain*, 112 F.4th 1088 (D.C. Cir. 2024), 2023 WL 3863247................................................15

Eur. Comm'n, *Communication on the Protection of Intra-EU Investment* (July 19, 2018)............5

Eur. Comm'n Decision 2017/7384 ..................................................................8, 18, 20

Restatement (Fourth) of Foreign Relations Law (2018) ...............................................19

Restatement (Third) of Foreign Relations Law (1987)..................................................19

Restatement (Third) U.S. Law of Int'l Com. Arb. (2019) ............................................13

## INTRODUCTION

Spain did not—and cannot—agree to arbitrate disputes with nationals of the European Union ("EU").  EU law bars member states like Spain from doing so.  And because Spain cannot offer to arbitrate intra-EU disputes, it never formed an agreement to arbitrate *this* intra-EU dispute.  Petitioners do not dispute the facts of EU law.  But to avoid its application, the petitioners brought this enforcement action not in their home countries of Luxembourg and the Netherlands, but rather abroad in the United States—a forum that has no connection to the parties or their underlying dispute.

After holding that jurisdiction exists under the Foreign Sovereign Immunities Act ("FSIA"), the D.C. Circuit "[took] no position on the ultimate enforceability of these awards." *NextEra Energy Glob. Holdings B.V. v. Kingdom of Spain*, 112 F.4th 1088, 1105 (D.C. Cir. 2024).  The D.C. Circuit explicitly left that issue to the district courts, noting that it was not determining "whether [the Energy Charter] Treaty's arbitration provision extends to EU nationals and thus whether Spain ultimately entered into legally valid agreements with the companies." *Id.* at 1104.  As explained in Spain's motion, there is no arbitration agreement.

In the six years since Spain's motion to dismiss was briefed, intervening EU developments have only reinforced that result.  Scores of EU courts have refused to enforce intra-EU ICSID awards like the one at issue here.  *Infra* p. 6.  The EU and twenty-six of its member states reiterated just last year that the Energy Charter Treaty ("ECT") "could not" and "cannot" provide "a legal basis" for intra-EU arbitration.  *Infra* pp. 6–7, 17.  And various member states have recently opted to withdraw from the ECT altogether partly because rogue arbitrators have nonetheless issued *ultra vires* intra-EU arbitral awards.  *Infra* p. 7.

These recent developments confirm that Petitioners' award is unenforceable.  The Court should dismiss the Petition with prejudice.

**BACKGROUND**

Spain assumes familiarity with the factual and procedural history, which are set out in more detail in the memorandum of law in support of its motion to dismiss, ECF No. 18-1 ("Spain Mem."). Nonetheless, a brief overview follows to contextualize recent developments.

This enforcement action arises out of an arbitration initiated by a Luxembourgish company and a Dutch company against Spain in November 2013, alleging Spain violated the ECT when it modified its subsidy regime for renewable energy projects in the country. That proceeding was administered by the International Centre for the Settlement of Investment Disputes ("ICSID") and registered as Case No. ARB/13/31. The Tribunal issued an award against Spain on June 15, 2018, *see* ECF No. 1-1 Ex. A (the "Award"). Petitioners filed this action to enforce the Award on July 27, 2018. *See* ECF No. 1 (the "Petition").

A.    **The Energy Charter Treaty**

The ECT provides legal safeguards for investment in energy projects, including signatories' promise to treat foreign investors fairly and equitably. ECT art. 10, ECF No. 1-4. Petitioners accuse Spain of breaking that promise by modifying the subsidies for their solar farm investments. *See* Petition ¶ 7.

To enforce its protections, the ECT includes an offer by signatory nations to investors from other signatory nations to resolve disputes via either litigation or arbitration. ECT art. 26(2)–(3), (4)(a)(i). Investors who choose arbitration can request arbitration with various international arbitral bodies, including ICSID. *Id.* But arbitrations must occur "in accordance with th[e] Treaty and applicable rules and principles of international law." *Id.* art. 26(6).

B.    **European Union Law**

This case centers on EU law—the supreme law for EU member states like Spain, Luxembourg, and the Netherlands, as well as Petitioners and other companies organized under

EU member states' laws.

### 1. The legal order of the European Union

Spain is one of the twenty-seven member states of the European Union.  Decl. of Prof. Steffen Hindelang ("Hindelang Decl.") (Dec. 18, 2018) ¶ 11, ECF No. 18-7.  For the members of today's EU, European Union law—which derives from various EU treaties, *i.e.*, "international agreement[s] between the Member States"—supplants any contrary national laws or other international agreements.  *Slovak Republic v. Achmea B.V.*, ECLI:EU:C:2018:158, ¶¶ 32, 41 (Hindelang Decl. Ex. 5).[1]  EU law takes "primacy over the laws of the Member States."  *In re ECHR*, ECLI:EU:C:2014:2454, ¶ 166 (Hindelang Decl. Ex. 26).

Even international agreements between EU member states "cannot apply in the relations between those States" if they contravene EU law.  *Budějovický Budvar v. Rudolf Ammersin GmbH*, ECLI:EU:C:2009:521, ¶ 98 (Hindelang Decl. Ex. 14); *accord In re ECHR* ¶ 201.  The same rule applies when non-EU states join the agreement:  An "international agreement cannot affect the … autonomy of the [EU] legal system."  *Kadi v. Council*, ECLI:EU:C:2008:461, ¶ 282 (Hindelang Decl. Ex. 20).  Between member states, EU law reigns supreme.

### 2. EU Law Prohibiting Member States from Arbitrating with Each Other's Nationals

The European Court of Justice—the EU's Supreme Court—has held that the ECT's arbitration provision would contravene EU law as applied between investors from one EU member and other EU states.  *Republic of Moldova v. Komstroy LLC*, ECLI:EU:C:2021:655, ¶ 66 (Hindelang Decl. Ex. 9).  Under EU law, the treaty simply does not authorize EU members like Spain to offer to arbitrate with other EU nationals—so the treaty by definition cannot create

---

[1] Unless otherwise noted, all exhibits are to the Supplementary Expert Declaration of Professor Steffen Hindelang, attached hereto.

an agreement to arbitrate.  *See Achmea* ¶ 62.

The problem is this:  a "keystone" of the EU legal system is the "uniform interpretation of EU law."  *In re ECHR* ¶ 176.  Thus, the European Court of Justice enjoys "exclusive jurisdiction" over EU-law questions.  *Comm'n v. Ireland*, ECLI:EU:C:2006:345, ¶ 123 (Hindelang Decl. Ex. 24).  No other court or dispute-resolution forum—including arbitrators— can interpret EU law unless the Court of Justice can review those decisions.  EU member states expressly agreed in a foundational EU treaty "not to submit a dispute concerning the interpretation or application of the [EU] Treaties to any method of settlement" outside the EU judicial system.  Consolidated Version of the Treaty on the Functioning of the EU ("TFEU") art. 344, Oct. 26, 2012, 2012 O.J. (C 326) 47 (first adopted in 1957) (Hindelang Decl. Ex. 4).

Arbitrations between EU members, however, put EU-law questions outside the Court of Justice's reach.  *Poland v. PL Holdings Sàrl*, ECLI:EU:C:2021:875, ¶ 45 (Hindelang Decl. Ex. 8).  Because EU law comprehensively regulates EU member states' treatment of each other's nationals, intra-EU arbitrations would almost always implicate EU-law issues.  *Achmea* ¶ 41. Arbitrators would be called upon "to interpret, and even apply, EU law."  *Komstroy* ¶ 50.  But unlike the "court[s] or tribunal[s] of a Member State," arbitrators cannot refer EU-law questions to the Court of Justice.  *Achmea* ¶ 49.  Nor do EU members' courts review arbitral awards de novo.  *Id.* ¶ 53.  Intra-EU arbitration thus risks having arbitrators resolve EU law, which jeopardizes the "consistency and uniformity . . . of EU law" that the EU treaties require.  *Id.* ¶ 35.

As a result, the European Court of Justice has repeatedly voided treaty provisions that purport to authorize arbitrations between EU members, or between an EU member and nationals of another EU member.  In 2006, the Court held that Ireland "breach[ed]" its EU treaty obligations by attempting to initiate arbitration against the United Kingdom (pre-Brexit) under the United Nations Convention on the Law of the Sea.  *Ireland* ¶¶ 132, 184.

The Court of Justice's *Achmea* decision confirmed that EU member states cannot offer to arbitrate with each other's investors, and voided such offers as contrary to EU law. *Achmea* held that, under "settled case-law," the EU treaties "preclud[ed]" an arbitration "provision in an international agreement concluded between Member States." *Achmea* ¶¶ 31–33, 62.

*Achmea* involved an investment treaty between Slovakia and the Netherlands. *Id.* ¶ 6. Dutch companies obtained an arbitral award against Slovakia, which moved to set aside the award in Germany. *Id.* ¶¶ 7, 9–11. Siding with Slovakia, the Court of Justice deemed the arbitration provision void: Any arbitration in which arbitrators might interpret EU law infringed "the autonomy of EU law." *Id.* ¶ 59. On remand, Germany's high court accordingly overturned the arbitral award because no "arbitration agreement exist[ed] between the parties." *Slovak Republic v. Achmea B.V.* (*Achmea II*), Case No. I ZB 2/15 (2018) (Ger.) (Hindelang Decl. Ex. 23).

Thereafter, the European Commission and twenty-two member states (including Spain and the Netherlands) recognized that *Achmea* foreclosed *all* intra-EU arbitration, including under the ECT. Eur. Comm'n, *Communication on the Protection of Intra-EU Investment* 2–4 (July 19, 2018), ECF No. 18-51; *Declaration of the Representatives of the Governments of the Member States on the Legal Consequences of the Judgment of the Court of Justice in* Achmea *and on Investment Protection in the European Union* 1 (Jan. 15, 2019)ECF No. 26-14.[2]

The European Court of Justice's *Komstroy* decision expressly confirmed that intra-EU arbitration under the ECT is impermissible. The Court explained that, because the EU itself ratified the ECT, that treaty "is an act of EU law" as applied between member states. *Komstroy* ¶¶ 23, 49. Arbitral panels formed under the ECT thus do not just run the risk of interpreting EU

---

[2] The other EU states, including Luxembourg, chose not to comment until the European Court of Justice rendered a judgment explicitly referring to the ECT." *See* ECF No. 26 ¶ 27 n.7.

law (as in *Achmea*)—they are *required* to interpret EU law. *Id.* ¶ 50. But arbitrators have no way to refer questions to the Court of Justice or otherwise guarantee the uniformity of EU law. *Id.* ¶ 52. The Court of Justice thus held that the ECT's arbitration provision "must be interpreted as *not being applicable* to disputes between a Member State and an investor of another Member State." *Id.* ¶ 66 (emphasis added).

The Court of Justice's *European Food* decision confirmed that EU law prohibits intra-EU arbitration under the ICSID Convention. *Comm'n v. Eur. Food SA*, ECLI:EU:C:2022:50, ¶ 142 (Hindelang Decl. Ex. 58). Because the ICSID Convention places awards beyond "any review by a court of a Member State as to its compliance with EU law," intra-EU ICSID arbitrations are incompatible with EU law. *Id.* The EU treaties "replaced [the ICSID] arbitration procedure" with a "system of judicial remedies" in European courts. *Id.* ¶ 145. Thus, ICSID arbitrations between EU members and EU nationals are prohibited. *See id.* ¶¶ 144–46.

Accordingly, EU courts have consistently "declined [to] enforc[e] intra-EU ICSID award[s]." Supp. Decl. of Prof. Steffen Hindelang ("Supp. Hindelang Decl.") (Feb. 10, 2025) ¶¶ 36–37 & nn.61–75 (collecting cases). Courts in France, Sweden, and Luxembourg have recently "set aside" or "invalid[ated] intra-EU awards" like Petitioner's because, without a "valid arbitration agreement," such awards lack a "valid legal basis." *Id.* ¶¶ 36–37 (citations omitted).

Finally, on June 26, 2024, the EU and twenty-six of its member states issued a formal declaration regarding the interpretation and application of the ECT as between them. *Id.* ¶¶ 27–32. This declaration "reaffirm[s], for greater certainty," the parties' "common understanding on the interpretation and application of the ECT"—that it "cannot and never could serve as a legal basis for intra-EU arbitration proceedings." *Declaration on the Legal Consequences of the Judgment of the Court of Justice in* Komstroy *and Common Understanding on the Non-Applicability of Article 26 of the Energy Charter Treaty as a Basis for Intra-EU Arbitration*

*Proceedings* ("June 2024 Decl.") 4 (June 26, 2024) (Hindelang Decl. Ex. 28). It "reiterate[s], expressly and unambiguously," "the consistent position of the European Union and its Member States" that Article 26 of the ECT "could not in the past, and cannot now or in the future serve as a legal basis" for intra-EU arbitration. *Id.* at 2–3. In short, this declaration makes clear that the ECT is "an instrument of the European Union's external energy policy" that was never intended to unsettle the foundational primacy of the EU legal order. *Id.* at 2.

Thus, under the Court of Justice's precedents and member states' consistent position, the ECT's guarantees remain in force. Investors from the ECT's non-EU signatories can still invoke the arbitration provision against any EU signatory, and EU investors can still arbitrate with the non-EU signatories. The ECT's standing offer to arbitrate is inapplicable only in an intra-EU context, *i.e.*, when investors from EU member states try to arbitrate with another EU member state. Hindelang Decl. ¶ 41. Investors in that situation—like Petitioners here—can litigate their disputes in court. *See, e.g.*, ECT art. 26(2)(a). But EU law is clear that arbitration is not an option. *See* Hindelang Decl. ¶¶ 37–52.

Arbitrators have nonetheless continued to issue *ultra vires* intra-EU arbitral awards. *See* Supp. Hindelang Decl. ¶ 26. The proliferation of such awards is one of the reasons various member states, including France, Germany, Poland, Luxembourg, the Netherlands, Portugal, Slovenia, and Spain, have opted to "withdraw from the ECT altogether" since "investor-State arbitration on the basis of the ECT" between EU member states was "never . . . envisaged" by the ECT's EU signatories. *Id.*

### 3.      EU Law Prohibiting Member States from Providing "State Aid"

EU law also forecloses challenges to Spain's energy subsidies on the merits. As noted, EU law supplants any contrary national law. *Achmea* ¶¶ 32, 41. And, under EU law, the renewable-energy subsidies Petitioners received were unlawful.

7

EU member states cannot provide government subsidies (called "state aid") that "distort[] or threaten[] to distort competition."  TFEU art. 107(1).  Member states must report any aid in advance to the European Commission, which determines whether the aid would distort competition.  *Id.* art. 108(2)–(3).  Absent Commission preapproval, the aid is unlawful.  *Id.* art. 108(3).

In 2014, the Court of Justice determined that Spain's longstanding subsidy regime amounted to "aid."  *See Elcogás SA v. Administración del Estado*, ECLI:EU:C:2014:2314 (Hindelang Decl. Ex. 80); *see also* Supp. Hindelang Decl. ¶ 51 & n.100.  Spain self-reported to the European Commission, which found that Spain's subsidies were "state aid" and that Spain had "breached" EU law by not seeking preapproval.  Eur. Comm'n Decision 2017/7384, at 20 (Nov. 10, 2017) (Hindelang Decl. Ex. 79).  The Commission authorized these subsidies prospectively, but declared past, unapproved subsidies illegal.  *Id.* at 20, 34.  The Commission cautioned Spain that paying any arbitral award to investors would itself be illegal state aid absent preapproval.  *Id.* at 32.

As a result, Spain, as an EU member state, cannot pay any such award without the European Commission's prior review and authorization.  *See* Supp. Hindelang Decl. ¶¶ 54–61. EU law thus bars recovery for purported losses from Spain's withdrawal of subsidies unless and until the Commission authorizes Spain to pay out the Award.  *See* Hindelang Decl. ¶¶ 53–61 (courts in the European Union decline to enforce arbitral awards when, as here, doing so would violate State Aid laws).  If Spain pays out the Award before then, the Commission could bring infringement proceedings against Spain, where Spain risks being subject to financial sanctions that could "easily run into hundreds of millions of euros."  Supp. Hindelang Decl. ¶ 61.

### C.    U.S. Proceedings

Petitioners could have sought to collect and enforce their arbitral award in Europe—

where every relevant event occurred.[3]  But again, EU law would have obligated the European courts to decline enforcement, both because EU law precluded Spain from forming an arbitration agreement with Petitioners and because ordering Spain to pay the Award absent Commission preapproval would be illegal state aid.

Instead, in July 2018, Petitioners filed this action to confirm and enforce their award against Spain.  Petitioners selected this forum even though the United States never signed the ECT and has nothing to do with Spain's energy subsidies.  Petitioners invoked legislation implementing the ICSID Convention, 22 U.S.C. § 1650a(a), under which U.S. courts enforce the "pecuniary obligations imposed by" an award rendered by ICSID arbitrators as if the award were a state-court "final judgment."  *See* Pet. ¶¶ 19–22.

In December 2018, Spain filed its motion to dismiss the Petition.  *See* ECF No. 18.  That motion became fully briefed in February 2019.[4]  After a stay related to Spain's annulment proceedings and a flurry of back-and-forth notices of supplemental authorities, the Court stayed this matter in September 2023 pending the D.C. Circuit's resolution of three interrelated appeals that touched directly on the issues in this case.  *See* Sept. 13, 2023 Minute Order.

On August 16, 2024, the D.C. Circuit issued its decision in those cases, holding that jurisdiction exists under the FSIA's arbitration exception because the ECT itself is an "arbitration agreement" that is "for the benefit of" private investors and therefore satisfies the FSIA's requirement that an arbitration agreement exists.  *NextEra Energy Glob. Holdings B.V. v. Kingdom of Spain*, 112 F.4th 1088, 1104 (D.C. Cir. 2024).  But the D.C. Circuit was clear about

---

[3] The arbitral proceeding is described in more detail in Spain's memorandum of law.  *See* Spain Mem. 8–11.

[4] In addition to the parties' submissions, the Commission filed an amicus brief in support of dismissal.  *See* ECF No. 50; *see also* Aug. 25, 2022 Minute Order.

the limits of its holding and the need for further proceedings:

> [W]e hold only that the district courts have jurisdiction to enforce these arbitration awards.  That does not mean they must or should do so.  By basing jurisdiction on the Energy Charter Treaty as an agreement "for the benefit" of foreign investors, ***we do not address the merits question*** whether that Treaty's arbitration provision extends to EU nationals and thus whether Spain ultimately entered into legally valid agreements with the companies.

*Id.* (emphasis added).  Spain presents that same unanswered "merits question" here.

Following issuance of the D.C. Circuit's mandate in those cases, the Court lifted its stay. ECF No. 103.  The Court also ordered supplemental briefing on Spain's pending motion.  *See id.* With the benefit of this supplemental briefing, Spain's motion to dismiss is now ripe. Accordingly, and for the reasons that follow, Spain respectfully requests that the Court dismiss the Petition and enter judgment in its favor.

## ARGUMENT

## I.    THE AWARD IS NOT ENTITLED TO FULL FAITH AND CREDIT BECAUSE THE ARBITRATORS LACKED JURISDICTION.

By statute, the "pecuniary obligations imposed" by an ICSID award are "given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States."  22 U.S.C. § 1650a(a).  Thus, the "same full faith and credit" standards apply to the pecuniary obligations of ICSID awards as to state-court judgments.  *Valores Mundiales, S.L. v. Bolivarian Republic of Venezuela*, 87 F.4th 510, 519 (D.C. Cir. 2023); *see, e.g.*, *TECO Guat. Holdings, LLC v. Republic of Guatemala*, 414 F. Supp. 3d 94, 101 (D.D.C. 2019) ("[I]n enforcing an ICSID award, district courts must look to established procedures for enforcing state court judgments in federal court.") (citation omitted).  Spain is therefore entitled "to raise the same defenses" to the Award that "a party could raise to a federal court's enforcement of a state court judgment."  *TECO Guat. Holdings*, 414 F. Supp. 3d at 102; *contra*

ECF No. 19 ("Opp'n") at 16–18 (Petitioners claiming the Court is powerless to do anything other than examine the Award's authenticity and enforce its obligations).

Under "well-established" full faith and credit standards, "want of jurisdiction [i]s an exceptional circumstance in which a judgment may be denied full faith and credit." *Valores Mundiales*, 87 F.4th at 519, 521; *see, e.g.*, *Underwriters Nat'l Assur. Co. v. N. Carolina Life & Acc. & Health Ins. Guar. Ass'n*, 455 U.S. 691, 704 (1982) ("[B]asic limitations on the full-faith-and-credit principles" require that "'the court in the first State had power to pass on the merits— had jurisdiction, that is, to render the judgment.'") (quoting *Durfee v. Duke*, 375 U.S. 106, 110 (1963)). Accordingly, if ICSID arbitrators lack jurisdiction, the awards they issue are not owed full faith and credit. *See Valores Mundiales*, 87 F.4th at 519–20.

Here, the arbitrators lacked jurisdiction to issue the Award because: (1) Spain never agreed to arbitrate anything with Petitioners and (2) the arbitrators exceeded any authority they supposedly had by awarding state aid. The Award is thus not entitled to full faith and credit.

## A.    There Was No Agreement to Arbitrate Between Spain and Petitioners.

EU law is pellucid that Spain lacked the capacity to agree to arbitrate intra-EU disputes that might let arbitrators, and not the European Court of Justice, resolve EU-law questions. *Supra* pp. 3–8. Spain never had the power to extend a standing offer to arbitrate to Petitioners, so the parties never formed an arbitration agreement and the arbitrators lacked jurisdiction.

### 1.    It is the Court's role to determine whether the Arbitral Tribunal had jurisdiction based on a valid agreement to arbitrate.

Previously, Petitioners contended that the arbitrators' conclusion that they had jurisdiction was itself entitled to full faith and credit under the ICSID statute. *See* Opp'n at 18– 21. But that statute extends "full faith and credit" only to "*pecuniary* obligations imposed by such an award," *i.e.*, the monetary award itself. 22 U.S.C. § 1650a(a) (emphasis added). The

arbitrators' assertion of their own jurisdiction is a *non-pecuniary* aspect of the award that gets no special deference.

Even as to state-court judgments, parties can collaterally attack a court's determination of its jurisdiction—and defeat full faith and credit—when the proceeding "substantially infringed the authority of another tribunal or agency of government." *Blinder, Robinson & Co. v. SEC*, 837 F.2d 1099, 1104 (D.C. Cir. 1988) (cleaned up). Here, the ICSID tribunal disregarded EU courts' exclusive jurisdiction over EU law, deeply infringing EU authority in a manner that undermines the "proper functioning of the EU." Supp. Hindelang Decl. ¶ 17. The arbitrators' jurisdictional rulings thus do not bind U.S. courts, and this Court must determine for itself whether the arbitrators had jurisdiction. Under governing EU law, that is not a close call. *Supra* pp. 3–8.

Petitioners also invoked the ICSID Convention's delegation clause, which provides that ICSID arbitrators "shall be the judge of [their] own competence." ICSID Convention art. 41(1); Opp'n at 20. But Spain challenges "whether a valid arbitration agreement exists," which "cannot be delegated to an arbitrator." *Dist. No. 1 v. Liberty Mar. Corp.*, 998 F.3d 449, 457 (D.C. Cir. 2021) (citation omitted). "'[A]rbitration is strictly a matter of consent.'" *Field Intel. Inc. v. Xylem Dewatering Sols. Inc.*, 49 F.4th 351, 356 (3d Cir. 2022) (citation omitted), which is why "contract formation is *always* an issue for the court, notwithstanding the presence of a delegation clause," *Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1030 n.7 (9th Cir. 2022) (collecting cases from Second, Fourth, Fifth, Ninth, and Tenth Circuits); *accord Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010). Consent "is a crucial principle of arbitration generally, including in the international context." *China Minmetals Materials Imp. & Exp. Co. v. Chi Mei Corp.*, 334 F.3d 274, 289 (3d Cir. 2003). After all, letting arbitrators decide whether an arbitration agreement exists would "force parties into arbitration when the parties

12

dispute whether they ever consented to arbitrate anything in the first place." *Dr.'s Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 251 (2d Cir. 2019). A contract thus cannot give arbitrators "any power, much less the power to determine its own jurisdiction, if the parties never entered into it." *China Minmetals*, 334 F.3d at 288. As the Restatement of the U.S. Law of International Commercial Arbitration and Investor-State Arbitration explains:

> Commentators widely agree that, even if competence-competence language were to be understood, as a general matter, as constituting "clear and unmistakable" evidence of an intent to delegate some threshold questions to the arbitral tribunal, that delegation cannot properly extend to challenges that go to the very existence of the arbitration agreement itself. The rationale behind this position is that, if no arbitration agreement exists, the question of its existence cannot logically be placed in the hands of a body that owes its own very existence to the arbitration agreement being challenged. … [C]ourts should be especially cautious in inferring from an indirect and generalized reference to competence-competence in arbitration rules or laws a specific intention to transfer to arbitrators primary authority over challenges that implicate party consent as strongly as the 'whether' and 'who' questions do.…

Restatement (Third) U.S. Law of Int'l Com. Arb. § 2.8, reporters' note b(iii). That is why international practice "overwhelmingly favors" some judicial review of an arbitral award when a party argues that "no valid arbitration agreement ever existed." *China Minmetals*, 334 F.3d at 288–89.

Here, Spain challenges the arbitrators' authority to arbitrate *anything* between Spain and EU nationals, because letting anyone besides EU courts resolve EU-law questions threatens the uniformity of EU law. The Court, accordingly, must determine at the very least whether the arbitral tribunal's jurisdiction was based on a valid arbitration agreement (it was not).

> **2.    EU law governs Spain's capacity to extend an offer to arbitrate.**

Arbitration agreements are contracts, so courts usually determine whether an agreement exists by "apply[ing] ordinary state-law principles that govern the formation of contracts." *First*

13

*Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (applying Illinois and Pennsylvania law).  Federal courts treat as "binding" "a decision of the State's highest court" articulating state contract law.  *See Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865, 1874 (2018) (citation omitted).

Here, U.S. state law does not govern Spain's ability to contract with Luxembourgish and Dutch nationals.  Instead, Spain, Luxembourg, and the Netherlands have agreed that EU law governs their relationships, including with each other's nationals.  *See Achmea* ¶ 33.  This Court should accordingly give binding deference on EU law to the European Court of Justice, the final arbiter of EU law.  *Cf. City of Harper Woods Emps.' Ret. Sys. v. Olver*, 589 F.3d 1292, 1299– 1303 (D.C. Cir. 2009) (following English cases on English law).  Competing interpretations of EU law by U.S. and European courts would risk undermining the Court of Justice's "exclusive jurisdiction" over EU law.  *See Ireland* ¶ 123.

Petitioners previously urged this Court to ignore the Court of Justice's views, deeming the ECT an international treaty that cannot be displaced by the Court of Justice's "internally binding" decisions.  Opp'n at 30 (formatting modified).  But under the EU's foundational treaties, EU law displaces contrary treaties between member states.  *Budějovický* ¶ 98.  Having agreed to follow those EU treaties, EU member states cannot make side deals to evade their EU- law obligations.  The EU would have crumbled decades ago if member states could circumvent unfavorable Court of Justice decisions just by signing multilateral agreements to ignore them. *See PL Holdings* ¶ 49.

That non-EU countries are parties to the ECT does not change the calculus.  EU law precludes arbitration only when the "bilateral relations" at issue are within the EU.  *See Komstroy* ¶¶ 64–65.  EU states remain free to agree to arbitration with non-EU states and their nationals.  *See id.* ¶¶ 45–46.  Spain is ready, willing, and able to arbitrate with investors from

non-EU signatories. But here, the relevant relationships—between Spain, Luxembourg, and the Netherlands—are encapsulated within the EU legal order and subject to the Court of Justice's "exclusive jurisdiction." Hindelang Decl. ¶ 18. EU law thus controls Spain's capacity to agree to arbitration with Petitioners.

### 3.    EU law barred any arbitration agreement here.

The application of EU law is dispositive. As the European Commission explained to the D.C. Circuit, the European Court of Justice has confirmed that EU law bars "Member States [from] . . . agree[ing] to arbitrate claims brought by EU nationals under the Energy Charter Treaty." Eur. Comm'n Br. in *NextEra*, 2023 WL 3863247, at *14; *accord* ECF No. 50. Twenty-six member states have since affirmed that, given "the primacy of European Union law," the ECT "cannot and never could serve as a legal basis for intra-EU arbitration proceedings." June 2024 Decl. at 4. These foreign governments' view that EU law disposes of this case is entitled to "respectful consideration" under Supreme Court precedent. *See Animal Sci.*, 138 S. Ct. at 1869. This Court need go no further.

The Court of Justice's *Komstroy* decision is unambiguous: "EU law precludes" the ECT's arbitration provision "from being imposed on Member States as between themselves." *Komstroy* ¶ 65. EU-law issues are endemic in intra-EU arbitrations. *See id.* ¶¶ 49–50; *see also* Hindelang Decl. ¶¶ 43–46. But arbitrators have no way to refer EU-law questions to EU courts and thus cannot ensure "consistency and uniformity in the interpretation of EU law." *Komstroy* ¶¶ 45, 60. Thus, EU member states may arbitrate with investors from outside the EU, but they cannot agree to arbitrate with EU investors. *Id.* ¶ 65.

*Komstroy*'s holding built on years of precedent recognizing that intra-EU arbitration is antithetical to member states' EU-law obligations. *E.g.*, *Achmea* ¶ 55; *Ireland* ¶¶ 132–33. By

joining the EU, member states agreed to "replace[] [intra-EU] arbitration procedure[s]" with a "system of judicial remedies" that are exclusive to European courts. *Eur. Food* ¶ 145.

By holding that the ECT does not permit intra-EU arbitration, the Court of Justice rendered Spain's putative offer to arbitrate void "*ab initio.*" Hindelang Decl. ¶ 42. That holding has "retroactive (*ex tunc*) effect," Supp. Hindelang Decl. ¶¶ 16, 32, so it applies to ongoing legal disputes arising before *Komstroy*, just like U.S. Supreme Court decisions presumptively apply to open cases, *see PL Holdings* ¶ 58; *cf. Danforth v. Minnesota*, 552 U.S. 264, 271 & n.5 (2008). Thus, faced with an analogous Court of Justice ruling invalidating an arbitration provision between Slovakia and the Netherlands, Germany's highest court refused to enforce an arbitral award. Slovakia did not "make an effective offer" to arbitrate, so no "arbitration agreement exist[ed] between the parties." *See Achmea II* ¶ 32. Since then, various other member states' courts have "declined [to] enforce[]" intra-EU arbitral awards because "no valid arbitration agreement [could have] existed." Supp. Hindelang Decl. ¶¶ 36–37 & nn.61–75 (collecting cases). Similarly, no agreement exists between Spain and Petitioners.

### 4. General treaty interpretation principles yield the same result.

Even if this Court interpreted the ECT for itself, Spain and Petitioners never formed an arbitration agreement.

Treaty interpretation is "a matter of determining the parties' intent." *BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25, 37 (2014). The ECT purports to authorize arbitration of "[d]isputes between a Contracting Party and an Investor of another Contracting Party." ECT art. 26(1). But other treaty provisions make clear that it should not be read to cavalierly violate EU law. For example, the treaty mandates that "applicable rules and principles of international law" govern arbitrations. *Id.* art. 26(6). International law includes the EU treaties, which are themselves "international agreement[s] between the Member States." *Achmea* ¶ 41. The treaty

16

also defines a "Regional Economic Integration Organisation" (like the EU) as an organization with "the authority to take decisions binding on [states] in respect of" "certain matters … governed by this Treaty."  ECT art. 1(3).

Put another way, the treaty both seeks to avoid conflict with other international law like the EU treaties and recognizes the EU's primacy over member states.  Given these EU-respecting provisions, the most straightforward reading of the ECT avoids conflict with the EU treaties by not permitting intra-EU arbitration in the first place—*i.e.*, the interpretation the Court of Justice adopted in *Komstroy*.  *See Komstroy* ¶ 66.

Treaty interpretation also depends on "the postratification understanding of signatory nations."  *Medellín v. Texas*, 552 U.S. 491, 507 (2008) (citation omitted).  Here, the signatories' understandings uniformly favor Spain.  As noted, Spain, Luxembourg, the Netherlands, and twenty-four other ECT signatories have stressed their "common understanding" that the ECT "cannot and never could serve as a legal basis for intra-EU arbitration proceedings."  June 2024 Decl. at 4; *see* Supp. Hindelang Decl. ¶¶ 28–32.

Put another way, Luxembourg and the Netherlands do "not understand the agreement they made with Spain [via the ECT] to obligate Spain to arbitrate with their nationals" like Petitioners.  *NextEra*, 112 F.4th at 1110.  And, as the D.C. Circuit recognized, Petitioners' contrary interpretation is one "that the treaty signers reject."  *Id.*  This Court should not upend the signatories' consensus on an international agreement that the United States "does not belong" to and has no "direct interest" in.  *Id.* at 1109.

### B.    The Arbitrators Exceeded Any Authority They Did Have by Awarding State Aid.

"[A]rbitrators wield only the authority they are given."  *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1416 (2019).  "[T]hey derive their powers" from the particular terms of the parties'

agreement. *Id.*; *see also Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010). Here, the arbitrators invoked the ECT as the purported agreement to arbitrate between the parties. Award ¶¶ 1, 224. But that treaty limits the jurisdiction of arbitrators to "decid[ing] the issues in dispute in accordance with [the ECT] and applicable rules and principles of international law." ECT art. 26(6).

As explained above, EU law forms part of those "applicable rules and principles of international law," *id.*, thereby excluding from the arbitrators' jurisdiction matters that may not be decided by arbitration under EU law. And, under EU law, the authorization of state aid is the exclusive province of the European Commission. *See* TFEU arts. 107(1), 108(3). Consequently, arbitral tribunals cannot award state aid. *Id.*; *see* Eur. Comm'n Decision 2017/7384 ¶¶ 165–66 (noting that this "[d]ecision is part of Union law, and as such also binding on Arbitration Tribunals, where they apply Union law.").

Notwithstanding this restriction on the arbitrators' jurisdiction, the Award ordered Spain to pay compensation to Petitioners that constitutes unauthorized state aid. Hindelang Decl. ¶¶ 53–61. By trespassing on the European Commission's exclusive jurisdiction, the arbitrators rendered an *ultra vires* award that exceeds any jurisdiction they could have under Article 26 of the Energy Charter Treaty. The Award is thus not owed full faith and credit.

\*       \*       \*

The fact that there was no agreement to arbitrate—and that the Award is therefore unenforceable—should not be surprising. The Award is "based on an interpretation of an international treaty that the treaty signers reject," *NextEra*, 112 F.4th at 1110, and arbitrators "derive[]" their power exclusively "from the agreement of the parties." *Taylor v. Fannie Mae*,

839 F. Supp. 2d 259, 261 (D.D.C. 2012).  The decision of an arbitral tribunal constituted without

such agreement has no legal effect and is not owed full faith and credit.

## II.    THE FOREIGN SOVEREIGN COMPULSION DOCTRINE BARS ENFORCEMENT OF THE AWARD.

For the reasons explained above, the award is unenforceable under the ICSID

Convention's implementing statute.  But, even if it were, the foreign sovereign compulsion

doctrine—and the principles of comity that underlie it—independently bars enforcement.

Comity is "the recognition which one nation allows within its territory to the legislative,

executive or judicial acts of another nation."  *Hilton v. Guyot*, 159 U.S. 113, 164 (1895).  It is a

"golden rule among nations—that each must give the respect to the laws, policies and interests of

others that it would have others give to its own in the same or similar circumstances."  *Usoyan v.*

*Republic of Turkey*, 6 F.4th 31, 48 (D.C. Cir. 2021) (citations omitted).

"The foreign sovereign compulsion doctrine 'reflects the practice of states in the interests

of comity.'"  *Blasket Renewable Invs., LLC v. Kingdom of Spain*, No. 23-cv-2701, 2024 WL

4298808, at *12 (D.D.C. Sept. 26, 2024) (quoting Restatement (Fourth) of Foreign Relations

Law § 442 cmt. 10 (2018)).  And, pursuant to that doctrine, a U.S. court should refrain from

entering an order that would compel a party to act in contravention of the laws of a foreign

sovereign.  Indeed, the D.C. Circuit has instructed that "[p]rinciples of international comity

*require* that domestic courts not take action that may cause the violation of another nation's

laws."  *F.T.C. v. Compagnie de Saint-Gobain-Pont-à-Mousson*, 636 F.2d 1300, 1327 n.150

(D.C. Cir. 1980) (emphasis added); *see also In re Sealed Case*, 825 F.2d 494, 498–99 (D.C. Cir.

1987) ("We have little doubt . . . that our government and our people would be affronted if a

foreign court tried to compel someone to violate our laws within our borders.").  The doctrine

thus provides a "foreign party" with "protection from being caught between the jaws of [a U.S.

court] judgment and the operation of laws in foreign countries."  Restatement (Third) of Foreign Relations Law § 441 (1987), reporters' note 1 (quotation marks omitted).

Here, Spain has a treaty obligation to keep EU-law disputes in the EU.  *See* TFEU art. 344.  And, as noted, *supra* pp. 7–8, because the Award itself is unapproved state aid, EU law "prohibit[s] Spain from paying the award[] unless and until the EC grant[s] approval to do so." *NextEra*, 112 F.4th at 1096.

The European Commission has not yet authorized payment of this award, so granting the petition would compel Spain to violate its EU-law obligations.  *See* Eur. Comm'n Decision 2017/7384 ¶ 165; Hindelang Decl. ¶ 61.  And paying out the Award in spite of those obligations would subject Spain to "litigation in national courts" as well as infringement proceedings brought by the European Commission, where Spain would face the threat of financial sanctions that could "easily run into hundreds of millions of euros."  Supp. Hindelang Decl. ¶ 61.  This Court should decline to issue an order that would place Spain "in violation of" EU law, *id.*, and instead issue judgment in favor of Spain.

## CONCLUSION

For the foregoing reasons, Spain respectfully requests the Court enter judgment for Spain and dismiss the Petition with prejudice.

Dated:  February 10, 2025

Respectfully submitted,

*/s/ Jonathan Landy*

Jonathan M. Landy (D.C. Bar No. 467847)
Benjamin W. Graham (D.C. Bar No. 1044724)
Noah C. McCullough (D.C. Bar No. 1672590)
Ayoub Ouederni (D.C. Bar No. 90005248)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, S.W.

Washington, DC  20024
Tel.:    (202) 434-5000
Fax:    (202) 434-5029
Email:   jlandy@wc.com